# 21-1370-cv

## United States Court of Appeals

### *for the*

## Second Circuit

---

SYNTEL STERLING BEST SHORES MAURITIUS LIMITED, SYNTEL, INC.,

*Plaintiffs-Counter-Defendants-Appellants,*

— v. —

THE TRIZETTO GROUP, INC., COGNIZANT TECHNOLOGY
SOLUTIONS CORP.,

*Defendants-Counter-Claimants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## FINAL FORM BRIEF FOR PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS

---

J. STEVEN BAUGHMAN
KANNON K. SHANMUGAM
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

JAREN JANGHORBANI
NICHOLAS GROOMBRIDGE
CRYSTAL L. PARKER
PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Plaintiffs-Counter-Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Appellant Syntel Sterling Best Shores Mauritius Limited (n/k/a Syntel Holding Mauritius Limited) is a wholly owned subsidiary of Appellant Syntel, Inc. (n/k/a Syntel LLC).  Appellant Syntel, Inc., is a wholly owned indirect subsidiary of Atos SE.  Atos SE has no parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE................................................................2

I.  BACKGROUND .............................................................................3

II.  PROCEDURAL HISTORY ............................................................7

SUMMARY OF THE ARGUMENT ....................................................14

STANDARD OF REVIEW .................................................................18

ARGUMENT ......................................................................................18

I.  THE DISTRICT COURT ERRED BY APPLYING THE WRONG
LEGAL STANDARD FOR IDENTIFYING A TRADE SECRET
WITH SPECIFICITY ....................................................................18

    A.  Reversal Is Required Because TriZetto Improperly Identified
Entire Documents Or Programs As Its Trade Secrets........................20

        1.  *The District Court Failed To Apply The Proper
Specificity Standard* ................................................21

        2.  *TriZetto's Argument That Entire Documents Or
Programs Are Trade Secrets Does Not Satisfy The
Specificity Requirement* .........................................24

        3.  *By Blessing TriZetto's Approach, The District Court
Effectively Shifted TriZetto's Burden To Syntel*.......................27

    B.  Under Any Standard, TriZetto's Failure To Present Testimony
On 96 Of The 104 Claimed Trade Secrets Mandates Vacatur
And A New Trial On The Remaining Trade Secrets.........................32

II.  TRIZETTO AUTHORIZED THE USE OF 102 OF THE 104
CLAIMED TRADE SECRETS....................................................37

    A.  The District Court Improperly Deferred To The Jury On The
Ground That Syntel Did Not Move For Summary Judgment............38

B.       The Amended MSA Unambiguously Authorized Use Of
         TriZetto's Confidential Information ....................................................39

III.   THE DISTRICT COURT ERRED AS A MATTER OF LAW BY
       AWARDING AVOIDED-COSTS DAMAGES ...........................................44

A.       The District Court Erred By Determining That Avoided Costs
         Are Available As Unjust-Enrichment Damages In This Case ...........47

B.       TriZetto Presented No Evidence Of Causation To Support
         Avoided-Costs Damages ...................................................................55

CONCLUSION .......................................................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**C**ASES

*360 Mortg. Grp., LLC* v. *Home Point Fin. Corp.*,
    740 F. App'x 263 (4th Cir. 2018) ......................................................55

*Agrofresh Inc.* v. *Essentiv LLC*,
    No. 16-cv-662-(MN), 2020 WL 7024867 (D. Del. Nov. 30, 2020) ....... 23, 32-33

*Anderson Grp., LLC* v. *City of Saratoga Springs*,
    805 F.3d 34 (2d Cir. 2015) ...........................................................53

*Big Vision Private Ltd.* v. *E.I. DuPont De Nemours & Co.*,
    1 F. Supp. 3d 224 (S.D.N.Y. 2014) .............................................27, 31

*BondPro Corp.* v. *Siemens Power Generations, Inc.*,
    463 F.3d 702 (7th Cir. 2006) .....................................................22, 23

*Brightview Grp., LP* v. *Teeters*,
    No. 19-cv-2774-(SAG), 2021 WL 1238501 (D. Md. Mar. 29,
    2021) ......................................................................................55

*Calendar Rsch. LLC* v. *StubHub, Inc.*,
    No. 17-cv-04062-(SVW)-(SS), 2020 WL 4390391 (C.D. Cal. May
    13, 2020) ...............................................................................35

*Cap. Asset Rsch. Corp.* v. *Finnegan*,
    160 F.3d 683 (11th Cir. 1998) ......................................................31

*Carlton Grp., Ltd.* v. *Mirabella SG SpA*,
    No. 16-cv-6649-(LGS), 2019 WL 324259 (S.D.N.Y. Jan. 25, 2019) ...............39

*Chapco, Inc.* v. *Woodway USA, Inc.*,
    No. 15-cv-1665-(JCH), 2018 WL 3581694 (D. Conn. July 24,
    2018) ......................................................................................39

*Children's Broadcasting Corp.* v. *Walt Disney Co.*,
    357 F.3d 860 (8th Cir. 2004) .......................................................50

*Decision Insights, Inc.* v. *Sentia Grp., Inc.*,
    311 F. App'x 586 (4th Cir. 2009) ................................................20, 22

*Design Innovation, Inc.* v. *Fisher-Price, Inc.*,
    463 F. Supp. 2d 177 (D. Conn. 2006)...................................................54

*Dow Chem. Canada Inc.* v. *HRD Corp.*,
    909 F. Supp. 2d 340 (D. Del. 2012).............................................23, 26

*E.J. Brooks Co.* v. *Cambridge Sec. Seals*,
    31 N.Y.3d 441 (2018) ..................................................................48, 52

*Epic Sys. Corp.* v. *Tata Consultancy Servs. Ltd.*,
    980 F.3d 1117 (7th Cir. 2020) ............................................................49

*Freeman Inv. Mgmt. Co.* v. *Frank Russell Co.*,
    729 F. App'x 590 (9th Cir. 2018) .......................................................23

*Freeman Inv. Mgmt.* v. *Frank Russell Co.*,
    No. 13-cv-2856-(JLS)-(RBB), 2016 WL 5719819 (S.D. Cal. Sept.
    30, 2016) ............................................................................................28

*Givaudan Fragrances Corp.* v. *Krivda*,
    No. 08-cv-4409-(PGS), 2013 WL 5781183 (D.N.J. Oct. 25, 2013) .................33

*GlobalTap LLC* v. *Elkay Mfg. Co.*,
    No. 13-cv-632-(RRP), 2015 WL 94235 (N.D. Ill. Jan. 5, 2015)............20, 22, 29

*GlobeRanger Corp.* v. *Software AG U.S. of Am., Inc.*,
    836 F.3d 477 (5th Cir. 2016) ........................................................50, 52

*IDX Sys. Corp.* v. *Epic Sys. Corp.*,
    285 F.3d 581 (7th Cir. 2002) ......................................................*passim*

*Imax Corp.* v. *Cinema Techs., Inc.*,
    152 F.3d 1161 (9th Cir. 1998) ..............................................22, 23, 26

*Integro USA, Inc.* v. *Crain*,
    No. 19-cv-8752-(JPO), 2019 WL 6030100 (S.D.N.Y. Nov. 14,
    2019) ............................................................................................37, 44

*Inteliclear, LLC* v. *ETC Glob. Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020) ......................................................*passim*

*Katara* v. *D.E. Jones Commodities, Inc.*,
   835 F.2d 966 (2d Cir. 1987) ...............................................................35

*Kephart* v. *Certain Underwriters at Lloyd's of London*,
   427 F. Supp. 3d 508 (S.D.N.Y. 2019) ................................................38

*L. Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ...............................................................38

*Loop AI Labs Inc.* v. *Gatti*,
   195 F. Supp. 3d 1107 (N.D. Cal. 2016) ......................................22, 26

*Mason* v. *Sybron Corp.*,
   Nos. 90-35897, 91-35245, 1992 WL 31327 (9th Cir. 1992) .............49

*Maxon Hyundai Mazda* v. *Carfax, Inc.*,
   726 F. App'x 66 (2d Cir. 2018) ..........................................................28

*MBIA Ins. Corp.* v. *Patriarch Partners VIII, LLC*,
   950 F. Supp. 2d 568 (S.D.N.Y. 2013) ................................................34

*Medidata Sol., Inc.* v. *Veeva Sys., Inc.*,
   No. 17-cv-589-(LGS), 2021 WL 467110 (S.D.N.Y. Feb. 9, 2021) ............19, 23

*Morse* v. *Fusto*,
   804 F.3d 538 (2d Cir. 2015) ...............................................................35

*Motorola Sols., Inc.* v. *Hytera Commc'ns Corp.*,
   495 F. Supp. 3d 687 (N.D. Ill. 2020) .................................................49

*Nat'l Auto Brokers Corp.* v. *Gen. Motors Corp.*,
   572 F.2d 953 (2d Cir. 1978) ...............................................................18

*Next Commc'ns, Inc.* v. *Viber Media, Inc.*,
   758 F. App'x 46 (2d Cir. 2018) ....................................................19, 21

*U.S. ex rel. O'Donnell* v. *Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016) ......................................................18, 38, 39

*Olaplex, Inc.* v. *L'Oréal USA, Inc.*,
   855 F. App'x 701 (Fed. Cir. 2021) ...........................................*passim*

*PaySys Int'l, Inc.* v. *Atos Se*,
  No. 14-cv-10105-(KBF), 2016 WL 7116132 (S.D.N.Y. Dec. 5,
  2016) ................................................................................................*passim*

*Reynolds* v. *Giuliani*,
  506 F.3d 183 (2d Cir. 2007) .............................................................32

*RLM Commc'ns, Inc.* v. *Tuschen*,
  66 F. Supp. 3d 681 (E.D.N.C. 2014) ...........................................53, 55

*Robocast, Inc.* v. *Microsoft Corp.*,
  No. 10-cv-1055-(RGA), 2014 WL 350062 (D. Del. Jan. 29, 2014) .................48

*SEC* v. *Contorinis*,
  743 F.3d 296 (2d Cir. 2014) .............................................................54

*Sit-Up Ltd.* v. *IAC/InterActiveCorp.*,
  No. 05-cv-9292-(DLC), 2008 WL 463884 (S.D.N.Y. Feb. 20,
  2008) .......................................................................................31

*SL Montevideo Tech., Inc.* v. *Eaton Aerospace, LLC*,
  491 F.3d 350 (8th Cir. 2007) ...........................................................31

*Softel, Inc.* v. *Dragon Med. & Sci. Commc'ns, Inc.*,
  118 F.3d 955 (2d Cir. 1997) .............................................................48

*State Farm Mut. Auto Ins. Co.* v. *Campbell*,
  538 U.S. 408 (2003)........................................................................54

*Stephenson* v. *Doe*,
  332 F.3d 68 (2d Cir. 2003) ...............................................................39

*Steves & Sons, Inc.* v. *JELD-WEN, Inc.*,
  No. 16-cv-545-(REP), 2018 WL 2172502 (E.D. Va. May 10, 2018) ....50, 53, 59

*Syntel Sterling Best Shores Mauritius Ltd.* v. *TriZetto Grp., Inc.*,
  No. 15-cv-211-(LGS), 2021 WL 1553926 (S.D.N.Y. Apr. 20,
  2021) .........................................................................................3

*Texas Advanced Optoelectronic Sols., Inc.* v. *Renesas Elecs. Am., Inc.*,
  895 F.3d 1304 (Fed. Cir. 2018) .........................................................44

*TLS Mgmt. and Mktg. Servs., LLC* v. *Rodriguez-Toledo*,
966 F.3d 46 (1st Cir. 2020)............................................................*passim*

*Univ. Computing Co.* v. *Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974) ............................................................48

*Utilase, Inc.* v. *Williamson*,
Nos. 98-1233, 98-1320, 1999 WL 717969 (6th Cir. Sept. 10, 1999)................33

*ValveTech, Inc.* v. *Aerojet Rocketdyne, Inc.*,
No. 17-cv-6788-(FPG), 2018 WL 4681799 (W.D.N.Y. Sept. 28,
2018) ............................................................................................26

*Vaporstream, Inc.* v. *Snap, Inc.*,
No. 17-cv-00200-(MLH)-(KSx), 2020 WL 2543814 (C.D. Cal.
Jan. 10, 2020)................................................................................48

*Veronica Foods Co.* v. *Ecklin*,
No. 16-cv-07223-(JCS), 2017 WL 2806706 (N.D. Cal. June 29,
2017) ............................................................................................19

*Victor G. Reiling Assocs.* v. *Fisher-Price, Inc.*,
No. 03-cv-222-(JBA), 2006 WL 1102754 (D. Conn. Apr. 25,
2006) ............................................................................................54

*VirnetX, Inc.* v. *Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ........................................................48

*Walmart Inc.* v. *Cuker Interactive, LLC*,
949 F.3d 1101 (8th Cir. 2020) ....................................................55, 59

## STATUTES

18 U.S.C. § 1836(b)(1)..........................................................19, 37, 44

18 U.S.C. § 1836(b)(3)..........................................................46, 54, 55

18 U.S.C. § 1839(3) ......................................................................19

18 U.S.C. § 1839(5) ..................................................................37, 44

18 U.S.C. § 1839(6) ..................................................................37, 44

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(b) ................................................................................18

## STATEMENT OF JURISDICTION

The district court entered final judgment on May 18, 2021. (SPA-34-35.) A notice of appeal was filed on May 26, 2021. (A-2327-28.) The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, 1338, and 1367. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the counterclaim plaintiffs met their burden to identify each of their alleged trade secrets with the specificity required under the federal Defend Trade Secrets Act (DTSA) and New York law where they failed adequately to identify any of the 104 alleged trade secrets; where they failed to make any attempt to separate material that was publicly known from the alleged trade secret material; and where no witness presented any testimony as to 96 of the 104 trade secrets.

2. Whether an amended agreement authorized the counterclaim defendants' use of 102 of the counterclaim plaintiffs' alleged trade secrets to provide certain services to third parties where the amended agreement "deleted in their entirety" all of the restrictions on the counterclaim defendants' right to compete that were contained in the parties' original agreement.

3. Whether avoided costs are available as unjust-enrichment damages under the DTSA where the value of the alleged trade secrets was not destroyed; where the alleged misappropriation was not used to launch a competing product or gain a head start; and where both the counterclaim plaintiffs' actual lost profits and

1

the counterclaim defendants' actual revenue from the alleged misappropriation were calculated by the counterclaim plaintiffs and were much lower.

## STATEMENT OF THE CASE

In this case, Syntel Sterling Best Shores Mauritius Limited and Syntel, Inc. (collectively "Syntel"), brought an action against the TriZetto Group, Inc., and Cognizant Technology Solutions Corporation (collectively "TriZetto"), for breach of a contract between the parties (the Master Services Agreement), misappropriation of confidential information, and intentional interference with contractual relations. (A-180-83 (¶¶15–28).) As is relevant here, TriZetto brought counterclaims for misappropriation of trade secrets in violation of the DTSA and New York law and infringement of copyrights. (A-188-92 (¶¶118–143), A-193-94 (¶¶158–169).) The jury returned a verdict for TriZetto on all counts. (A-2252-53.) Syntel renewed its motion for judgment as a matter of law under Rule 50(b), and it moved in the alternative for a new trial or remittitur under Rule 59. (SPA-1.) Syntel argued, among other things, that TriZetto failed adequately to specify any trade secret; there was no misappropriation as a matter of law because it was authorized to use 102 of the trade secrets; and TriZetto's avoided-cost damages were improper. (SPA-4, SPA-13.) The district court (Hon. Judge Lorna G. Schofield) denied Syntel's post-trial motions in relevant part and entered a final

2

judgment and permanent injunction. *See* No. 15-cv-211-(LGS), 2021 WL 1553926, at *15–16 (S.D.N.Y. Apr. 20, 2021); (A-2316-26; SPA-34-35.)

## I. BACKGROUND

Syntel is an information-technology company that provides, among other things, software installation, customization, and support services. (*See* A-446-47 (470:15-471:14).) TriZetto develops software for health-insurance companies, physicians, and hospitals, and it offers related services. (A-283 (165:5-11).) One of TriZetto's software products is Facets, an administrative platform that insurers use to store information and process claims related to health-plan members. (A-2118; A-223 (60:5-16).)

TriZetto generates Facets-related revenue in two ways. First, it makes hundreds of millions of dollars per year licensing Facets software to customers, including health-care providers and insurance companies. (A-435-36 (422:25-423:8).) These licenses grant customers the right to use Facets and related materials, including the materials at issue here. (A-228-29 (69:11-70:4); A-290-91 (173:10-174:14).) It is undisputed that Syntel has never competed in the software market nor attempted to do so. (A-272 (134:1-6); A-437 (424:1-10).)

Second, software licensees often hire TriZetto or a third party to provide various software support services, including performing upgrades. (A-224-25 (65:1-66:5); A-232-33 (73:22-74:19); A-272-74 (134:17-136:5); A-496 (725:15-

24).)  Because TriZetto permits Facets customers to choose their service provider (A-322-23 (243:16-244:18)), it competes in this services market with various third-party providers (A-273 (135:10-20)).  Depending on the terms of TriZetto's contract with each customer, a third-party provider can either (1) freely access TriZetto's materials through the customer or (2) enter into a separate contract directly with TriZetto—a so-called "third-party access agreement"—to gain access to TriZetto's materials for purposes of servicing the customer.  (A-322-23 (243:22-244:13); A-484 (601:13-15); A-494-95 (722:4-723:3); A-641.)  Either way, the service provider is allowed to use TriZetto's guides, manuals, and other Facets materials for free.  (A-484 (601:13-15); A-494-95 (722:4-723:3).)  As recognized in the permanent injunction, Syntel is authorized to use TriZetto's materials to perform Facets services for Blue Shield of California (BSC) under scenario (1), and for Capital District Physicians Health Plan (CDPHP) under scenario (2).  (A-2322-23.)

In 2007, Syntel began providing employees to carry out Facets software services on TriZetto's behalf.  (A-277 (139:1-3); A-320 (221:3-16); A-448-49 (472:17-473:17).)  In 2010, Syntel and TriZetto formalized the relationship by entering into the Master Services Agreement (MSA), which provided that, in exchange for guaranteed yearly minimum payments of approximately $25 million, Syntel would provide certain services to TriZetto.  (*See* A-317-18 (209:7-210:22);

A-550 (§1.01(99)).)  To avoid any potential improper use of TriZetto's confidential information, Syntel agreed not to compete with TriZetto for services contracts with TriZetto's Facets customers.  (A-604 (§29.17).)  Specifically, "to prevent any misuse or disclosure of Confidential Information," MSA Section 29.17 prohibited Syntel from "provid[ing] any products or services" that required "technical, design, process or architectural knowledge of TriZetto's products or services relating to TriZetto's products."  (A-604 (§29.17).)  Under Section 13.01 of the MSA, TriZetto's data could not be "used by [Syntel] or [Syntel's] Agents other than in connection with providing the Services" under the agreement or "commercially exploited by or on behalf of [Syntel] or [Syntel's] Agents" "[w]ithout TriZetto's approval."  (A-577 (§13.01).)  Similarly, under Section 19.01 of the MSA, TriZetto's "Confidential Information" could not be used without TriZetto's "prior consent."  (A-584 (§19.01).)  But the MSA contemplated that the parties might choose to alter the scope of Syntel's work and explicitly stated that the "Services" provided by Syntel would also include "any new services agreed to by the Parties." (A-550 (§1.01(99)).)

Syntel and TriZetto enjoyed a strong and cooperative relationship in which they worked together under the MSA to outperform the Facets services competition and develop strategies to enhance TriZetto's business.  (A-449-50 (473:18-474:18).)  As Syntel's former TriZetto engagement manager explained,

5

the parties worked so closely it was difficult to distinguish between Syntel and

TriZetto employees: there was "one team." (A-470-72 (544:2-546:19).) During

this period, Syntel's employees were given access to Facets technical documents to

further TriZetto's goals, including performing upgrades for customers. (A-234-35

(75:12-76:2); A-275-76 (137:24-138:10); A-278 (142:17-25).)

In 2012, at TriZetto's request, the parties amended the MSA. (A-450-51

(474:22-475:18); A-468-69 (522:24-523:11).) In exchange for being released from

its minimum financial commitments to Syntel, TriZetto affirmatively and expressly

removed all restrictions on Syntel's right to compete for Facets service contracts.

(A-634-35.) In particular, the Amended MSA stated that "Section 29.17"—which

focused on "prevent[ing] any misuse or disclosure of Confidential Information"

(A-604)—"and any other provision in the Agreement related to [Syntel] being

restricted from competing with TriZetto are deleted in their entirety." (A-634-35.)

After entering the Amended MSA, the parties continued to enjoy a

cooperative relationship in which Syntel even provided TriZetto with advice and

services unrelated to Facets. (A-452-54 (476:8-478:10); A-455-56 (479:21-

480:19); A-457-58 (482:13-483:13).) At times, they pursued Facets services

opportunities together; at others, they competed with each other. (A-452-54

(476:8-478:10).) TriZetto executives even congratulated Syntel when Syntel beat

6

TriZetto to win a Facets services contract with CDPHP.  (A-452-53 (476:22-477:8).)

In November 2014, Syntel's competitor, Cognizant, acquired TriZetto.  (A-303-04 (186:21-187:4); A-314 (201:21-23).)  Syntel exercised its right to terminate the Amended MSA, requested payment of rebates owed under the contract, and raised concerns with TriZetto's hiring of significant numbers of Syntel employees who had been performing Facets work for TriZetto.  (A-2119; A-459-61 (487:5-489:16); A-485-86 (609:13-610:9).)  In response, TriZetto refused to pay the rebates and, for the first time, raised concerns about Syntel's use of TriZetto's confidential information.  (A-2119; A-454 (478:11-15).)

## II.  PROCEDURAL HISTORY

On January 12, 2015, Syntel filed suit against TriZetto in the Southern District of New York.  (A-172-78.)  As amended, the complaint alleged breach of the MSA, misappropriation of confidential information, and intentional interference with contractual relations.  (A-180-83 (¶¶15–28).)  TriZetto counterclaimed, alleging, as is relevant here, that Syntel misappropriated trade secrets in violation of the DTSA and New York law and infringed its copyrights.  (A-188-92 (¶¶118–143), A-193-94 (¶¶158–169).)

During discovery, the district court entered a preclusion order barring Syntel from (1) "offering or presenting any evidence that it did not misappropriate and

7

unlawfully copy Defendants' FACETS test cases and automation scripts" and

(2) "offering or presenting any evidence that it independently developed any of the

Platform Management Tools at issue in this case." (A-203.) However, the order

did not relieve TriZetto of its burden of proving any of the items were, in fact,

"trade secrets." (*Id.*) As a result of the preclusion order, the jury was instructed

that Syntel had misappropriated two of the 104 claimed trade secrets—the so-

called "test cases" and "automation scripts." (A-2131; A-527-28 (853:24-854:3).)

The case was scheduled for trial in October 2020. Because of Covid-19

travel restrictions, Syntel requested an adjournment, explaining that Syntel's "key

witnesses and company representatives [would] be unable to participate in person

and fully perform []critical trial activities." (A-207.) This request was denied.

(*Id.*) The district court held an in-person jury trial from October 19 to October 27,

2020. Three Syntel witnesses—including Syntel's key fact witness, Chief

Delivery Officer Murlidhar Reddy, who lives in India (A-444 (468:1-13); A-445

(469:8-25))—could not travel to New York and instead appeared remotely, while

all of TriZetto's witnesses were able to testify in person.

At trial, TriZetto elected to proceed with misappropriation claims on 104

alleged Facets trade secrets, which TriZetto characterized as falling into three

categories: (1) software; (2) guides and manuals; and (3) tools. (A-252 (113:5-

10).) TriZetto's "software" category included three pieces of software. (A-252

8

(113:13-18); A-344-45 (282:19-283:1).)  The "guides and manuals" category included 97 different items, each representing multiple versions of a Facets-related instructional guide or manual.  (A-345 (283:3-13).)  The "tools" category consisted of four Facets-related tools.  (A-343-44 (281:24-282:17)).)[1]

During trial, TriZetto's witnesses provided only high-level or category-based descriptions of its alleged trade secrets.  This was done entirely in open court, and TriZetto made no attempt to separate its alleged secrets from any publicly-known material.  Indeed, TriZetto freely admitted, in seeking to seal the hundreds of exhibits that it said corresponded to its 104 trade secrets, that "no witness provided testimony disclosing the content of these trade secrets" and "an observer of trial would not have learned the contents of these trade secret documents as a result of their attendance at trial."  (A-2293; A-2294-315.)  Instead, TriZetto asserted that every word in the millions of lines of software code and pages of documents constituted part of its asserted 104 trade secrets.  (A-327-28 (265:23-266:17); A-344-45 (282:18-283:1); A-397-98 (377:4-378:8).)  Consistent with that approach, TriZetto's expert, Dr. Bryan Bergeron, rather than analyzing the information within various programs or documents to determine what was or was not actually a

---

[1]    TriZetto also proceeded with its copyright infringement counterclaim at trial. That claim is not directly at issue in this appeal.  (*See infra* p. 32 n.5.)

9

trade secret, simply testified that, "if there is a trade secret in the document, the document is a trade secret." (A-385-86 (337:5-338:6).)

For the three pieces of software, TriZetto asserted that the entire source code of each was a trade secret. (A-344-45 (282:18-283:1); A-397-98 (377:4-378:8).) Yet the source code itself was hardly mentioned. TriZetto's witnesses did nothing more than tell the jury that the source code of Facets was very "complex" and was "millions of lines" long. (A-327-28 (265:23-266:17).) No witness testified about the source code of the other two programs.

For the guides and manuals, a TriZetto employee, Mr. Mike Noonan, testified that one, the Data Models Guide, "contains" TriZetto's trade secrets and he provided high-level descriptions of relational databases and how data is organized in tables within the document. (A-246-50 (87:9-91:1).) No witness testified even to the name and corresponding trial exhibit for the other 96 guides and manuals except for a passing reference to earlier versions of three guides and manuals in one witness's cross-examination. Instead, for those 96 guides and manuals, TriZetto's expert, Dr. Bergeron, merely "flipped" through his demonstratives and testified "[t]hose are all the guides and manuals." (A-345 (283:2-13).)

Finally, for the four tools that were alleged trade secrets, TriZetto merely provided generic descriptions of how each tool works, its purpose, or why

10

customers like using it. (*See* A-257-58 (118:13-119:1); A-261-63 (122:22-124:19); A-264-67 (125:21-128:2); A-294 (177:11-19); A-358-61 (297:5-300:25).) That testimony consisted entirely of public information.

At the close of trial, the jury was given a court exhibit titled "Listing of TriZetto's Alleged Trade Secrets" for reference in deliberations. (A-2120-27.) That exhibit contained only the title of guides and manuals or the name of the software and tools. (*Id*.) For example, the first listed trade secret was simply "Facets," and the eighth was "Audit Archive Guide." (A-2121.) No other information about any claimed trade secret was provided in the exhibit.

The jury also heard testimony with respect to damages on TriZetto's counterclaim that Syntel had engaged in misappropriation in violation of the DTSA, which applies only to misappropriation occurring after the DTSA's May 2016 effective date. TriZetto's expert, Mr. Thomas Britven, presented three theories to the jury. (A-412 (396:7-12).) TriZetto's principal theory was unjust enrichment based on avoided development costs, *i.e.*, the costs that Syntel allegedly saved by not independently developing all of the purported trade secrets on its own. (A-412 (396:7-12); A-419 (403:9-12).) Under this theory, Mr. Britven testified that the DTSA damages should be $284,855,192—the entire amount TriZetto spent on developing Facets from 2004 to 2014. (A-418 (402:12-14).) Mr. Britven reached this figure even though he calculated TriZetto's total claimed lost

11

profits from Syntel's alleged DTSA misappropriation as $8.5 million (based entirely on Facets services performed for one customer, UnitedHealth Group (UHG)). (A-518-19 (806:22-807:6).) Mr. Britven also calculated Syntel's corresponding total revenue from the alleged DTSA misappropriation as $27 million, which Syntel's expert, Mr. John Plumpe, confirmed translated to only $823,899 in actual profits. (A-498-99 (734:24-735:19); A-518-19 (806:22-807:6).) According to Mr. Britven, Syntel avoided the approximately $285 million in development costs even though TriZetto's witnesses testified that the value of the trade secrets was not destroyed and that TriZetto's practice is to give third-party service providers, including Syntel, access to the alleged trade secrets at no cost. (A-274-75 (136:6-137:5); A-322-23 (243:22-244:13); A-484 (601:13-15); A-494-95 (722:4-723:3); A-517 (797:11-17).)

As a first alternative, Mr. Britven presented a reasonable royalty theory that set damages at 50% of TriZetto's entire development costs, or $142 million. (*See* A-428-29 (412:22-413:2); A-497 (729:7-14).) As a second alternative, he suggested that TriZetto's damages should be the $8.5 million in TriZetto lost profits. (A-433 (419:4-8);A-518-19 (806:22-807:6).)

Over Syntel's objection, the district court adopted TriZetto's proposed verdict form, which did not require the jury to identify which alleged trade secrets were misappropriated. (A-2234-49; A-2252.) Instead, the jury returned a verdict

12

finding Syntel misappropriated "one or more" of TriZetto's trade secrets, in violation of the DTSA and New York law, and infringed "one or more" of TriZetto's copyrights. (A-2252.) The jury also found against Syntel on each of its claims. (A-2252.) The jury awarded TriZetto $284,855,192 in compensatory damages for DTSA misappropriation and $569,710,384 in punitive damages. (A-2254, A-2256.) As a result of the verdict form, it is impossible to know which trade secrets the jury found misappropriated or how those alleged secrets were accounted for in the damages award.

After trial, Syntel renewed its motion for judgment as a matter of law under Rule 50(b) and moved in the alternative for a new trial or remittitur under Rule 59. (SPA-1.) Syntel made three arguments relevant to this appeal. First, it argued that that TriZetto failed to identify any trade secrets with the requisite specificity. (SPA-4.) Second, it argued that there was no misappropriation because Syntel was authorized to use 102 of the trade secrets. (*Id*.) Third, it argued that DTSA avoided-cost damages were improper here. (SPA-13.) Syntel also argued that the punitive damages awarded were grossly excessive. (SPA-18.) TriZetto moved for a permanent injunction and pre- and post-judgment interest. (SPA-25, SPA-31-32.)

On April 20, 2021, the district court denied Syntel's post-trial motions, except that it granted Syntel's motion for a new trial or remittitur on punitive

damages.  (SPA-32.)  TriZetto agreed to remittitur and accepted a reduced punitive

damages award of $284,855,192.  (SPA-35.)  The district court granted TriZetto's

motion for a permanent injunction and post-judgment interest, but it denied pre-

judgment interest.  (SPA-32.)  The district court entered final judgment and a

permanent injunction on May 18, 2021.  (SPA-34-35; A-2316-26.)  This appeal

follows.  (A-2327-28.)

## SUMMARY OF THE ARGUMENT

The district court failed to hold TriZetto to the fundamental burden of proof

required of any claimed holder of trade secrets.  TriZetto was relieved of its burden

to identify *any* of its 104 trade secrets, let alone each and every one, with the

specificity required for a jury to determine if a trade secret actually existed.

Compounding that error, the court allowed the jury to decide the legal issue of

authorization under the Amended MSA and endorsed a compensatory damages

theory unrelated to any actual loss to TriZetto or benefit to Syntel.  If allowed to

stand, the district court's judgment will set a dangerous precedent for interpreting

the DTSA—a statute still in its infancy—leaving those accused of

misappropriation on the hook for potentially hundreds of millions of dollars of

development costs for hypothetical enrichments from unidentified trade secrets.

At trial, TriZetto made the strategic decision to speak in generalizations.  It

made no effort to spell out exactly what its 104 trade secrets were or to establish

14

what actual benefit Syntel obtained from their alleged use beyond $27 million in revenue (and a mere $823,899 in profits). The district court endorsed TriZetto's approach, refusing to require the jury to specify in its verdict which of the 104 were actually trade secrets or were actually misappropriated. In denying Syntel's post-trial motions, the district court further blessed TriZetto's improper, threadbare approach, allowing the jury to rule in TriZetto's favor on its claims of trade secret misappropriation without requiring any alleged secret to be identified by more than a cursory title, and endorsing—as a floor for DTSA *compensatory* damages— amounts representing the entire development cost of all secrets. The district court's judgment in TriZetto's favor on its trade secret claims should be reversed or vacated.

I.     Under the proper legal standard, no reasonable jury could have found the existence of any trade secret on the evidence TriZetto presented, let alone 104 of them. The law in numerous other circuits, and in district courts in this Circuit, requires the claimant to adequately specify each trade secret, including by separating information known in the trade from information it alleges is a "trade secret." That law also prohibits a claimant from asserting that "everything" is a trade secret. Yet the district court here forged a new path. Rather than holding TriZetto to that well-established standard, it allowed TriZetto to assert that everything contained within all of the code and documents named as its 104

15

alleged trade secrets was a "trade secret." That assertion was demonstrably false, as the documents contain undeniably public information. And the district court effectively shifted TriZetto's burden to Syntel to prove that the millions of lines of code and pages of documents were public.

That was far from the only error the district court made regarding the specificity of the alleged "trade secrets." For 96 of the 104 alleged trade secrets, no TriZetto witness even testified to the name and corresponding trial exhibit. Yet somehow the district court concluded TriZetto adequately specified these trade secrets, too—rendering the specificity requirement a dead letter. Should this Court affirm, it will be departing from the great weight of authority on the specificity issue and creating a circuit conflict in a critical and developing area of DTSA law.

II.     The district court erred in denying Syntel's motion for judgment as a matter of law for an independent reason: the Amended MSA unambiguously authorized Syntel's use of 102 of the alleged trade secrets, such that there can be no misappropriation. In holding otherwise, the district court improperly deferred to the jury on the legal issue of the interpretation of an unambiguous contract and concluded (1) the scope of covered "Services" was not expanded by the Amended MSA and (2) the provisions of the original MSA that restricted Syntel's ability to use TriZetto's confidential information were not altered or deleted by the Amended MSA. But the Amended MSA unambiguously expanded the scope of "Services"

16

to encompass Syntel's servicing of third parties and "deleted in their entirety" "any other provision in the Agreement related to [Syntel] being restricted from competing with TriZetto." (A-634-35.)

III.    Finally, the district court erred in allowing avoided costs as permissible unjust-enrichment damages under the DTSA here. The district court's opinion set avoided costs as the baseline for damages in every DTSA case, regardless of the circumstances, including cases like this one where it is impossible to know what the jury found were trade secrets or which secrets it found were misappropriated. That was erroneous for two reasons. First, avoided costs are a special compensatory remedy available only in specific situations, none of which applies here: the trade secrets were not destroyed, Syntel never launched a competing product or gained a "head start," and both TriZetto's actual claimed loss and Syntel's purported benefit were readily calculated. Second, not every misappropriation causes a defendant to be unjustly enriched by the full development costs of the alleged secrets. Instead, the claimant must actually link the misappropriation to the alleged benefit received. Here, TriZetto's supposed causal link—that Syntel was enabled to "compete immediately" to "provide complex consulting services"—is demonstrably false, as Syntel was already providing Facets services with TriZetto's permission before the alleged DTSA misappropriation even occurred, and TriZetto permitted third parties to use its

17

materials to service Facets customers at no cost. Accordingly, the measure of damages was seriously flawed. The judgment in TriZetto's favor on its trade secret claims should be reversed or vacated.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court. *See, e.g.*, *U.S. ex rel. O'Donnell* v. *Countrywide Home Loans, Inc.*, 822 F.3d 650, 655 n.9 (2d Cir. 2016). Under that standard, judgment as a matter of law should be granted if a reasonable jury would lack a legally sufficient evidentiary basis to support the non-moving party's claim. *Id.*; Fed. R. Civ. P. 50(b). In assessing a motion for judgment as matter of law, this Court reviews a jury's factual determinations for substantial evidence. *See, e.g.*, *Nat'l Auto Brokers Corp.* v. *Gen. Motors Corp.*, 572 F.2d 953, 956 (2d Cir. 1978).

## ARGUMENT

## I. THE DISTRICT COURT ERRED BY APPLYING THE WRONG LEGAL STANDARD FOR IDENTIFYING A TRADE SECRET WITH SPECIFICITY

Under both the DTSA and New York law, before a jury can find a trade secret was misappropriated, the claimant must prove, and the jury must find, that a protectable trade secret actually exists. *See, e.g.*, *IDX Sys. Corp.* v. *Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002); *PaySys Int'l, Inc.* v. *Atos Se*, No. 14-cv-10105-(KBF), 2016 WL 7116132, at *10 (S.D.N.Y. Dec. 5, 2016); 18 U.S.C.

18

§§ 1836(b)(1), 1839(3).[2]  A trade secret is information that is (1) kept secret by the owner through "reasonable measures" and (2) "derives independent economic value … from not being generally known to, and not being readily ascertainable through proper means by" another person.  18 U.S.C. § 1839(3).[3]  To allow the jury to determine whether a "trade secret" exists, the claimant bears the burden of identifying each alleged secret with specificity.  *See, e.g.*, *Olaplex, Inc.* v. *L'Oréal USA, Inc.*, 855 F. App'x 701, 711–12 (Fed. Cir. 2021); *see also TLS Mgmt. and Mktg. Servs., LLC* v. *Rodriguez-Toledo*, 966 F.3d 46, 53 (1st Cir. 2020).

The district court effectively dispensed with that requirement here.  Opining that this Court "has not squarely articulated the precise contours of the specificity requirement in the context of trade secrets," the district court required only that a trade secret "be described specifically enough … [so] that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation."  (SPA-8-9.)  Rather than requiring TriZetto to articulate specifically what information actually constituted its asserted trade secrets,

---

[2]  Due to the overlap in the statutory language, courts have looked to the law on states' versions of the Uniform Trade Secrets Act when interpreting and applying the DTSA.  *See, e.g.*, *Veronica Foods Co.* v. *Ecklin*, No. 16-cv-07223-(JCS), 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017); *Medidata Sol., Inc.* v. *Veeva Sys., Inc.*, No. 17-cv-589-(LGS), 2021 WL 467110, at *3 (S.D.N.Y. Feb. 9, 2021) (applying New York specificity precedent to DTSA claim).

[3]  Similar factors are considered under New York law.  *See Next Commc'ns, Inc.* v. *Viber Media, Inc.*, 758 F. App'x 46, 48 (2d Cir. 2018).

therefore, the district court concluded that TriZetto pointed to entire programs or documents, permitting the jury to proceed to determine whether those programs or documents were used or disclosed.

The district court's watered-down specificity standard represents a major departure from the law applied by numerous circuit courts, and by district courts within this circuit, all of which require a far more exacting showing than the district court did here. The district court thereby erred as a matter of law, and this Court should take this opportunity to confirm the correct standard—which, had the district court applied it, would surely have compelled a different result.

## A. Reversal Is Required Because TriZetto Improperly Identified Entire Documents Or Programs As Its Trade Secrets

In order to meet its burden of identifying each trade secret with specificity, TriZetto needed to call out for the jury the non-public information that comprised its 104 trade secrets and explain why that "secret" material was deserving of protection. *See, e.g.*, *IDX*, 285 F.3d at 583–84; *Decision Insights, Inc.* v. *Sentia Grp., Inc.*, 311 F. App'x 586, 594–95 (4th Cir. 2009). In doing so, TriZetto was required to do more than "simply persist in the blunderbuss statement that '[e]verything … [is] a trade secret,'" because "[t]hat view is wrong as a matter of law." *GlobalTap LLC* v. *Elkay Mfg. Co.*, No. 13-cv-632-(RRP), 2015 WL 94235, at *5 (N.D. Ill. Jan. 5, 2015). Yet the district court blessed precisely that view here. Under the proper standard, TriZetto failed to establish the existence of any

20

trade secret, and reversal of the judgment on TriZetto's trade secret claims is required on that basis.

### 1.   The District Court Failed To Apply The Proper Specificity Standard

The existence of a trade secret is a threshold, antecedent requirement, distinct from the question of whether the trade secret was disclosed or misappropriated.  "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) *that the plaintiff possessed a trade secret*, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Inteliclear, LLC* v. *ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020) (emphasis added); *see also Olaplex*, 855 F. App'x at 705–06.  A claimant's reliance on overly "vague and general" descriptions of the allegedly misappropriated secrets is fatal.  *Next Commc'ns*, 758 F. App'x at 49 n.3.

Satisfying the specificity requirement takes serious effort by the claimant. *IDX*, 285 F.3d at 583–84; *see also Olaplex*, 855 F. App'x at 710–12.  As other circuits consistently recognize, a claimant must identify an alleged "trade secret" with enough specificity to allow the jury to evaluate whether that particular information actually qualifies as a trade secret:  general or overbroad assertions as to what constitutes the alleged trade secret are untestable.  *PaySys*, 2016 WL 7116132, at *10; *Olaplex*, 855 F. App'x at 710–12; *TLS*, 966 F.3d at 53–54; *IDX*,

285 F.3d at 583–84; *Decision Insights*, 311 F. App'x at 594–95; *see also Imax Corp.* v. *Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998); *Loop AI Labs Inc.* v. *Gatti*, 195 F. Supp. 3d 1107, 1116 (N.D. Cal. 2016).  The specificity requirement is especially important "where a trade secrets claim involves a sophisticated and highly complex system," because the "trier of fact will not have the requisite expertise to define what the plaintiff leaves abstract."  *Olaplex*, 855 F. App'x at 712; *InteliClear*, 978 F.3d at 658; *see also Imax*, 152 F.3d at 1167; *Decision Insights*, 311 F. App'x at 594–95.

For purposes of the specificity requirement, it is not sufficient simply to identify entire documents or programs allegedly containing trade secrets, as that "leaves mysterious exactly which pieces of information are the trade secrets." *IDX*, 285 F.3d at 584; *see also PaySys*, 2016 WL 7116132, at *10; *Loop AI*, 195 F. Supp. 3d at 1116.  Put another way, the "proper inquiry is not whether the *documents* describing [an alleged trade secret] were readily ascertainable but rather whether the '*substance*' of that [alleged trade secret] was readily ascertainable." *TLS*, 966 F.3d at 56 (emphasis added); *see also GlobalTap*, 2015 WL 94235, at *7. Thus, as several courts of appeals and various district courts have confirmed, a claimant seeking to satisfy the specificity requirement must "separate the trade secrets from the other information … known to the trade."  *IDX*, 285 F.3d at 583; *TLS*, 966 F.3d at 54; *see also BondPro Corp.* v. *Siemens Power Generations, Inc.*,

463 F.3d 702, 710 (7th Cir. 2006); *Freeman Inv. Mgmt. Co.* v. *Frank Russell Co.*, 729 F. App'x 590, 591 (9th Cir. 2018); *Medidata Sol.*, 2021 WL 467110, at *3; *Dow Chem. Canada Inc.* v. *HRD Corp.*, 909 F. Supp. 2d 340, 346–48 (D. Del. 2012). High-level or categorical testimony is not enough. *See, e.g.*, *TLS*, 966 F.3d at 53; *BondPro*, 463 F.3d at 710; *Agrofresh Inc.* v. *Essentiv LLC*, No. 16-cv-662-(MN), 2020 WL 7024867, at *7 (D. Del. Nov. 30, 2020). The claimant must show "what aspects of the [documents] were public knowledge and which were not." *TLS*, 966 F.3d at 54; *see also Imax*, 152 F.3d at 1167; *Freeman Inv.*, 729 F. App'x at 591.

There can be no doubt that the district court did not hold TriZetto to the proper standard. As one court of appeals has stated: "Courts and juries also require precision because, especially where a trade secrets claim involves a sophisticated and highly complex system, the district court or trier of fact will not have the requisite expertise to define what the plaintiff leaves abstract." *Olaplex*, 855 F. App'x at 712 (quoting *InteliClear*, 978 F.3d at 658). As discussed above, TriZetto alleged its trade secrets were "complex" and fell into three categories: (1) software; (2) guides and manuals; and (3) tools. (A-250 (91:6-12); A-252 (113:5-10); A-328 (266:7-17); A-343-45 (281:24-283:13).) Rather than requiring TriZetto to identify specifically what each of its 104 trade secrets was—including by identifying for the jury the trial exhibit in which each individual secret was

located and identifying the portions of each exhibit reflecting the "secret" information—the district court concluded it was sufficient for TriZetto to identify a secret "specifically enough … that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation." (SPA-8-9.)  In so doing, however, the district court effectively dispensed with the specificity requirement, permitting TriZetto implausibly to argue that everything was a trade secret and leaving the jury with no guidance whatsoever.  That was erroneous.

### 2. *TriZetto's Argument That Entire Documents Or Programs Are Trade Secrets Does Not Satisfy The Specificity Requirement*

At trial, TriZetto offered no evidence from which the jury could separate what was known or readily ascertainable from the "secret" information contained in any—let alone every—item alleged to be a trade secret.[4]  (A-385-86 (337:5-338:6); A-377 (324:17-20); A-397 (377:4-13); A-398 (378:5-8).)  Instead, TriZetto simply asserted that everything was a trade secret.  As TriZetto's expert testified, TriZetto's position was that, "if there is a trade secret in the document, the document is a trade secret."  (A-385-86 (337:5-338:6).)  But a party's "assert[ion] that all information in or about its software is a trade secret" is "not plausible."

---

[4]    Remarkably, TriZetto argued below that its witnesses need not do so because "[n]o such requirement exists."  (A-2269.)

*IDX*, 285 F.3d at 583.  And no TriZetto witness did more.  For example, while

Mr. Noonan testified that one manual "contains TriZetto's trade secrets," he failed

to identify what the actual secrets were, let alone where in the manual they were

contained.  (A-246-50 (87:9-91:1).)  That cannot be sufficient to meet TriZetto's

burden. *See, e.g.*, *IDX*, 285 F.3d at 584.

The district court's characterization of TriZetto's evidence does not alter the

analysis.  While the district court concluded TriZetto met its burden with respect to

the software and tools secrets because its witnesses "explain[ed] the technology in

detail" (SPA-9), that "detailed explanation" consisted of nothing more than a

generic overview of the function of Facets itself, the two associated pieces of

software used for upgrades, and the four accompanying tools, consisting entirely of

high-level, public information.  (A-223 (60:11-16); A-225-27 (66:21-68:11); A-

237-44 (78:24-85:21); A-254-56 (115:6-117:15); A-257-58 (118:13-119:1); A-

261-63 (122:22-124:19); A-264-67 (125:21-128:2); A-358-59 (297:5-298:23); A-

360-61 (299:18-300:25); A-185-86 (¶49); A-187 (¶78).)  But even if, as the district

court erroneously observed, TriZetto had "explain[ed] [its] technology in detail,"

much more was needed.  TriZetto needed to provide the jury not with an

explanation of technology but rather with a basis to evaluate whether a trade secret

existed.  It did not.  For example, TriZetto offered the jury no basis to know, after

25

years of circulation, which aspects of Facets software were "known to the trade," and which were not. *IDX*, 285 F.3d at 584; *PaySys*, 2016 WL 7116132, at *11.

Tellingly, at no point did TriZetto ask to seal the courtroom when discussing its "secrets." To be clear, Syntel is not arguing that the law required TriZetto actually to disclose its trade secrets in open court. However, the inadequacies of TriZetto's presentation are underscored by its exclusive reliance on public information, which courts have recognized "is an indicator that the trade secrets are not identified with sufficient particularity." *ValveTech, Inc.* v. *Aerojet Rocketdyne, Inc.*, No. 17-cv-6788-(FPG), 2018 WL 4681799, at *6 (W.D.N.Y. Sept. 28, 2018); *see also Loop AI*, 195 F. Supp. 3d at 1112–13. As several courts of appeals have concluded, such "generic," "vague," "high-level" descriptions are insufficient to identify trade secrets with specificity. *TLS*, 966 F.3d at 53–54 (First Circuit); *IDX*, 285 F.3d at 583 (Seventh Circuit); *see also InteliClear*, 978 F.3d at 658–59 (Ninth Circuit); *Imax*, 152 F.3d at 1168 (Ninth Circuit); *Olaplex*, 855 F. App'x at 709–10, 712 (Federal Circuit). That is unsurprising, because generic, public descriptions do not allow a jury to evaluate whether the supposedly secret information qualifies as a "trade secret." *Olaplex*, 855 F. App'x at 712; *see also Dow Chem.*, 909 F. Supp. 2d at 348; *Loop AI*, 195 F. Supp. 3d at 1116.

TriZetto's failure was confirmed in its post-trial filings; there, in seeking to keep the documents allegedly containing its trade secrets sealed following trial,

TriZetto explained that "no witness provided testimony disclosing the content of these trade secrets" and that "an observer of trial would not have learned the contents of these trade secret documents as a result of their attendance at trial." (A-2293.)  It is impossible to understand how TriZetto could have met its specificity burden if an observer at the (never-sealed) trial would not have understood the "secret" contents of the very documents TriZetto says contain its trade secret, and TriZetto offered no testimony on 96 of the alleged trade secrets. Jurors cannot determine whether information is "not known in the trade" or "readily ascertainable" if they are never told specifically what information is the claimed "trade secret."  TriZetto's approach was plainly insufficient.

### 3.     By Blessing TriZetto's Approach, The District Court Effectively Shifted TriZetto's Burden To Syntel

There can be no dispute that it was TriZetto's burden to establish its trade secrets with specificity.  A trade secret claim fails "as a matter of law" where a claimant does not show "what aspects of the [documents] were public knowledge and which were not." *TLS*, 966 F.3d at 54; *see also IDX*, 285 F.3d at 583–84.  By permitting TriZetto to claim that every line of code and every page of multiple document versions were its trade secrets, the district court improperly shifted the burden to Syntel to prove what was public. *PaySys*, 2016 WL 7116132, at *11. As other circuit courts and courts within this circuit have confirmed, such burden-shifting "is the reverse of what the law requires."  *Id.*; *see also IDX*, 285 F.3d at

583; *Big Vision Private Ltd.* v. *E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 263 (S.D.N.Y. 2014), *aff'd sub nom.*, *Big Vision Priv. Ltd.* v. *E.I. du Pont de Nemours & Co*., 610 F. App'x 69 (2d Cir. 2015); *Freeman Inv. Mgmt.* v. *Frank Russell Co.*, No. 13-cv-2856-(JLS)-(RBB), 2016 WL 5719819, at *10 (S.D. Cal. Sept. 30, 2016), *aff'd*, 729 F. App'x 590 (9th Cir. 2018).

Here, the district court expressly shifted the burden to Syntel. For example, when Syntel identified a patent publicly disclosing technical information about Facets, the district court allowed TriZetto to argue to the jury that, even if the "30 pages" of the patent were public and did disclose Facets information, "[i]t can't possibly contain all the information associated with the millions of pages of TriZetto's trade secrets, right?" (A-396-98 (376:25-378:8); A-532-33 (955:18-956:6).) TriZetto thus effectively argued that *Syntel* was required to show that all or most of the information was public. After trial, the district court doubled down on that approach, faulting Syntel for its "limited cross-examination on the identification of the trade secrets." (SPA-9.) But whether TriZetto met its burden does not turn in any way on whether Syntel brought out contrary evidence on cross-examination. *See, e.g.*, *Maxon Hyundai Mazda* v. *Carfax, Inc.*, 726 F. App'x 66, 68 (2d Cir. 2018).

Moreover, it is beyond dispute that the code and documents containing TriZetto's alleged trade secrets include information that is publicly known or

readily ascertainable.  For example, the guides and manuals contain public

information regarding how a QWERTY keyboard works (CA-25-27) and an

overview of how HMO plans work (CA-42-43).  Similarly, TriZetto filed a portion

of its source code publicly with the Patent and Trademark Office (A-2033-36; A-

2037-99), and TriZetto's own witness conceded that TriZetto held publicly

available patents on its technology, which its expert never considered (A-286

(169:2-6); A-381-84 (330:10-333:2); A-398 (378:2-8)).  TriZetto's expert also

admitted that three earlier versions of its guides and manuals were publicly

available—the same guides and manuals that Mr. Noonan testified reflect how

Facets works, including its "heart."  (A-374-77 (321:19-324:24); A-378-80

(326:16-328:18); A-247 (88:13-19).)  TriZetto's overbreadth and vagueness is

"fatal to its claim for trade secret protection."  *GlobalTap*, 2015 WL 94235, at *7;

*see also IDX*, 285 F.3d at 583; *PaySys*, 2016 WL 7116132, at *10–11.  Having

failed to adequately separate and identify what was secret, TriZetto failed to

establish that any trade secret existed.

On similar facts, a district court in this circuit, applying New York and

Florida law, granted summary judgment where the plaintiff made the "overbroad

assertion" that "every line" of its millions of lines of source code constituted a

trade secret, concluding that the plaintiff had "failed to comply with th[e] basic

requirement" to identify its alleged trade secret with specificity.  *PaySys*, 2016 WL

7116132, at *9–11.  The court flatly rejected the very approach that TriZetto

pursued here, reasoning that the plaintiff could not "avoid its obligation to

carefully delineate precisely what in fact remains secret by designating 'all' of its

source code as secret."  *Id.* at *11.

Here, the district court did not reject the showing that portions of TriZetto's

claimed trade secrets were public, but nevertheless concluded that TriZetto need

not separate the public and allegedly secret information because the jury "could

apply the relevant legal tests to each asserted trade secret."  (SPA-10.)  But that is

nonsensical:  without any guidance as to what within the complex programs or

documents is actually the trade secret material, the jury is unable to determine

whether that information is "known to the trade" or has "value" or whether that

value is "derived … from not being generally known."  *IDX*, 285 F.3d at 583–84;

*see also PaySys*, 2016 WL 7116132, at *8, *11.  And it is impossible to test

whether that is true for the entirety of any document or program, let alone 104.

*PaySys*, 2016 WL 7116132, at *10.

The district court's error is highlighted by its reliance on cases focused on

compilation trade secrets—a distinct form of trade secret involving a non-public

combination of pieces of information that are individually public (such as a list of

names).  (SPA-10 (citing *Harbor Software, Inc.* v. *Applied Sys., Inc.*, 887 F. Supp.

86, 89–91 (S.D.N.Y. 1995); *Next Commc'ns*, 758 F. App'x at 48).)  Such cases are

inapposite here, where TriZetto made no effort to allege that its trade secrets were compilation trade secrets. *See, e.g.*, *Sit-Up Ltd.* v. *IAC/InterActiveCorp.*, No. 05-cv-9292-(DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008); *see also Cap. Asset Rsch. Corp.* v. *Finnegan*, 160 F.3d 683, 686–88 (11th Cir. 1998). And even assuming that the district court properly relied on such cases or that TriZetto may now argue its trade secrets are compilations, the law is clear that a claimant must still satisfy the specificity requirement by "show[ing] that [its] compilation is unique." *Sit-Up*, 2008 WL 463884, at *9–10; *see also Cap. Asset Rsch.*, 160 F.3d at 688; *SL Montevideo Tech., Inc.* v. *Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007); *Big Vision*, 1 F. Supp. 3d at 271. TriZetto adduced no such evidence.

Under the proper standard, TriZetto fell far short of its obligation to "describe the subject matter" of each trade secret "with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons … skilled in the trade." *InteliClear*, 978 F.3d at 658. The district court therefore erred by denying Syntel's motion for judgment as matter of law on TriZetto's DTSA and New York misappropriation claims. Accordingly, the judgment in TriZetto's favor on its trade secret claims should be reversed, and the

case remanded for further proceedings.[5]  *See Reynolds* v. *Giuliani*, 506 F.3d 183, 197 (2d Cir. 2007).

### B. Under Any Standard, TriZetto's Failure To Present Testimony On 96 Of The 104 Claimed Trade Secrets Mandates Vacatur And A New Trial On The Remaining Trade Secrets

Even if TriZetto's approach of asserting everything is a trade secret were somehow proper, TriZetto did not offer any testimony specific to 96 of the 104 claimed trade secrets.  In fact, no TriZetto witness so much as testified to the name and corresponding exhibit number of any of those 96 secrets on direct examination.  Having failed to provide even that basic level of evidence, TriZetto plainly did not meet its burden of identifying those trade secrets with specificity.

All of the 96 trade secrets at issue were in the "guides and manuals" category.  The district court determined that TriZetto sufficiently identified all of the trade secrets in that category (SPA-9), but that conclusion was unsupported.  First, the district court's statement that "TriZetto linked the asserted trade secret to particular documents or source code alleged to be trade secrets" (SPA-9) is simply incorrect.  The district court did not—and could not—offer a single record citation to support that statement.

---

[5]  The district court did not rule on Syntel's challenge to the jury's award of copyright damages.  (SPA-12 n.3.)  Therefore, the case should be remanded with instructions to rule on that challenge and to amend the injunction order as it relates to TriZetto's "trade secrets."

The district court referred to a court exhibit—apparently Court Exhibit 6 (A-2120-27)—in determining that TriZetto had met its burden. (SPA-9.) But that exhibit—a "Listing of TriZetto's Alleged Trade Secrets"—included only the name of each software program or tool (*e.g.*, "1. Facets") and the title of each guide or manual (*e.g.*, "8. Audit Archive Guide"). (A-2121.) It did not even include corresponding exhibit numbers, let alone a description of the alleged trade secret within each guide or manual. That was insufficient: merely telling the factfinder the name of a document is not the same as adequately specifying the trade secret associated with that document or program. For example, in *Givaudan Fragrances Corp.* v. *Krivda*, the district court granted summary judgment against the claimant where it identified hundreds of formulas only by name and failed to disclose the actual subject matter it claimed it owned and was misappropriated. No. 08-cv-4409-(PGS), 2013 WL 5781183, at *7 (D.N.J. Oct. 25, 2013), *aff'd*, 639 F. App'x 840 (3rd Cir. 2016). As the court aptly remarked, "the name of the [trade secret] is not the protected secret and it conveys nothing … with respect to the subject matter that [plaintiff] is claiming that it owns or that [defendant] has allegedly misappropriated." *Id.*; *see also IDX*, 285 F.3d at 583–84; *InteliClear*, 978 F.3d at 658; *Utilase, Inc.* v. *Williamson*, Nos. 98-1233, 98-1320, 1999 WL 717969, at *7 (6th Cir. Sept. 10, 1999); *Olaplex*, 855 F. App'x at 710–12; *Agrofresh*, 2020 WL

33

7024867, at *6–7.  Thus, the list of names in the court exhibit is plainly insufficient.

The district court's apparent implicit reliance on TriZetto's expert's demonstratives as the item "link[ing] the asserted trade secret to particular documents" fares no better.  (SPA-9.)  As a factual matter, these demonstratives did nothing more than list the name, exhibit numbers, and general category (*e.g.*, "Billing" or "Commissions") for each guide or manual.  Further, these demonstratives were not even discussed by Dr. Bergeron.  They were shown to the jury for mere seconds as he testified "[t]hose are all the guides and manuals."  (A-345 (283:2-13).)  More fundamentally, demonstratives are not evidence, and the district court should not have relied on them as evidence supporting the jury's verdict.  (A-2130); *MBIA Ins. Corp.* v. *Patriarch Partners VIII, LLC*, 950 F. Supp. 2d 568, 611 (S.D.N.Y. 2013).  No evidence in the record directed to the jury to the trial exhibits associated with the 96 claimed trade secrets, let alone sufficiently explained their contents.  Indeed, given TriZetto's silence on those documents during trial, they, along with hundreds of other documents, appeared in the record only as a result of the court's procedure requiring the pre-admission of all unobjected-to exhibits.  (A-209; 10/7/2020 Minute Entry for proceedings held before Judge Lorna G. Schofield: Final Pretrial Conference at 34:13-37:13 (located on docket immediately prior to docket entry 861).)

34

But even if the court exhibit and demonstratives were taken into account, and even assuming that the jury knew what trial exhibits to look at for each of the 96 claimed trade secrets, that is not enough. For purposes of the specificity requirement, it is not sufficient simply to tell the jury the title of a guide or manual and that it generally covers some category of technology. The jury needs guidance from the claimant about what the claimed trade secret really is. *See, e.g.*, *Olaplex*, 855 F. App'x at 710–12; *IDX*, 285 F.3d at 583; *Calendar Rsch. LLC* v. *StubHub, Inc.*, No. 17-cv-04062-(SVW)-(SS), 2020 WL 4390391, at *4, *8 (C.D. Cal. May 13, 2020). TriZetto unambiguously failed to provide that guidance as to these trade secrets (or, indeed, any of the others).

As discussed above, over Syntel's objection, the district court adopted TriZetto's proposed verdict form, which did not require the jury to identify which alleged trade secrets were proven or misappropriated. (A-2235-49; A-2252.) As a result, it is impossible to know whether the jury's verdict rested on any of the 96 claimed trade secrets. At a minimum, therefore, the general-verdict rule requires vacatur of the judgment in TriZetto's favor on its trade secret claims, and a remand for a new trial limited to the remaining claimed trade secrets. *E.g.*, *Morse* v. *Fusto*, 804 F.3d 538, 551 (2d Cir. 2015); *Katara* v. *D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir. 1987).

*     *     *     *     *

35

The specificity requirement is both foundational and critical: "without particularity (pre-trial and at trial), there is an inadequate basis for a fair adjudication of what information was actually used by the defendants." *Olaplex*, 855 F. App'x at 712. That is exactly what happened here. Because the district court permitted TriZetto to blow through the specificity requirement, TriZetto successfully avoided its burden of showing what particular parts of any document or code reflected a trade secret; whether those particular pieces of information reflecting the alleged trade secrets were actually used, when, and by whom; and how any such use of the particular information actually caused harm to TriZetto or a benefit to Syntel. If allowed to stand, the district court's approach would provide a template for future plaintiffs in trade secret cases to elide difficulties of proof on their claims.

TriZetto alleged it possessed 104 trade secrets. But for the 97 guides and manuals, it offered only limited, categorical testimony. Indeed, for 96 of the 97, the jury was not even told what to call them, beyond "guides and manuals." For the other eight trade secrets, the jury was given only generic information, including that the secrets relate to claims-processing software, were costly, took years to make, and that TriZetto tried to keep them secret. Unsurprisingly, left afloat in a sea of generic allegations, and with little guidance beyond a list of the alleged secrets and some high-level descriptions, the jury returned a verdict in a little over

three hours—spending at most less than two minutes to identify and determine misappropriation for each of the 104 alleged secrets.  TriZetto's evidence fell far short of what is required to support a claim of misappropriation, and reversal or vacatur of the judgment in TriZetto's favor is required.

## II.    TRIZETTO AUTHORIZED THE USE OF 102 OF THE 104 CLAIMED TRADE SECRETS

To prove misappropriation under both DTSA and New York law, TriZetto needed to show not only that it had a protectable trade secret, but also that Syntel's use or acquisition of that trade secret was "improper."  *See* 18 U.S.C. §§ 1836(b)(1), 1839(5), 1839(6); *Integro USA, Inc.* v. *Crain*, No. 19-cv-8752-(JPO), 2019 WL 6030100, at *2 (S.D.N.Y. Nov. 14, 2019).  Even if TriZetto had met its burden to adequately specify its 104 "trade secrets," the judgment on TriZetto's trade secret claims should be vacated for an independent reason:  the Amended MSA authorized Syntel to use 102 of the 104 claimed trade secrets, and Syntel's use of those trade secrets was therefore proper.[6]

In denying Syntel's motion for judgment as a matter of law, the district court erred by ultimately deferring to the jury on the interpretation of the unambiguous language of the parties' contract—a question of law.  (SPA-5.)  If the district court

---

[6]    The two remaining claimed trade secrets were the subject of the district court's preclusion order; as a result, the jury was directed to find misappropriation as to those alleged secrets.  (A-203; A-2131.)

had correctly interpreted the Amended MSA, without searching for an

interpretation that supported the jury's misappropriation verdict, it would have

reached a different result.  Syntel is entitled to vacatur as a result of the district

court's error.

### A.    The District Court Improperly Deferred To The Jury On The Ground That Syntel Did Not Move For Summary Judgment

The question whether a contract is ambiguous is a question of law for the

court.  *See, e.g.*, *L. Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d

458, 465 (2d Cir. 2010); *Kephart* v. *Certain Underwriters at Lloyd's of London*,

427 F. Supp. 3d 508, 515 (S.D.N.Y. 2019); *see also O'Donnell*, 822 F.3d at 656

n.9, 664 n.16.  Where a contract is unambiguous, the jury plays no role in

interpreting its meaning.  *See*, *e.g.*, *O'Donnell*, 822 F.3d at 664 n.16.  In spite of its

conclusion that the Amended MSA was unambiguous, the district court's analysis

indicates it treated interpretation of the contract as a question of fact for the jury.

(SPA-5-6.)  Indeed, while the court oscillated between whether the interpretation

was an issue of fact or law when raised under Rule 50, it ultimately treated it as an

issue of fact, concluding that, because the jury found Syntel liable for

misappropriation, it must have found that the Amended MSA did not authorize

Syntel's use—and that such a finding "was not seriously erroneous or contrary to

overwhelming evidence."  (SPA-6.)  That was erroneous.

38

The district court's decision to defer to the jury on this crucial question of contract interpretation appears to be based on its belief that Syntel was in some way obligated to raise the question by moving for summary judgment, and the court chided Syntel for its "novel approach" of raising the question outside of summary judgment. (SPA-5.) But Syntel had no obligation to move for summary judgment on this issue. *See, e.g.*, *Chapco, Inc.* v. *Woodway USA, Inc.*, No. 15-cv-1665-(JCH), 2018 WL 3581694, at *5 (D. Conn. July 24, 2018); *Carlton Grp., Ltd.* v. *Mirabella SG SpA*, No. 16-cv-6649-(LGS), 2019 WL 324259, at *2 (S.D.N.Y. Jan. 25, 2019); *see also Stephenson* v. *Doe*, 332 F.3d 68, 76–77 (2d Cir. 2003). And Syntel's decision to raise the issue at trial and in a motion for judgment as a matter of law, rather than via summary judgment, was hardly "novel." *See O'Donnell*, 822 F.3d at 656 n.9, 664, 664 n.16; *Stephenson*, 332 F.3d at 76–77; *Chapco*, 2018 WL 3581694, at *5.

As a result of its error, the district court searched for some interpretation of the parties' contract that could support the jury's verdict. As explained below, the interpretation it adopted was directly at odds with the contract's unambiguous language.

## B. The Amended MSA Unambiguously Authorized Use Of TriZetto's Confidential Information

Syntel and TriZetto agree that the relevant portions of the Amended MSA are unambiguous, but they disagree about what that unambiguous meaning is.

(SPA-6.)  Properly construed, the Amended MSA authorized Syntel's use as a matter of law.  Accordingly, no reasonable jury could find that Syntel misappropriated TriZetto's 102 trade secrets.  *See Olaplex*, 855 F. App'x at 709.

In 2012, at TriZetto's request, the parties amended the MSA.  (A-450-51 (474:22-475:18); A-468-69 (522:24-523:11).)  In exchange for being released from its minimum financial commitments to Syntel, TriZetto affirmatively and expressly "deleted in their entirety" all restrictions on Syntel's right to compete for Facets service contracts.  (A-634-35.)  Despite acknowledging that amendment, the district court concluded that Syntel was not authorized to use the claimed trade secrets because the Amended MSA "did not amend the definition of 'Services'" and "left undisturbed … sections 13.01 and 19.01."  (SPA-6.)  But that conclusion is inconsistent with the unambiguous language of the Amended MSA, which expanded the scope of "Services" covered under the original MSA.  And even if the Amended MSA had not made that change, the only reasonable interpretation of the Amended MSA is that it deleted Sections 13.01 and 19.01 in their entirety. The Amended MSA therefore authorized Syntel's use of the claimed trade secrets.

There is no dispute that, "to prevent any misuse or disclosure of Confidential Information," Section 29.17 of the original MSA prohibited Syntel from competing with TriZetto in providing Facets services to third parties.  (A-604 (§29.17).) Specifically, Syntel was prohibited from, *inter alia*, providing services or products

40

requiring "knowledge of TriZetto's products or services relating to TriZetto's products." (A-604 (§29.17).) In exchange for limiting Syntel's ability to generate revenue by providing services to third parties, TriZetto guaranteed Syntel minimum annual payments of approximately $25 million. (*See* A-317-18 (209:7-210:22); A-450-51 (474:22-475:18).) Consistent with that prohibition, the MSA stated that TriZetto's approval was required for Syntel to use TriZetto's confidential information "other than in connection with providing the Services" under the MSA. (A-577 (§13.01); *see also* A-584 (§19.01).) "Services" was defined to include both certain enumerated categories of services and "any new services agreed to by the Parties to be provided by Service Provider pursuant to this Agreement." (A-550 (§1.01(99)).)

In 2012, however, at TriZetto's request, the parties entered the Amended MSA under which Syntel lost its right to guaranteed revenue from TriZetto, but gained the right to earn money from directly servicing Facets customers. (*See* A-317-18 (209:7-210:22); A-450-51 (474:22-475:18).) To effect that change, Article 2 of the Amended MSA stated that "Section 29.17 and any other provision in the [original MSA] related to [Syntel] being restricted from competing with TriZetto are deleted in their entirety." (A-634-35 (emphasis omitted).) The proper interpretation of this provision is that it effectively expanded the scope of covered "Services," which the original MSA defined to include "any new services agreed to

41

by the Parties." (A-550 (§1.01(99)).) In striking the MSA's prohibition on competition, the parties agreed that Syntel could perform new services for third parties in competition with TriZetto; as a result of the amendment, therefore, such services were covered by the MSA's existing definition of "Services." (A-550 (§1.01(99)).)

Sections 13.01 and 19.01 remained in the MSA, but they no longer served to prohibit Syntel from providing competitive services to third parties. Section 13.01 continued to allow "TriZetto Data" to be used "in connection with providing the Services," which now included the new competitive services agreed in the Amended MSA. (A-577 (§13.01).) And Section 19.01 continued to allow Syntel to use TriZetto's "Confidential Information" with TriZetto's "prior consent," which TriZetto provided in the Amended MSA by agreeing that Syntel could service third parties. (A-584 (§19.01).) Both Sections also continued to prohibit Syntel from using TriZetto's materials in other ways, such as by disclosing TriZetto's Data and Confidential Information to the public. (A-577 (§13.01), A-584 (§19.01).) Thus, consistent with the parties' contemporaneous actions—such as TriZetto's congratulating Syntel on winning CDPHP's business (*supra* p. 6-7)—the Amended MSA permitted Syntel to use TriZetto information while servicing Facets customers, including UHG.

What is more, if Sections 13.01 and 19.01 were construed to prohibit Syntel from providing competitive services to third parties, they would no longer have any effect by virtue of the Amended MSA. That is because the Amended MSA "deleted in their entirety" not only Section 29.17, which expressly restricted Syntel from competing with TriZetto, but also "any other provision in the Agreement related to [Syntel] being restricted from competing with TriZetto." (A-634-35.) TriZetto's own witnesses testified that TriZetto's confidential materials were necessary for Syntel to provide "complex" consulting services to third parties, such as software upgrades. (*See, e.g.*, A-366-67 (305:21-307:3); A-404-05 (388:23-389:2).) The district court's interpretation assumes that "complex" services requiring these materials were somehow excluded from Syntel's competition rights, but there is no support for such a limitation on Syntel's authorized competition in the plain language of the MSA or Amended MSA.

The Amended MSA leaves no ambiguity—if *any* MSA provisions restricted Syntel from "competing with TriZetto," they were "deleted in their entirety." (A-634-35.) The Amended MSA unambiguously authorized Syntel's use of the 102 claimed trade secrets because TriZetto consented to Syntel providing additional "Services." But even if that were not the case, any provisions restricting Syntel's use of those materials no longer had force and effect insofar as they restricted

43

Syntel's ability to "compet[e] with TriZetto."  (A-634-35.)  In either case, Syntel

cannot be liable for misappropriation of the 102 trade secrets at issue.

As TriZetto authorized Syntel's use of those 102 trade secrets, no reasonable

jury could have found misappropriation of them.  *Texas Advanced Optoelectronic

Sols., Inc.* v. *Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1314–15 (Fed. Cir. 2018);

*Olaplex*, 855 F. App'x at 709.  To be liable for trade secret misappropriation under

both DTSA and New York law, the acquisition or use of the trade secret must have

been "improper."  18 U.S.C. §§ 1836(b)(1), 1839(5), 1839(6); *see also Integro

USA*, 2019 WL 6030100, at *2.  But, there is no improper use—*i.e.*, use without

"express or implied consent," *Olaplex*, 855 F. App'x at 709—where the parties'

contract expressly authorized the use.

\*        \*        \*

Should the Court agree that the district court misconstrued the parties'

agreement, it should at a minimum vacate the judgment in TriZetto's favor on its

trade secret claims under the general-verdict rule, *see* Part I.B, *supra*, and remand

for a new trial limited to the two remaining claimed trade secrets.

## III.  THE DISTRICT COURT ERRED AS A MATTER OF LAW BY AWARDING AVOIDED-COSTS DAMAGES

At trial, TriZetto was able to calculate both the claimed (1) actual loss to

TriZetto ($8.5 million in lost profits) and (2) actual benefit to Syntel ($27 million

in total revenue) caused by Syntel's alleged misappropriation.  (A-518-19 (806:22-

44

807:6).) Yet TriZetto ignored those figures and ambitiously sought a far greater damages award. TriZetto's principal theory of compensatory damages rested on the assumption that any use of any trade secret causes the defendant to be unjustly enriched by at least the costs avoided to develop that alleged trade secret *in its entirety*. The district court proceeded to adopt that theory and award TriZetto the astonishing amount of almost $285 million in compensatory damages. If the judgment in this case is allowed to stand, the practical effect will be to make avoided costs available in every DTSA case and to entitle a trade secret owner to a windfall whenever there is misappropriation (however trivial) of any trade secrets relating to an owner's product, in the form of full payment of the secret's entire cost of development. That cannot be the law.

In upholding the jury's award of avoided costs, the district court made two critical errors. The first was determining that avoided-costs damages are available here. Contrary to the district court's reasoning, avoided costs are not the "floor" for damages and are not available in every case. In ignoring the actual loss and benefit figures that TriZetto's expert calculated, the district court adopted a punitive view of compensatory damages that awarded TriZetto damages more than 33 times its actual loss and more than 10 times the total revenue obtained by Syntel for the unspecified misappropriation of "one or more" trade secrets. This Court, which has yet to address the proper measure of DTSA damages, should confirm

that, where the value of the trade secrets is undiminished; the plaintiff's actual loss and defendant's actual benefit are readily calculable; and the defendant has not made use of the full value of the alleged trade secrets, the plaintiff cannot use "avoided costs" as the "floor" for damages. To hold otherwise would endorse awards of "compensatory" damages that are orders of magnitude greater than any trade secret defendant could reasonably foresee.

The district court's second error was not requiring TriZetto to show that Syntel's misappropriation actually caused the magnitude of benefit to Syntel that TriZetto alleged. The DTSA allows, upon a finding of liability, damages representing "unjust enrichment caused by the misappropriation of the trade secret." 18 U.S.C. § 1836(b)(3)(B). But, contrary to TriZetto's theory, not every misappropriation causes the defendant to receive the benefit of the full value of a trade secret. Instead, the relevant question is what actual benefit the defendant received as a result of its actions. Here, where Syntel used the alleged trade secrets to, at most, service a single Facets customer—something TriZetto allows third parties including Syntel to do for free—no reasonable juror could have found Syntel was unjustly enriched by the full 10-year, $285 million cost of developing Facets. At a minimum, the judgment should be vacated and the damages reduced to $8.5 million representing TriZetto's actual lost profits.

46

### A. The District Court Erred By Determining That Avoided Costs Are Available As Unjust-Enrichment Damages In This Case

In denying Syntel's motion for judgment as a matter of law, the district court reasoned that, because the DTSA expressly permits unjust-enrichment damages, and because a defendant's avoided costs have been held to be a form of unjust enrichment, such damages were permissible here. (SPA-13-14.) Syntel does not dispute that the DTSA permits unjust-enrichment damages. Nor does Syntel dispute that some courts have awarded avoided costs as unjust-enrichment damages under the DTSA or similar state statutes. But, there is no basis to award avoided costs as compensatory damages where, as here, TriZetto was readily able to calculate both its claimed actual losses ($8.5 million) and Syntel's actual enrichment ($27 million in revenue, corresponding to $823,899 in profits), and Syntel never destroyed the value of the trade secrets or made full use of them. If affirmed, this case would stand for the proposition that any misappropriation allows a plaintiff to recover at least its entire costs of developing the trade secret under the DTSA, even where that cost is orders of magnitude greater than any actual loss or benefit to the parties. Such a windfall should be unavailable as a matter of law.

Contrary to the district court's suggestion (SPA-13-16), avoided costs should not be used as a "baseline" for damages. Instead, consistent with their historical use in trade secret cases, avoided costs should be treated as a special

47

remedy applicable only in certain situations. In fact, avoided costs are never available under New York trade secret law. *E.J. Brooks Co.* v. *Cambridge Sec. Seals*, 31 N.Y.3d 441, 454 (2018).

As this Court has recognized, avoided or development costs may be available to compensate a plaintiff for its loss in the rare circumstance when a plaintiff's "actual loss" is the full value of the trade secret, such as when the defendant destroys the secret's value by publicly disclosing it. *See Softel, Inc.* v. *Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997); *see also Univ. Computing Co.* v. *Lykes-Youngstown Corp.*, 504 F.2d 518, 535–36 (5th Cir. 1974); *E.J. Brooks*, 31 N.Y.3d at 454. But here, TriZetto never sought its development costs as compensation for its own losses. That is because, according to TriZetto, its actual post-DTSA loss was limited to $8.5 million in lost profits from servicing UHG[7] (A-518-19 (806:22-807:6)), and the value of the secrets was

---

[7]     Below, TriZetto offered, as an alternative theory of damages, a reasonable royalty of 50% of avoided costs. The district court did not reach Syntel's arguments on reasonable royalty so they are not before this Court. (SPA-12 n.3). Nevertheless, TriZetto's alternative royalty theory is also improper as a matter of law because it was based solely on avoided costs split 50/50 between TriZetto and Syntel. Courts have consistently rejected the use of such an arbitrary division as the basis for calculating a royalty because that methodology is insufficiently tied to the facts. *See VirnetX, Inc.* v. *Cisco Sys., Inc.*, 767 F.3d 1308, 1331–34 (Fed. Cir. 2014); *Vaporstream, Inc.* v. *Snap, Inc.*, No. 17-cv-00200-(MLH)-(KSx), 2020 WL 2543814, at *2–6 (C.D. Cal. Jan. 10, 2020); *Robocast, Inc.* v. *Microsoft Corp.*, No. 10-cv-1055-(RGA), 2014 WL 350062, at *3 (D. Del. Jan. 29, 2014).

not destroyed (A-274-75 (136:6-137:5); A-435 (422:3-8); A-435-36 (422:19-423:8); A-517 (797:11-17)).  Indeed, Facets is worth even more today than it was when the alleged misappropriation occurred.  (A-517 (797:11-17).)

Here, the district court determined that avoided costs were available not as compensation for TriZetto's actual loss, but rather as a form of unjust-enrichment damages.  (SPA-14-15.)  As the Ninth Circuit recognized, "[d]isgorgement of profits is generally the appropriate remedy for misappropriation of a trade secret." *Mason* v. *Sybron Corp.*, Nos. 90-35897, 91-35245, 1992 WL 31327, *2 (9th Cir. 1992).  Following that rule, avoided costs—a special remedy—are available only when the defendant's "unjust enrichment" was actually the full value of the trade secrets.  That occurs when the defendant launches a competing product using the trade secrets, or when the defendant gains a head start that could have only been achieved through misappropriation.  *See, e.g.*, *Motorola Sols., Inc.* v. *Hytera Commc'ns Corp.*, 495 F. Supp. 3d 687, 696, 711 (N.D. Ill. 2020).

The DTSA and non-DTSA cases the district court cited are consistent with the foregoing view of the narrow circumstances in which avoided-cost damages are available.  (SPA-13-16.)  For example, in *Motorola*, 495 F. Supp. 3d at 696, the trade secrets were used to develop and sell a "functionally indistinguishable" competing product (and avoided-costs damages were ultimately not awarded (A-2290)).  In *Epic Sys. Corp.* v. *Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1123,

49

1128, 1144 n.5 (7th Cir. 2020), in which no evidence of actual harm was provided, trade secrets were used to "address key gaps" in a competing product to "steal [plaintiff's] client." In *GlobeRanger Corp.* v. *Software AG U.S. of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016), the defendant "used the [trade secrets] in developing its own product." In *Children's Broadcasting Corp.* v. *Walt Disney Co.*, 357 F.3d 860, 863–64 (8th Cir. 2004), where the damages represented not avoided costs but the increased value of the defendants' radio station, the defendants used the trade secrets to accelerate market entry of their directly competing station. And in *Steves & Sons, Inc.* v. *JELD-WEN, Inc.*, No. 16-cv-545-(REP), 2018 WL 2172502, at *5–6 (E.D. Va. May 10, 2018), the plaintiffs presented evidence that "[the defendant] has used [the plaintiffs'] financial information to avoid the research and development costs that would normally be necessary to thoroughly understand the requirements for building a [competing] doorskin plant."

Here, Syntel never used the full value of TriZetto's trade secrets in any way, and thus never benefited fully from them. As explained above, there were two Facets markets: the software-product market and the services market. (*Supra* pp. 3–4.) It is undisputed that Syntel never developed, let alone sold, a competing software product. (A-272 (134:1-6); A-418 (402:20-23); A-437 (424:1-10); A-446-47 (470:15-471:1).) As a result, Syntel never made any use or received any benefit in the software market. And it is undisputed that Syntel had already been

50

in the third-party Facets services market since 2013, when, with TriZetto's congratulations, it began providing Facets services to CDPHP—years before the alleged post-May 2016 DTSA misappropriation occurred—and Syntel had the right to use the materials TriZetto asserted were its trade secrets to service CDPHP at no cost.  (A-641; A-452-53 (476:22-477:8); A-322-23 (243:22-244:13); A-484 (601:6-15); A-494-95 (722:4-723:3).)  Therefore, no alleged misappropriation of TriZetto's trade secrets could have accelerated Syntel's entry into the services market:  it was already there.

In determining that avoided-costs damages were available, the district court adopted reasoning that invites trade secret owners to seek avoided costs in every DTSA case in which those costs exceed the actual financial benefit to the defendant or loss to the owner.  The district court explicitly encouraged just that, suggesting that avoided-costs damages were appropriate where "the wrongdoer made only a modest profit—as Syntel did here—or no profit from the use of the trade secrets."  (SPA-16.)  Rather than acknowledging the actual benefit to Syntel—and that avoided-costs were an improper proxy for that benefit here—the court reasoned that Syntel's failure to generate profits equal to or greater than TriZetto's development costs suggested that Syntel was ineffective at generating returns from its misappropriation or miscalculated the payout from their use.  In other words, the district court reasoned that the floor for damages in every DTSA

case is the entire cost of developing the alleged trade secrets, even where the undisputed actual financial benefit to the defendant indicates otherwise. That defies logic, especially in a case like this in which TriZetto was providing third parties access to its trade secrets for free in order to service Facets customers. (A-322-23 (243:22-244:13); A-484 (601:13-15); A-494-95 (722:4-723:3); A-641.) As the dissent in *E.J. Brooks* recognized, "a secret's value can be measured by what it would cost someone else to develop it … because no one would pay more for a secret than that amount." 31 N.Y.3d at 463. In other words, avoided costs should be a cap, not a floor, for damages. Yet, under the district court's logic, this maximum amount would be available in all cases of misappropriation, no matter how slight the real harm to the trade secret owner.

The district court erred by relying on the Fifth Circuit's decision in *GlobeRanger*, *supra* page 50, as support for its holding that "the wrongdoer, not the aggrieved party, should bear the business risk that the wrongdoer's use of purloined trade secrets will not be profitable" (SPA-16). In *GlobeRanger*, the defendant "used the [trade secrets] in developing its own product." 836 F.3d at 499. In that scenario, the defendant used the full value of the trade secrets when it incorporated them into a new competing product, and it bore the risk that its product would not succeed in the marketplace. As explained above, this case does not present those facts. Syntel never developed a competing product and only

competed for services—a market in which Syntel and other third parties were routinely granted permission to use TriZetto's alleged trade secrets at no cost. (A-272 (134:1-6); A-322-23 (243:22-244:13); A-418 (402:20-23); A-484 (601:13-15); A-494-95 (722:4-723:3); A-641.) Thus, Syntel's "business risk" was unchanged: Syntel could bid on services contracts and, if it won, its cost of using TriZetto's materials was zero.

In affirming the jury's compensatory damages award based on a theory about allocating business risk between the parties, the district court effectively awarded punitive damages in the guise of compensatory damages. TriZetto itself presented evidence of the actual financial impact of Syntel's actions on both parties. (A-518-19 (806:22-807:6).) Yet rather than focusing on that evidence, the district court reasoned that avoided-cost damages over 10 times the total revenue Syntel obtained (and over 356 times its actual profits) were appropriate because Syntel should "bear the business risk" of its misappropriation. (SPA-16.) Compensatory damages, however, are not meant to compensate for unrealized or theoretical losses or benefits; instead, they are meant to place the parties in the position they would have been had the wrongful act not occurred. *See, e.g.*, *Anderson Grp., LLC* v. *City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015); *Steves & Sons*, 2018 WL 2172502, at \*6; *RLM Commc'ns, Inc.* v. *Tuschen*, 66 F. Supp. 3d 681, 698 (E.D.N.C. 2014). This is equally true for unjust enrichment.

*See, e.g.*, *SEC* v. *Contorinis*, 743 F.3d 296, 306–07 (2d Cir. 2014); *Design Innovation, Inc.* v. *Fisher-Price, Inc.*, 463 F. Supp. 2d 177, 181 (D. Conn. 2006); *Victor G. Reiling Assocs.* v. *Fisher-Price, Inc.*, No. 03-cv-222-(JBA), 2006 WL 1102754, at *2 (D. Conn. Apr. 25, 2006).

To the extent the district court deemed it necessary to punish Syntel for any "unrealized" potential profits or "risks" it took, any such punishment is appropriately considered in the context of punitive damages, which are already separately provided for in the DTSA. 18 U.S.C. § 1836(b)(3)(C); *see, e.g.*, *Victor G. Reiling Assoc.*, 2006 WL 1102754, at *2. To allow such punishment under the guise of compensatory damages would allow damages untethered to any actual loss or benefit to the parties, posing the same "danger of arbitrary deprivation of property" as punitive damages but without the constitutional due-process safeguards that necessarily accompany punitive awards. *State Farm Mut. Auto Ins. Co.* v. *Campbell*, 538 U.S. 408, 417 (2003).

It takes little imagination to see the impact the decision below will have on DTSA cases nationwide if it is allowed to stand: as a matter of course, every DTSA plaintiff will seek avoided costs for any misappropriation, no matter the relationship to any actual losses or actual unjust enrichment. And, if successful, plaintiffs may receive damages that are orders of magnitude larger than any actual loss or benefit. This Court should make clear that avoided-costs damages are

inappropriate in these circumstances and vacate the district court's extravagant damages award.

## B. TriZetto Presented No Evidence Of Causation To Support Avoided-Costs Damages

Even if avoided costs were otherwise available as a form of damages here, the award of avoided costs was inappropriate for the independent reason that no causal link exists between the $285 million award and any misappropriation alleged by TriZetto after the DTSA's enactment.

Causation is a critical element for the award of compensatory damages, including in trade secret cases. *See, e.g.*, *RLM Commc'ns*, 66 F. Supp. 3d at 698. Thus, while the DTSA does provide for unjust-enrichment damages, it expressly limits those to damages "caused by the misappropriation." 18 U.S.C. § 1836(b)(3)(B). In awarding unjust-enrichment damages, therefore, a court must have evidence that the misappropriation actually caused the claimed benefit to the defendant. *See, e.g.*, *360 Mortg. Grp., LLC* v. *Home Point Fin. Corp.*, 740 F. App'x 263, 267 (4th Cir. 2018); *Walmart Inc.* v. *Cuker Interactive, LLC*, 949 F.3d 1101, 1110 (8th Cir. 2020); *Brightview Grp., LP* v. *Teeters*, No. 19-cv-2774-(SAG), 2021 WL 1238501, at *17–18 (D. Md. Mar. 29, 2021). Here, TriZetto simply presented no evidence as to how any post-2016 misappropriation caused a $285 million benefit to Syntel. At most, the evidence indicated that the alleged misrepresentation caused Syntel improperly to gain $27 million in revenue (and a

55

mere $823,899 in profits) from servicing UHG. (A-498-99 (734:24-735:19); A-518-19 (806:22-807:6).)

TriZetto's causation theory was that, by using TriZetto's information to service a single customer, Syntel was able to "compete immediately with TriZetto to provide complex consulting services," avoiding the cost to develop Facets and associated materials. (SPA-17.) In other words, by providing Facets services to UHG, Syntel experienced the same level of benefit it would have received if it had spent $285 million to develop the entire Facets software platform and accompanying materials itself. The district court agreed with TriZetto that the jury could find this single use with UHG was sufficient to cause Syntel to benefit "in the form of avoided costs." (SPA-17.) But there was no evidence in the record to support that proposition, as Syntel was already competing for consulting services that used TriZetto's materials—with TriZetto's express permission at zero cost—since 2013, well before the alleged DTSA misappropriation. (*Supra* pp. 4, 6, 50–51.) But even if it were correct that Syntel received some benefit from the limited use of some alleged trade secrets to provide services to UHG, that benefit is far less than the benefit for which the jury awarded damages.

As an initial matter, there was no evidence in the record to suggest that the use of these materials gave Syntel any "head start." To the contrary, it is undisputed that Syntel properly provided Facets consulting services for CDPHP

and BSC. (A-641; A-2322-23.) Syntel began providing services to CDPHP in 2013 and to BSC in 2015. (A-641; A-2322-23.) Thus, Syntel had the ability to, and in fact did, enter the services market well before the alleged DTSA misappropriation began. Yet in the face of those undisputed facts, the district court reasoned that the ability to "compete immediately" with TriZetto supported the conclusion that Syntel "benefited in the form of avoided costs" of \$285 million. (SPA-17.) But given that Syntel had been lawfully competing with TriZetto since 2013—and had permission to use TriZetto's materials permission free of charge while doing so—there is no support for the proposition that a single act of misappropriation suddenly allowed Syntel to compete in a new manner worth \$285 million to Syntel. (A-322-23 (243:22-244:13); A-484 (601:13-15); A-494-95 (722:4-723:3); A-641.) At trial, TriZetto alleged Syntel should have obtained a third-party access agreement to service UHG. (*See* A-322-23 (243:16-244:18).) But even if UHG or TriZetto had informed Syntel that such an agreement was required under the UHG/TriZetto contract (to which Syntel was not a party (CA-44; A-321-22 (242:1-243:11)), Syntel could simply have obtained such an agreement, accessed TriZetto's materials for free, and still serviced UHG.

More broadly, the flaws in TriZetto's theory, and the due-process risks it presents, are plain to see. Under TriZetto's avoided costs theory, endorsed by the district court, Syntel would obtain the exact same \$285 million as supposed unjust

enrichment regardless of whether Syntel was authorized to use the allegedly

misappropriated materials for some customers; how any of the material was

actually used; when the alleged misappropriation occurred; how many customers it

provided Facets services to; or when or for how long those services were provided.

Under that theory, even if Syntel were authorized to use the materials for 100

customers, a single act of misappropriation (even to service an otherwise

authorized customer) would result in $285 million in avoided costs. It would also

make no difference whether Syntel made $27 million in revenue servicing a single

client in 2016, as alleged here, or $270 million in revenue servicing 100 clients

over a multiyear period: Syntel would owe TriZetto the exact same $285 million

in avoided costs. Indeed, TriZetto originally sought the same avoided-costs

damages for Syntel's pre-2016 conduct in connection with its claim for trade secret

misappropriation under New York law, before the district court made clear that

avoided-costs damages were unavailable on that claim. (*See* A-210.) Thus,

TriZetto asserted that Syntel received the full benefit of the trade secrets even

before any liability under the DTSA could exist and that Syntel received that exact

same benefit years later.

Unsurprisingly, in TriZetto's view, all roads lead to the extravagant claim

that it is entitled to $285 million in compensatory damages. That cannot be

correct. Not all misappropriation gives the defendant the benefit of the entire

amount of avoided costs, and an award based on the contrary proposition is legally infirm. *See, e.g.*, *Walmart*, 949 F.3d at 1110; *Steves & Sons*, 2018 WL 2172502, at *6.

The lack of causal relationship between the jury's avoided-costs award and any benefit obtained by Syntel as a result of alleged misappropriation is further highlighted by the permanent injunction entered here. That injunction prohibits Syntel from any future use of TriZetto's 104 claimed trade secrets and copyrighted works (other than in performing contractually-authorized work for CDPHP and BSC) even though it is required to pay the entirety of the secrets' cost. (A-2322-23.) Had Syntel used the alleged secrets for one minute, one week, one month, one year, or for the next 25 years, it would be liable for the same avoided-costs damages. The fact that avoided costs would be the same even though Syntel is enjoined from using them going forward confirms that avoided costs are not compensating TriZetto for any actual harm or actual benefit to Syntel here.

The avoided-costs award was improper and lacked the causal relationship to the alleged misappropriation that the DTSA requires. The only "unjust enrichment" here, if any, was the money Syntel made servicing UHG—which TriZetto readily calculated as $27 million in revenue (resulting in $823,899 in profits). (A-498-99 (734:24-735:19); A-518-19 (806:22-807:6).) Because the jury's avoided-costs award was improper, and because TriZetto's reasonable-

royalty calculation was also based on avoided costs, this Court should vacate the judgment below and direct the district court on remand to enter a damages award of $8.5 million in lost profits—the only other DTSA damages theory TriZetto presented to the jury—and an accordingly adjusted punitive damages award.

## CONCLUSION

The judgment of the district court in TriZetto's favor on its trade secret claims should be reversed or vacated, and the case remanded for further proceedings.

Dated: January 6, 2022        Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By*:*   */s/ Jaren Janghorbani*

Jaren Janghorbani
Nicholas P. Groombridge
Crystal Parker
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990
Emails:
jjanghorbani@paulweiss.com
ngroombridge@paulweiss.com
cparker@paulweiss.com

J. Steven Baughman
Kannon K. Shanmugam
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
Fax: (202) 223-7420
Emails:
sbaughman@paulweiss.com
kshanmugam@paulweiss.com

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS**

I, Jaren Janghorbani, counsel for appellant and member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4)(A), that the attached Brief of Plaintiffs-Appellants is proportionally spaced, has a typeface of 14 points or more, and contains 13,854 words.

January 6, 2022
/s/ *Jaren Janghorbani*
Jaren Janghorbani