# 21-1370

## United States Court of Appeals
## for the Second Circuit

SYNTEL STERLING BEST SHORES MAURITIUS LIMITED, SYNTEL, INC.,

*Plaintiffs-Counter-Defendants-Appellants,*

v.

THE TRIZETTO GROUP, INC., COGNIZANT TECHNOLOGY SOLUTIONS CORP.,

*Defendants-Counter-Claimants-Appellees.*

Appeal from the United States District Court for the Southern District
of New York, No. 1:15-cv-00211 (LGS) (SDA)

## FINAL FORM RESPONSE BRIEF OF APPELLEES

Adam R. Alper
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1400

John C. O'Quinn
Jason M. Wilcox
Hannah L. Bedard
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
(202) 389-5000

Michael W. De Vries
KIRKLAND & ELLIS LLP
555 S Flower Street
Los Angeles, CA 90071
(213) 680-8400

Leslie Schmidt
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4000

*Counsel for Defendants-Counter-Claimants-Appellees*

January 6, 2022

## CORPORATE DISCLOSURE STATEMENT

Appellee The TriZetto Group, Inc. is indirectly wholly owned by Appellee Cognizant Technology Solutions Corporation. Cognizant Technology Solutions Corporation has no parent corporation and no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS*

INTRODUCTION ........................................................................... 1

STATEMENT OF THE ISSUES ..................................................... 4

STATEMENT OF THE CASE AND THE FACTS ................................. 5

    A.    Background ................................................................. 5

    B.    Procedural History .................................................... 14

SUMMARY OF THE ARGUMENT .................................................. 20

STANDARD OF REVIEW............................................................. 25

ARGUMENT ............................................................................. 26

I.     TriZetto Adequately Identified The Trade Secrets ....................... 26

    A.    Substantial Evidence Supports The Jury's Verdict ............ 27

          1.    TriZetto's Witnesses Offered Detailed Testimony
               About The Trade Secrets .............................................. 29

          2.    Courts Have Approved Similar Methods For
               Identifying Trade Secrets, And TriZetto Was Not
               Required To Offer Greater Specificity ........................ 34

          3.    The District Court Did Not Shift The Burden
               To Syntel ................................................................. 42

    B.    TriZetto Presented Testimony And Other Evidence On
        Its Manual And Guides Trade Secrets ................................. 45

    C.    A New Trial Is Not Warranted ........................................... 46

II.    TriZetto Did Not Authorize The Use Of 102 Of The 104 Trade
     Secrets ..................................................................... 48

III.   The Jury Properly Awarded Avoided-Costs Damages For
     Unjust Enrichment ....................................................... 58

A.    Avoided Costs Are Available As Unjust-Enrichment Damages In This Case ........................................................ 62

    1.   Avoided Costs Are Available When A Defendant Uses Trade Secrets To Save Development Costs It Would Otherwise Incur ............................................... 62

    2.   Syntel's Arguments Would Upend Settled Law And Create Troubling Incentives ............................... 67

B.    Substantial Evidence Supports the Jury's Avoided-Costs Award Under The DTSA ............................................ 71

CONCLUSION .......................................................................... 77

***\* All emphasis added unless otherwise noted.***

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3M v. Pribyl,*
259 F.3d 587 (7th Cir. 2001)............................30, 32, 34, 36, 40, 41, 43

*Advance Pharm. v. U.S.,*
391 F.3d 377 (2d Cir. 2004) ............................................................. 47

*Advanced Fluid Sys. v. Huber,*
381 F. Supp. 3d 362 (M.D. Pa. 2019)............................................ 36, 41

*Agrofresh v. Essentiv,*
2020 WL 7024867 (D. Del. Nov. 30, 2020) ........................................ 38

*Matter of AmeriSciences,*
781 F. App'x 298 (5th Cir. 2019)..................................................... 59, 64

*Autodesk v. ZWCAD Software,*
2015 WL 2265479 (N.D. Cal. May 13, 2015)................................... 35, 42

*Banos v. Rhea,*
33 N.E.3d 471 (N.Y. 2015) .................................................................55

*Cash v. County of Erie,*
654 F.3d 324 (2d Cir. 2011) ............................................................. 25

*Chowdhury v. Worldtel Bangladesh Holding,*
746 F.3d 42 (2d Cir. 2014) ........................................................... 47, 48

*Comput. Assocs. v. Quest Software,*
333 F. Supp. 2d 688 (N.D. Ill. 2004).................................................. 40

*In re Cross Media Mktg.,*
2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006) ..................................... 68

*Decision Insights v. Sentia Group,*
311 F. App'x 586 (4th Cir. 2009)....................................................... 36

*DVD Copy Control Ass'n v. Bunner*,
  116 Cal. App. 4th 241 (2004) ............................................................. 45

*DVD Copy Control Ass'n v. McLaughlin*,
  2000 WL 48512 (Cal. Super. Ct. Jan. 21, 2000) ................................ 45

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
  2015 WL 9704079 (S.D.N.Y. Dec. 23, 2015) ..................................... 34

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
  31 N.Y.3d 441 (2018) ......................................................................... 19

*Epic Sys. v. Tata Consultancy Servs.*,
  980 F.3d 1117 (7th Cir. 2020) ................................... 62, 64, 65, 66, 73

*ExpertConnect v. Fowler*,
  2019 WL 3004161 (S.D.N.Y. July 10, 2019) ................................ 36, 41

*Forro Precision v. IBM*,
  673 F.2d 1045 (9th Cir. 1982) ........................................................... 33

*Givaudan Fragrances v. Krivda*,
  2013 WL 5781183 (D.N.J. Oct. 25, 2013) .......................................... 38

*GlobalTap v. Elkay Mfg.*,
  2015 WL 94235 (N.D. Ill. Jan. 5, 2015) ............................................ 38

*GlobeRanger v. Software AG U.S.A.*,
  836 F.3d 477 (5th Cir. 2016) ... 4, 34-36, 40-41, 59-60, 62-63, 68-69, 73, 76

*IDX Systems v. Epic Systems*,
  285 F.3d 581 (7th Cir. 2002) ........................................................ 38, 39

*Imax v. Cinema Techs.*,
  152 F.3d 1161 (9th Cir. 1998) ........................................................... 38

*Integrated Cash Mgmt. Servs. v. Digital Transactions*,
  920 F.2d 171 (2d Cir. 1990) .............................................................. 27

*KCG Holdings v. Khandekar*,
  2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020) ................................ 30, 40

iv

*Legg v. Ulster Cnty.*,
 979 F.3d 101 (2d Cir. 2020) ............................................................ 25

*Life Spine v. Aegis Spine*,
 8 F.4th 531 (7th Cir. 2021) .............................................................. 54

*LivePerson v. [24]7.ai*,
 2018 WL 5849025 (N.D. Cal. Nov. 7, 2018) ........................... 27, 32, 40

*Loop AI Labs v. Gatti*,
 195 F. Supp. 3d 1107 (N.D. Cal. 2016) ............................................. 38

*MacDermid Printing Sols. v. Cortron*,
 833 F.3d 172 (2d Cir. 2016) ............................................................ 25

*Matarese v. Moore-McCormack Lines*,
 158 F.2d 631 (2d Cir. 1946) ........................................................ 64, 75

*Motorola Sols. v. Hytera Commc'ns*,
 495 F. Supp. 3d 687 (N.D. Ill. 2020) ................................................ 34

*Motorola v. Lemko*,
 2012 WL 74319 (N.D. Ill. Jan. 10, 2012) .......................................... 37

*Northpoint Tech. v. MDS Am.*,
 413 F.3d 1301 (Fed. Cir. 2005) ........................................................ 48

*O'Neill v. Krzeminski*,
 839 F.2d 9 (2d Cir. 1988) ................................................................ 26

*Oakwood Labs. v. Thanoo*,
 999 F.3d 892 (3d Cir. 2012) ........................................................ 27, 42

*Olaplax v. L'Oreal USA*,
 855 F. App'x 701 (Fed. Cir. 2021) ................................................ 37, 38

*Paolitto v. John Brown E. & C.*,
 151 F.3d 60 (2d Cir. 1998) .............................................................. 25

*PaySys Int'l v. Atos Se*,
 2016 WL 7116132 (S.D.N.Y. Dec. 5, 2016) ....................................... 39

*Peerless Indus. v. Crimson AV LLC,*
2015 WL 1275908 (N.D. Ill. Mar. 17, 2015) ...................................... 34

*Quantlab Techs. v. Kuharsky,*
696 F. App'x 682 (5th Cir. 2017)....................................................... 64

*Ruckelshaus v. Monsanto,*
467 U.S. 986 (1984)............................................................................ 54

*Russo v. Ballard Med. Prods.,*
550 F.3d 1004 (10th Cir. 2008)............................................... 70, 73, 75

*Salsbury Labs. v. Merieux Labs.,*
908 F.2d 706 (11th Cir. 1990)...................................................... 68, 76

*Softel v. Dragon Med. & Sci. Commc'ns,*
118 F.3d 955 (2d Cir. 1997) ............................................................... 63

*Steves & Sons v. JELD-WEN,*
2018 WL 2172502 (E.D. Va. May 10, 2018) ...................................... 65

*Syncsort v. Innovative Routines Int'l,*
2011 WL 3651331 (D.N.J. Aug. 18, 2011) ......................................... 45

*TLS Mgmt. & Mktg. Servs. v. Rodriquez-Toledo,*
966 F.3d 46 (1st Cir. 2020) .......................................................... 39, 42

*Trandes v. Guy F. Atkinson Co.,*
996 F.2d 655 (4th Cir. 1993)....................................................... 34, 36

*U.S. v. Genovese,*
409 F. Supp. 2d 253 (S.D.N.Y. 2005)................................................ 44

*U.S. v. Restrepo,*
986 F.2d 1462 (2d Cir. 1993) ............................................................ 76

*U.S. v. Salmonese,*
352 F.3d 608 (2d Cir. 2003) ....................................................... 46, 47

*Univ. Computing v. Lykes-Youngstown,*
504 F.2d 518 (5th Cir. 1974).................................................. 63, 64, 68

*ValveTech v. Aerojet Rocketdyne,*
  2018 WL 4681799 (W.D.N.Y. Sept. 28, 2018) .................................... 38

*Vermont Microsys. v. Autodesk,*
  88 F.3d 142 (2d Cir. 1996) ................................................................. 26

*Wellogix v. Accenture,*
  716 F.3d 867 (5th Cir. 2013) ....................................................... 36, 59

## Statutes

18 U.S.C. § 1836(b) ........................................................................ 58, 63, 75

18 U.S.C. § 1839(3) ............................................................................ 43, 45

## Other Authorities

Restatement (Third) of Unfair Competition § 45 ............................. 59, 63

## INTRODUCTION

The jury correctly held Syntel accountable for its widespread theft of TriZetto's trade secrets and awarded $285 million in compensatory damages. The jury found in TriZetto's favor on every disputed issue after listening to almost a dozen witnesses and considering hundreds of documents chronicling Syntel's unlawful actions. That evidence left no doubt that Syntel built its Facets consulting business by misappropriating TriZetto's software, tools, and documentation—materials that took TriZetto many years and many hundreds of millions of dollars to develop. Syntel not only misappropriated TriZetto's technology as part of its strategy for launching an "all-out war" against TriZetto, but also misleadingly told customers and the public that the stolen materials were "our tools" and "Syntel's test cases."

On appeal, Syntel does not deny that it used over a hundred TriZetto trade secrets or that it repeatedly lied about, and attempted to conceal, that use. Instead, Syntel asks this Court to bless its conduct and overturn the jury's verdict by arguing TriZetto did not sufficiently identify the 104 trade secrets Syntel stole and that Syntel was "authorized" to take TriZetto's trade secrets (for free, no less). And Syntel

asks the Court to set aside the jury's damages award by arguing it should not have to compensate TriZetto for the significant development costs Syntel undeniably saved by misappropriating the trade secrets. Because Syntel's misconduct ultimately did not generate the $1 billion in profits it projected, Syntel contends it should get to pocket those cost savings. None of Syntel's arguments have merit.

Syntel's argument that TriZetto did not identify its trade secrets with the specificity required under the Defend Trade Secrets Act (DTSA) and New York law finds no support in principle or precedent. TriZetto linked each of the 104 trade secrets Syntel misappropriated to particular confidential exhibits, mirroring methods courts routinely approve for identifying voluminous trade secrets. Multiple witnesses described those trade secrets, discussed their development, and explained their value. This testimony—which was a significant part of the trial—along with those specific exhibits, gave Syntel more than enough notice about the boundaries of the trade secrets to defend itself, and provided sufficient evidence from which the jury could find that these were trade secrets. The law does not require more, and whether TriZetto adequately identified its trade secrets is a *fact* question the jury properly resolved in

TriZetto's favor. Syntel's arguments provide no basis for overturning those factual determinations.

Syntel was also not authorized to use those 104 trade secrets to compete against TriZetto. Syntel's use reflected a deliberate decision to misappropriate TriZetto's intellectual property. In the parties' Master Services Agreement (MSA), Syntel agreed not to "use" TriZetto's trade secrets without TriZetto's "prior consent." TriZetto never consented to Syntel using the trade secrets to service Syntel's own customers, and certainly did not do so as part of the 2012 Amendment to the MSA. Those amendments merely removed contractual provisions "related to [Syntel] being restricted from *competing* with TriZetto"—they did not authorize Syntel to use TriZetto's trade secrets while engaged in such competition. Were there any doubt, Syntel's witnesses testified "it would be flat wrong" to suggest Syntel could "use TriZetto's trade secrets to compete against TriZetto." Syntel's argument ultimately contradicts the unambiguous contractual language and, again, depends on factual assertions the jury rejected.

Finally, TriZetto offered substantial evidence of the causal connection between Syntel's conduct and the jury's $285 million avoided-

costs award. Had Syntel not misappropriated the trade secrets, it would have needed to spend at least $285 million to offer the Facets services it performed for years following the DTSA's enactment. Syntel complains it is unfair it must turn over those avoided costs because its profits turned out to be small, but its arguments mistakenly assume avoided costs do not reflect the actual *benefit* it received from misappropriating TriZetto's trade secrets. The research and development dollars that Syntel avoided spending through its misappropriation undeniably benefited Syntel. That benefit does not disappear simply because "misappropriating the trade secret turned out not to be so profitable." *GlobeRanger v. Software AG U.S.A.*, 836 F.3d 477, 500 (5th Cir. 2016). Syntel's arguments to the contrary invite a "heads-I-win-tails-you-lose" approach to unjust enrichment that would effectively eliminate avoided costs as a measure of damages, despite its well-recognized pedigree in trade-secret law.

The judgment should be affirmed in all respects.

## STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports the jury's finding that TriZetto sufficiently identified its trade secrets.

4

2.      Whether the 2012 Amendment to the MSA unambiguously eliminated the confidentiality protections in the MSA, where the Amendment deleted any provisions "related to [Syntel] being restricted from *competing* against TriZetto" but did not mention the MSA's *confidentiality* provisions.

3.      Whether the jury properly awarded avoided costs as unjust-enrichment damages for Syntel's misappropriation, where TriZetto presented substantial evidence that Syntel saved significant development costs by misappropriating TriZetto's trade secrets.

## STATEMENT OF THE CASE AND THE FACTS

### A.      Background

TriZetto is a technology company that develops innovative software and provides related services for hospitals, doctors, and health insurance companies.   A-283(165:5-8);  SPA-2.   TriZetto's Facets® platform automates and manages healthcare claim adjudication and processing, resulting in faster claims processing, significant administrative savings, and lower premiums.   A-212(8:12-14); A-223(60:5-20); A-231-32(72:11-73:6);  A-239-44(80:14-85:21).   Many large insurance companies use Facets to manage services for over 170 million people in the U.S.  A-223(60:17-20); A-285(168:17-24).

5

In addition to selling the Facets software, TriZetto offers consulting services to help its clients upgrade and customize their Facets system. A-313(196:23-25); A-402-03(386:21-387:13). Facets is an "extremely complex application[] that basically runs a health plan," and it is highly customizable to meet the specific needs of individual clients. A-205-06 (¶¶4-5); A-225(66:15-20); A-250(91:6-12); A-262-63(123:24-124:4); A-328(266:7-17); A-383(332:8-13). Laying out the full capabilities of the system takes hundreds of user guides and manuals, each one offering extensive detail about how Facets works internally and how to use it. A-227-28(68:20-69:1); A-267-71(128:6-132:2). Installing or upgrading a custom system often takes highly skilled consultants, intimately familiar with Facets, several months. A-298(181:13-25); A-366-67(305:23-306:18).

TriZetto permits Facets customers to hire third-party service providers, but customers usually hire TriZetto for their most complex projects because of TriZetto's unique software tools (sometimes called accelerators). A-224-25(65:22-66:20); A-403-05(387:1-389:2). Those tools include the Data Dictionary, Custom Code Impact Tool, and test cases and automation scripts. Without those tools, customers would struggle

6

to install and develop customized Facets systems, if they could even do so at all.

One of TriZetto's unique tools, the Data Dictionary, provides a searchable repository of the thousands of database tables and tens of thousands of database fields in Facets, with easy-to-understand descriptions of the fields and relationships between the various tables and fields. A-226(67:11-17); A-257-59(118:13-120:14). The Custom Code Impact Tool identifies the specific lines of customized code affected by a Facets upgrade, eliminating the need for clients to manually identify changes in Facets' complex database structure between versions and then manually search for customized code that must be updated to account for those changes. A-226-27(67:22-68:4); A-261-63(122:22-124:19).

TriZetto also maintains a repository of approximately 500 test cases and 13,000 automation scripts. A-266(127:3-21). When a client installs a new or upgraded version of Facets, it must be tested to ensure proper operation. A-227(68:5-11). Test cases are step-by-step instructions for validating that a specific task functions properly. A-263-66(124:20-127:7). These test cases range from simple tasks, like saving a new

patient record, to complex ones, like processing claims. A-263-66(124:20-127:7). Automation scripts streamline this testing by converting test cases into computerized scripts that perform each step automatically. A-266-67(127:8-128:2). The test cases and automation scripts are the product of substantial research and development. A-266-67(127:24-128:2).

TriZetto considers its software, tools, and guides trade secrets. They represent "the culmination of [] decades of work" and cost TriZetto over $500 million to develop. A-229(70:9-20); A-250(91:6-18); A-284(167:14-23). To protect its investments, TriZetto requires its customers to sign non-disclosure agreements, to promise to treat the software, tools, and guides as "confidential trade secrets," and to agree not to use or disclose those materials without TriZetto's express permission. A-282(156:2-5); A-290-92(173:10-175:13); A-322-23(243:22-244:8); A-391(370:19-23); CA-29. Customers access the guides through a secure online portal. A-228-29(69:2-70:8). TriZetto never shares the source code for its software or tools. A-228-29(69:2-70:8); A-246-47(87:9-88:5); A-290(173:7-9); A-346-47(284:25-285:11); A-394-95(374:14-375:1).

8

Although TriZetto performs much of its own customer service directly, sometimes it works through subcontractors. In 2010, TriZetto and Syntel entered into the MSA. In that agreement, TriZetto promised Syntel approximately $25 million in yearly minimum revenue for providing subcontracted Facets services on TriZetto's behalf. SPA-2; A-297-301(180:21-184:21). The MSA defined the "Services" to be performed by Syntel as "the services, functions, processes and responsibilities described in this Agreement." A-650(§1.01(99)) ("Services"); A-653(§3.02) ("Designated Services").

To avoid any improper use of TriZetto's confidential information, Syntel agreed TriZetto's data could not be "used by [Syntel] or [Syntel's] Agents other than in connection with providing the Services" or "commercially exploited by" Syntel "[w]ithout TriZetto's approval." A-659(§13.01). Other provisions similarly prohibited Syntel from using TriZetto's "Confidential Information" without TriZetto's "prior consent." A-661-62(§19.01). In addition to these confidentiality obligations, the contract included a *separate* non-compete provision, under which Syntel could not provide "substantially similar" services or offer any "products

9

or services" that "require technical, design, process or architectural knowledge of TriZetto's products or services." A-664-65(§29.17).

Consistent with Syntel's confidentiality obligations, TriZetto treated Syntel as a trusted business partner and gave Syntel's employees access to its trade secrets to perform services for TriZetto. A-281(155:5-8); A-299(182:18-25); A-466(516:5-13). Those employees had an unprecedented level of physical access to TriZetto's buildings, "access to the applications that were behind [TriZetto's] firewall," and "access to [TriZetto's] secure customer portal [] exchange." A-299(182:18-25). Syntel's employees had no prior Facets experience, so TriZetto trained them on its software and proprietary tools to assist TriZetto. A-233-35(74:25-76:2); A-299(182:4-9); A-473-75(567:19-569:16). TriZetto ultimately paid Syntel more than $100 million during the parties' relationship. A-218(32:21-22); A-304(187:14-22).

In 2012, TriZetto and Syntel amended the MSA. A-316-18(208:5-210:22); A-613-30. The 2012 Amendment lowered the minimum revenue commitment TriZetto promised Syntel, and in exchange, it deleted the non-competition provision (§29.17) and "any other provision in the [MSA] related to [Syntel] being restricted from competing with TriZetto." A-

10

613-14(Art.2(2)). The restrictions in §§ 13.01 and 19.01 on Syntel's use of TriZetto's confidential information remained unchanged, and the definition of "Services" likewise remained the same. A-613-30. For years after the 2012 Amendment, TriZetto continued to view its relationship with Syntel as positive and cooperative. A-235(76:3-19); A-279-80(150:23-151:10); A-304(187:8-13); A-324-25(247:11-248:10).

Syntel had a different perspective. In 2012, Syntel formed a plan "to go to war" with a "Trojan Horse" strategy to destroy TriZetto from the inside, using an "arsenal" of tools and accelerators to "target" TriZetto's customers. A-737-38; A-462(505:12-13). Those tools and accelerators would be *TriZetto's*, which Syntel would steal to achieve its near-term "$1B goal." A-639; A-638. As part of its plan, Syntel employees who were supposed to access the trade secrets only to service TriZetto's customers instead shared those secrets with Syntel's internal consulting team. A-818-20; A-1036; A-331-33(269:14-271:14); A-467(517:5-15).

Everyone at Syntel understood "[i]t would be flat wrong" to use TriZetto's trade secrets to compete against TriZetto. A-464-66(514:6-516:1); A-489-90(620:22-24, 630:1-21). But, for years, the company executed a "TriZetto Combat Plan" where, when the time was right,

11

Syntel would "go for the kill" using TriZetto's own trade secrets against it. A-1039-43; A-704. That time came in September 2014, when Cognizant announced its acquisition of TriZetto for $2.7 billion. A-295-96(178:21-179:5). Cognizant's acquisition permitted Syntel to terminate the MSA and start its "open war" with TriZetto and Cognizant. A-639; A-212(8:15-20); A-314(201:21-23).

Syntel knew it could not compete for Facets work without TriZetto's confidential information. It also knew that terminating the MSA meant the clock was ticking on its access to TriZetto's confidential information. A-704; A-335-36(273:13-274:8); A-369(308:4-20); A-739-817. Following instructions from Syntel's "Facets Architect," its employees began downloading as many confidential TriZetto materials as they could. A-336(274:15-18); A-365(304:8-14); A-368-69(307:15-308:11); A-410-11(394:7-395:5); A-704-05; A-727-29; A-739-817; A-1047-48; A-1057-61. For example, one Syntel employee asked the others, "[s]end me the list of exact [TriZetto] manuals that you need" so he could add them to Syntel's files. A-729. Syntel also downloaded more than 700 test cases and automation scripts, A-340(278:17-20), and then turned around and told

12

its customers the stolen tools and test cases were "our tools" and *Syntel's* test asset[s]." CA-3; CA-5; CA-17; A-734-35; A-1041.

But each of those tools and testing aids were rebranded versions of TriZetto's tools. Syntel's "D2 Data Generator" is a renamed version of TriZetto's data dictionary, A-315(205:20-25), A-357-58(296:23-297:3); its "Step Up Probe" was developed from TriZetto's Custom Code Impact Tool, A-315(205:8-12), A-360(299:9-16); and its "Factory" was "a repository of 3,000 plus Facets test cases" and "500 automation scripts," all copied from TriZetto, A-315(205:13-19), A-363(302:10-23), A-2107. Syntel continued advertising the stolen tools as its own through trial, and admitted using them through at least 2018. A-2030-31; A-342-43(280:15-281:10); A-488(617:9-16); A-491(631:7-23).

Syntel's strategy to steal TriZetto's trade secrets allowed it to take advantage of the cost savings it incurred from not having to spend hundreds of millions of dollars to develop its own software tools. Leveraging those cost savings, Syntel undercut TriZetto and offered its services for lower prices. A-476(571:2-15). Its pricing strategy successfully won the business of a long-time TriZetto customer, United Health Group ("UHG"). A-322(243:16-17); A-476(571:2-15); A-

13

480(582:11-23); A-2266-67(463:8-466:2). Syntel called beating TriZetto out for that contract its "first kill." A-463(508:17-22).

Syntel also lied to conceal its misappropriation. TriZetto first raised concerns about potential misappropriation in 2014, after discovering suspicious downloads. A-305-12(188:15-195:3); A-610-11; A-640; A-2103-104. Syntel assured TriZetto it would honor its confidentiality obligations (the same ones Syntel now claims the 2012 Amendment removed), even though Syntel had already misappropriated TriZetto's trade secrets. A-612. To facilitate its deception, the head of Syntel's consulting team intentionally misspelled words to frustrate future searches for emails discussing TriZetto's trade secrets. A-727-29; A-338-39(276:22-277:7). As a result, the magnitude of Syntel's theft did not become clear until years later.

## B. Procedural History

In January 2015, Syntel filed this suit in the Southern District of New York. A-172-78; SPA-2. Its complaint alleged breach of contract, misappropriation of confidential information, and intentional interference with contractual relations, which stemmed from Cognizant hiring several former Syntel employees. A-213(9:1-10); A-493(721:7-16);

14

A-511-12(774:19-775:1). Syntel claimed TriZetto owed it $3.4 million under the MSA, and asked the court to award it $6 billion in punitive damages. A-176-77(¶¶22, 24, (e)). TriZetto filed counterclaims, asserting that Syntel misappropriated trade secrets in violation of the DTSA and New York law and that Syntel's D2 Data Generator infringed TriZetto's copyrights. A-212-15(8:21-10:10, 12:21-24).

During discovery, Syntel again lied and destroyed documents to conceal its misappropriation. Soon after TriZetto filed its counterclaims, Syntel deleted nearly 300 files to cover its tracks. A-1061; A-340-42(278:22-280:13). Two members of Syntel's consulting team testified that they never accessed TriZetto's software tools despite being copied on emails distributing those trade secrets. A-2264-66(37:5-14, 462:19-25); A-2261-62(102:9-11, 103:3-4, 104:5-8); A-1035-36. Another senior manager testified Syntel never possessed a repository of TriZetto test cases and automation scripts. A-723-24. Syntel later produced hundreds of them. A-340(278:17-20).

Given this pattern of misconduct, the district court ordered a neutral forensic examination of Syntel's digital electronic devices and files. A-195-201; SPA-2. After careful review, the examiner concluded

15

"Syntel was actively creating a repository of th[e] trade secrets on its own or of its own to be used in future work." A-336(274:19-24). In addition to the deleted documents, the examiner discovered that Syntel had destroyed several computers and hidden others. A-341-42(279:6-280:13).

The district court entered a preclusion order based on those findings. SPA-2-3. The order barred Syntel from (1) "offering or presenting any evidence that it did not misappropriate and unlawfully copy TriZetto's Facets test cases and automation scripts" and (2) "offering or presenting any evidence that it independently developed any of the Platform Management Tools at issue in this case." SPA-3. Syntel tried to circumvent the preclusion order multiple times at trial, forcing the court to give three separate curative instructions to the jury. A-388-89(367:21-368:15); A-481-82(593:21-594:1); A-527(853:24-25). Syntel does not appeal the preclusion order.

TriZetto presented substantial evidence at trial that Syntel misappropriated 104 trade secrets that fell into three categories: (1) software, (2) tools, and (3) manuals and guides. A-252(113:5-10). The software category included three pieces of software: the Facets software, TriZetto's DBBLD scripts, and the upgrade framework for updating the

16

Facets database. A-252(113:11-18). The tools consisted of TriZetto's Data Dictionary, Custom Code Impact Tool, and test cases and automation scripts. A-257-67(118:1-128:4). The remaining category included confidential Facets manuals and guides. A-267-69(128:3-130:18). TriZetto introduced each manual into evidence along with the source code and other confidential material for its software and tools. A-354-55(292:23-293:7); A-2157 (DTX-1423 (A-2100); DTX-1424 (A-2101); DTX-1425 (A-2102)).

Mike Noonan, a software engineer who has worked on Facets since 1990, provided detailed testimony concerning each of TriZetto's trade secrets. For each trade secret, Mr. Noonan identified and described it, explained its value to TriZetto's business, and described the steps TriZetto took to keep it confidential. A-229(70:9-25); A-252-71(113:13-132:2). As part of his testimony, he discussed specific features of Facets' internal architecture, described one of TriZetto's test cases, and highlighted representative examples of the types of confidential information in TriZetto's guides. A-245-50(86:8-91:12); A-264-68(125:3-129:17). Chuck Sanders, another TriZetto employee, further explained how TriZetto protected its 104 trade secrets. A-287-93(170:1-176:13).

17

TriZetto's technical expert, Bryan Bergeron, also testified about the trade secrets and what makes them valuable. A-344-49(282:15-287:20). Dr. Bergeron then offered extensive testimony recounting Syntel's misappropriation, including a side-by-side comparison of the source code for TriZetto's Data Dictionary and the identical code Syntel misappropriated and marketed as its own proprietary tool. A-352-55(290:15-293:7); A-2101-02.

Syntel did not contest that it downloaded and used TriZetto's confidential software, tools, and manuals. It offered no expert testimony that disputed liability. And Syntel's counsel asked Dr. Bergeron to confirm "there is no dispute in this case that Syntel used TriZetto materials of the type that you opine are trade secrets," A-387(341:4-7), before telling the jury "I don't think anyone in the room disputes that Syntel used certain TriZetto material, *confidential material*," A-387(341:8-9).

Syntel instead framed the entire case as about "what use was proper or improper." A-387(341:13-16). Syntel's central theme was that the 2012 MSA Amendment authorized Syntel's use of TriZetto's trade secrets. Its own witnesses undermined that theory. Syntel's first

18

witness, Murli Reddy, testified "[i]t would be flat wrong" to use TriZetto's trade secrets to compete against TriZetto. A-464-66(514:6-516:1). Syntel's general counsel, Daniel Moore, confirmed "Syntel has not taken the position that the amendment … permits it to use [TriZetto's] confidential information to build competing products or services." A-490(630:12-24); A-640. Indeed, there is no contemporaneous evidence that anyone intended the 2012 Amendment to authorize Syntel to compete against TriZetto using TriZetto's trade secrets, or that Syntel believed that it had such authorization. A-236(77:16-19); A-279(150:14-20); A-311(194:12-15); A-319(215:7-16).

To support its damages claim, TriZetto presented expert testimony from Thomas Britven. He testified that Syntel saved $284.9 million in development costs through its misappropriation. A-412-19(396:1-403:12); A-425(409:7-22). Although federal law allows TriZetto to recover these avoided costs, New York law does not. *See E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 454 (2018). Mr. Britven thus also testified that Syntel would have paid a $142.4 million reasonable royalty and that TriZetto suffered at least $8.5 million in lost profits. A-412(396:1-12); A-425-26(409:23-410:19); A-428-29(412:22-413:2).

19

The jury returned a verdict for TriZetto on all counts on October 27, 2020. It found Syntel misappropriated TriZetto's trade secrets, violating both the DTSA and New York law, and infringed TriZetto's copyrights. A-2252. The jury also found against Syntel on each of its claims. A-2253. To compensate for Syntel's misappropriation, the jury awarded TriZetto $284,855,192 under the DTSA and $142,427,596 under New York law, A-2254; the jury separately awarded TriZetto $59,100,000 for copyright infringement, which is unchallenged on appeal, *id*. To avoid double recovery, the jury limited its award to $284,855,192 in compensatory damages and $569,710,384 in punitive damages.

The district court largely denied Syntel's post-trial motions, but remitted the punitive damages award. SPA-32. TriZetto agreed and accepted a reduced punitive damages award of $284,855,192. SPA-34-35. The district court also entered a permanent injunction that, with two exceptions not relevant here, enjoins Syntel from using any of the 104 trade secrets. A-2316-26.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's judgment.

20

### I. TriZetto Adequately Identified Its Trade Secrets.

Substantial evidence supports the jury's fact finding that TriZetto adequately identified its 104 trade secrets. TriZetto went above the thresholds that courts routinely apply when deciding whether a trade secret was sufficiently identified. TriZetto's fact and expert witnesses offered extensive testimony identifying each trade secret and describing how it was developed, how valuable it was, and how TriZetto kept it confidential, and they further identified the exhibits corresponding to TriZetto's trade secrets. The jury had ample evidence from which to determine whether TriZetto's asserted trade secrets were sufficiently identified. Tellingly, so did Syntel: As *Syntel* had proposed, the court provided the jury with a list of all 104 asserted trade secrets.

Syntel's argument relies on an unduly rigid construct for identifying trade secrets that is unsupported by the law. Syntel contends that TriZetto was not allowed to identify its trade secrets by document, and instead needed to parse out the secret information from any public information in each and every document. But that is not the law. Rather, a trade-secret holder only needs to describe the trade secret with sufficient particularity to separate it from matters of general knowledge

and permit the defendant to ascertain at least the boundaries of the trade secret. TriZetto absolutely did that here.

Moreover, whether TriZetto's trade secrets were adequately identified was ultimately a question for the jury. While masquerading as a legal challenge, Syntel's argument is really an attack on the jury's factual findings. But Syntel fails to show those findings are unsupported by substantial evidence. This Court should, thus, affirm.

## II. TriZetto Did Not Authorize The Use Of 102 of The 104 Trade Secrets.

The 2012 Amendment did not give Syntel the right to secretly access and download TriZetto's trade secrets and then market them as its own. Syntel argued that TriZetto authorized its use of 102 of the 104 trade secrets (it did not address two that were subject to the preclusion order), and the jury rejected that argument. Whether Syntel's argument is framed as a legal issue regarding the contract's interpretation or a factual issue based on extrinsic evidence (if the contract is ambiguous), the 2012 Amendment did not authorize Syntel's use. The 2012 Amendment only deleted the *non-compete* provisions in the MSA so that Syntel could offer *its own* consulting services like any of TriZetto's other competitors (none of which had access to its trade

22

secrets). Indeed, it left undisturbed Syntel's express confidentiality obligations under the MSA, and it did not alter the MSA's definition of "Services." Syntel's assertion that extrinsic evidence shows Syntel was authorized to use TriZetto's trade secrets raises factual issues for the jury, which was free to reject those arguments, especially in light of Syntel's lead witness's testimony that it would be "flat wrong" to interpret the 2012 Amendment as authorizing Syntel to freely use TriZetto's trade secrets. The Court should affirm the judgment on this issue, too.

## III. *The Jury Properly Awarded Avoided-Costs Damages.*

The jury's award of $285 million in compensatory damages is legally permissible and amply supported by the evidence. The DTSA allows for unjust-enrichment damages, and avoided costs are a well-recognized way of measuring unjust enrichment. The evidence showed that, by misappropriating TriZetto's trade secrets, Syntel avoided at least $285 million in research and development costs it would have otherwise incurred to independently develop the technology it misappropriated from TriZetto. Syntel did not challenge that damages calculation,

23

suggest that it could have developed the trade secrets for less, or contend that it did not need to use all of TriZetto's trade secrets.

Syntel's challenges to the jury's award and the district court's decision are unfounded. Syntel complains it did not actually receive $285 million of benefits through its misappropriation because it purportedly only made $27 million in revenue. Not true. If Syntel had not misappropriated TriZetto's trade secrets, then its supposed $27 million in revenue would have been at least a $257 million loss, because Syntel would have needed to develop its own technology. Moreover, the damages award does not open the floodgates to avoided-costs damages where unwarranted. The district court properly instructed the jury that TriZetto had the burden to prove the amount Syntel would have incurred to achieve the same result without misappropriation. That amount will differ depending on the specific facts in every case, and not every trade-secret holder will be able to prove such costs would have been incurred. Here, however, the *facts* showed that Syntel could not have competed with TriZetto unless it misappropriated TriZetto's trade secrets or independently developed its own software, tools, and guides, which would have cost at least $285 million.

24

Because avoided costs are a legally permissible measure of unjust-enrichment damages under the DTSA and the jury's damages award is supported by substantial evidence, the Court should affirm its award.

## STANDARD OF REVIEW

This Court reviews a district court's denial of judgment as a matter of law *de novo*, applying the same standard as the district court. *Cash v. County of Erie*, 654 F.3d 324, 332-33 (2d Cir. 2011). This standard puts a "heavy burden" on the movant, who is only entitled to JMOL when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Id*. at 333; *MacDermid Printing Sols. v. Cortron*, 833 F.3d 172, 180 (2d Cir. 2016). The Court "may not make credibility determinations or weigh the evidence," and "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Legg v. Ulster Cnty.*, 979 F.3d 101, 114 (2d Cir. 2020).

A damages calculation "is generally within the province of the jury, and a district court's refusal to set aside a jury award will be overturned only for abuse of discretion." *Paolitto v. John Brown E. & C.*, 151 F.3d

60, 66 (2d Cir. 1998). A reviewing court should accord great deference to a trial court's factual findings regarding damages, *Vermont Microsys. v. Autodesk*, 88 F.3d 142, 151 (2d Cir. 1996), and unless the damages award "is so high as to shock the judicial conscience and constitute a denial of justice," *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988), the Court should affirm.

## ARGUMENT

## I. TriZetto Adequately Identified The Trade Secrets

Syntel first contends that the trade secrets the jury concluded it had misappropriated are not trade secrets at all because TriZetto purportedly failed to adequately identify them. But TriZetto's witnesses spent hours describing the trade secrets, and every trade secret was admitted into evidence as a confidential exhibit. TriZetto even showed the jury side-by-side source code comparisons to prove Syntel misappropriated its tools. This was more than sufficient to identify the asserted trade secrets, as the court's instructions required the jury to do before finding misappropriation. A-523-27(849:12-853:11). There is no basis to disturb the jury's findings.

For its part, Syntel had no problem identifying the trade secrets. Before trial, it touted the trade secrets in its customer proposals,

26

spending pages discussing the benefits of (what it falsely claimed were) its "Facets Upgrade Tools & Accelerators," including the Custom Code Impact Tool, Data Dictionary, and its repository of Facets test cases and automation scripts. A-707; A-709-11; A-722; A-734-35. After trial, to comply with the court's injunction, Syntel searched for and identified for removal all 104 trade secrets from its systems, without expressing any confusion about what constituted the trade secrets. A-2335; A-2337. Syntel thus understood what the alleged trade secrets were, and so did the jury.

## A. Substantial Evidence Supports The Jury's Verdict

The existence of a trade secret, including whether it was adequately described, is a question of fact that must be "decided on a case-by-case basis." *Oakwood Labs. v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2012); *Integrated Cash Mgmt. Servs. v. Digital Transactions*, 920 F.2d 171, 174 (2d Cir. 1990). Whether a party adequately described an asserted trade secret ultimately turns on whether the description enables a defendant to defend itself at trial. *Oakwood*, 999 F.3d at 906; *LivePerson v. [24]7.ai*, 2018 WL 5849025, *9 (N.D. Cal. Nov. 7, 2018) (applying New York law).

27

This issue was squarely put to the jury. At the close of evidence, the district court provided the jury with a *jointly* submitted list of TriZetto's 104 proposed trade secrets, which included the corresponding trade secret number and title (as it appears on the exhibit list) for each one. A-520-27(846:18-853:11); A-2120-27; A-2132-33. This belies Syntel's suggestion that TriZetto did not "identify[] for the jury the trial exhibit in which each individual secret was located," as well as its assertion that the jury was "not even told what to call" the trade secrets. Syntel Br. 23, 36. Furthermore, the court's final jury instructions expressly referenced this list, A-521(847:11-18), and stated that TriZetto was required to prove by a preponderance of the evidence "[w]hat the trade secret is—*i.e.*, TriZetto must identify the trade secret with adequate specificity so you can understand what TriZetto was protecting and requiring to be maintained as a secret," A-526-27(852:20-853:2). Thus, the jury was required to look at each item and determine whether it was a trade secret before it could find misappropriation. It concluded the trade secrets were sufficiently identified and also misappropriated. A-2251-60. Substantial evidence supports the verdict, which should not be overturned.

### 1. TriZetto's Witnesses Offered Detailed Testimony About The Trade Secrets

Several witnesses identified TriZetto's trade secrets and described them with great specificity, going beyond what the law requires. After providing key background on TriZetto's development of its trade-secret software and service offerings, Mr. Noonan described each of the three categories of trade secrets and identified the particular secrets in each. A-237-50(78:24-91:18); A-252-68(113:3-129:10). Then, for each trade secret, he (1) explained the technology, (2) how it was developed, (3) the value of that trade secret, and (4) how the material was maintained as confidential. A-224-29(65:1-70:25); A-252-71(113:13-132:2). Syntel had the opportunity to cross-examine Mr. Noonan, but did not ask him one question about his identification or explanation of the trade secrets. And while Syntel suggests that the exhibits corresponding to each trade secret were never identified, that is incorrect—Dr. Bergeron provided that information to the jury. A-2270-81; A-345(283:2-13); A-350(288:3-19); A-358-62(297:5-301:10); A-364-65(303:8-304:6); A-368-69(307:12-308:1).

**Software Trade Secrets (Nos. 1-3)**. TriZetto presented extensive evidence describing its software trade secrets: the Facets software code, DBBLD scripts, and upgrade framework. A-252(113:11-18). After

29

providing an overview of Facets' functionality, Mr. Noonan addressed the database tables and claim data model at "the heart of Facets." A-236-50(77:20-91:5); CA-31-39. Mr. Noonan confirmed this model and the rest of Facets internal architecture is not publicly available. A-246-47(87:5-88:5). He then described the DBBLD and upgrade framework software, the competitive advantage those software applications provide, and the steps TriZetto takes to keep those applications confidential. A-225-26(66:21-67:8); A-254-56(15:6-117:25); A-287-88(170:24-171:14); A-344-45(282:18-283:1). TriZetto introduced the source code for all three of its software trade secrets into evidence. A-354-55(292:23-293:7); A-2157 (DTX-1423 (A-2100); DTX-1424 (A-2101); DTX-1425 (A-2102)).

This is more than enough information for the jury to identify the asserted trade secrets and determine whether the Facets software, DBBLD scripts, and upgrade framework merit trade-secret protection. *See 3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) (identifying 500-plus pages of internal documents); *KCG Holdings v. Khandekar*, 2020 WL 1189302, *10 (S.D.N.Y. Mar. 12, 2020) (identifying entire source code).

**Tools Trade Secrets (Nos. 4, 102-104).** TriZetto likewise offered substantial detail about its tools and accelerators. Mr. Noonan not only

30

described how the Data Dictionary operates, but also the confidential window it opens into "th[e] data structure that we built at the heart of Facets." A-257-61(118:1-122:21). Unlike situations where significant aspects of the trade secrets are publicly known or where versions of the trade secrets are used by others in the industry, the jury heard that Mr. Noonan, in his 30 years of experience, has "[n]ever seen anything like the Facets Data Dictionary out in the world" and he would not "expect to see the Data Dictionary software code or the documents describing it out in the public" domain. A-261(122:1-10). With respect to the Custom Code Impact Tool, Mr. Noonan described what the tool does, explained how it benefits customers, and confirmed TriZetto keeps that source code confidential. A-261-63(122:22-124:19). The source code for both the Data Dictionary and the Custom Code Impact Tool were admitted into evidence. A-2157 (DTX-1423 (A-2100); DTX-1425 (A-2102)).

Mr. Noonan separately addressed the test cases and automation scripts trade secrets. A-227(68:5-11); A-263-67(124:20-128:4). Those trade secrets, as he explained to the jury, contain detailed instructions about how to test Facets after an installation or upgrade. A-227(68:5-11). These are not generic items generally known in the field—TriZetto

31

has "been building these with Facets [] over the course of Facets' life" and they are completely confidential.  A-263-67(124:20-128:4).  To illustrate a test case, Mr. Noonan showed the jury a specific one for processing a claim and explained the steps it performs.  A-263-66(124:25-127:2) (describing CA-18-24).  Syntel nowhere explains how showing the jury a specific test script in a specific document falls short of sufficiently identifying the trade secret.  The law makes clear it is sufficient.  *See LivePerson*, 2018 WL 5849025, *9-10.

**Manuals and Guides Trade Secrets (Nos. 5-101).**  TriZetto also sufficiently identified the trade secrets in its 96 specific guides and manuals.  A-227-28(68:17-69:16); A-267-71(128:6-132:2).  Those manuals are not like user guides for off-the-shelf software.  A-267(128:12-18).  In connection with explaining how to use the software, they dive deeply into "the inner workings of Facets" and the software's internal architecture.  A-267(128:6-18).  Mr. Noonan used TriZetto's data model guide as an example, showing the jury its disclosures of TriZetto's unique and valuable data model.  A-246-50(87:8-91:5); A-267-68(128:22-129:5); CA-30-32.  *See 3M*, 259 F.3d at 595-96.

TriZetto further identified its 104 trade secrets through evidence of Syntel's misappropriation. *See Forro Precision v. IBM*, 673 F.2d 1045, 1057 (9th Cir. 1982). Syntel knew *exactly* what TriZetto's most valuable trade secrets were. Syntel commanded its employees to steal the very trade secrets that were presented to the jury to further its "go to war" plan. A-736-37; A-1039-43. Moreover, Syntel recognized the value of these trade secrets by advertising them as "differentiators" such that there is "[n]o other alternative[]" to Syntel. A-1039-43; A-2030-31; CA-7-17. This was confirmed by Dr. Bergeron, who showed the jury, among other things, a side-by-side comparison of the source code for TriZetto's Data Dictionary and Syntel's D2 Data Generator. A-352-55(290:15-293:7); A-2101-02. He even identified the specific Data Dictionary files Syntel copied. A-356-57(295:21-296:18). Dr. Bergeron also showed the jury a specific file Syntel created using TriZetto's Custom Code Impact Tool and a specific test case Syntel misappropriated. A-358-59(297:21-298:23); A-362(302:4-23); A-818; A-2135 (DTX-96 (A-819-1034); DTX-108 (CA-18-24)).

Far from disputing the identification that Mr. Noonan and Dr. Bergeron offered, one of Syntel's core trial themes was that TriZetto

authorized its use of these specific materials. Syntel's counsel told Dr. Bergeron "I think there is no dispute in this case that Syntel used TriZetto materials of the type that you opine are trade secrets" and "I don't think anyone in the room disputes that Syntel used certain TriZetto material, confidential material." A-387(341:4-9). Even on appeal, Syntel does not dispute that it misappropriated over 700 test cases and automation scripts. Syntel Br. 37 n.6; A-363(302:4-23). Like Syntel and its counsel, the jury understood what confidential TriZetto materials Syntel used and recognized using those materials without TriZetto's permission was wrong.

## 2. Courts Have Approved Similar Methods For Identifying Trade Secrets, And TriZetto Was Not Required To Offer Greater Specificity

TriZetto's identification of the set of information and materials Syntel misappropriated mirrors methods courts routinely approve. *See GlobeRanger*, 836 F.3d at 492-93; *3M*, 259 F.3d at 595-96; *Trandes v. Guy F. Atkinson Co.*, 996 F.2d 655, 661-63 (4th Cir. 1993); *Motorola Sols. v. Hytera Commc'ns*, 495 F. Supp. 3d 687, 698-99 (N.D. Ill. 2020); *Peerless Indus. v. Crimson AV LLC*, 2015 WL 1275908, *12 (N.D. Ill. Mar. 17, 2015); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 2015 WL 9704079, *8-9

34

(S.D.N.Y. Dec. 23, 2015). If accepted, Syntel's arguments would work a revolution in trade-secret law and erect a substantial barrier to trade-secret protection by requiring line-by-line granularity. No court has required such an approach where the materials in question have been treated confidentially, let alone in circumstances like those here, where the trade secrets are in a unique field. Syntel's position would also lead to perverse results: Either trade-secret trials would need to be held largely behind closed doors or trade-secret owners would be forced to publicly disclose their trade secrets—information that derives value from remaining confidential—to prevail. *See Autodesk v. ZWCAD Software*, 2015 WL 2265479, *5-6 (N.D. Cal. May 13, 2015). Like its other arguments, Syntel's "seal the courtroom" theory seeks to impose a heightened burden no court has adopted.

*GlobeRanger* is directly on point. There, the Fifth Circuit held the trade-secret owner adequately identified its trade secrets by producing its proprietary software's source code. 836 F.3d at 492-93. Advancing the same argument as Syntel, the defendant argued the trade-secret owner must identify "more specific, 'concrete secrets'" within that code. *Id.* at 493. The Fifth Circuit disagreed, holding the specificity

35

requirement does not "requir[e] greater specificity than what GlobeRanger provided at trial." *Id.*; *Wellogix v. Accenture*, 716 F.3d 867, 875 (5th Cir. 2013).

Other circuit courts reached similar conclusions in *3M* and *Trandes*. In *3M*, the Seventh Circuit held the trade-secret owner sufficiently identified its secrets as over 500 pages of internal operating procedures and manuals. 259 F.3d at 595-96. In doing so, the court rejected the argument that a trade-secret plaintiff must "divulge what specific information contained within" its manuals "could be considered secret." *Id.* at 595. Identifying the manuals sufficed. *Trandes* likewise held producing source code is an acceptable method of identifying a software trade secret—no parsing between the lines of code that are and are not "secret" is necessary. 996 F.2d at 661-63; *see Decision Insights v. Sentia Group*, 311 F. App'x 586, 593-94 (4th Cir. 2009).

District courts across the country apply the same standard. *See ExpertConnect v. Fowler*, 2019 WL 3004161, *4 (S.D.N.Y. July 10, 2019) (identifying "specific *documents* that are alleged to be trade secrets"); *Advanced Fluid Sys. v. Huber*, 381 F. Supp. 3d 362, 386-87 (M.D. Pa. 2019) (identifying specific documents, providing those documents to the

36

jury, and explaining how defendant used them); *Motorola v. Lemko*, 2012 WL 74319, *16-19 (N.D. Ill. Jan. 10, 2012) (identifying documents "by Bates number, file type, and/or location").

The clear principle reflected in the case law is that a trade-secret owner adequately identifies its alleged secrets by offering a description of those claimed secrets and introducing into evidence the source code or documents embodying that confidential information. That is exactly what TriZetto did by introducing those materials into evidence and offering detailed testimony about what makes its software, tools, and guides confidential and valuable.

Syntel, by contrast, relies on several fact-bound decisions finding either a plaintiff failed to adequately identify its secrets or that its secrets were, for the most part, not really "secret." The first category does not require a more specific identification than TriZetto provided; instead, those cases are examples where plaintiffs failed to meet the standards described above. For example, the plaintiff in *Olaplax v. L'Oreal USA* identified its trade secrets "only at [a] high level of generality" as "business information," "testing and know how," and "dead ends and trial and errors." 855 F. App'x 701, 706, 709 (Fed. Cir. 2021). It did not point

to any specific documents, identify its testing methods, or offer evidence that *any* of the information in these broad categories was "not *readily ascertainable* by proper means." *Id.* at 710-711. *Givaudan Fragrances v. Krivda* is also distinguishable. 2013 WL 5781183 (D.N.J. Oct. 25, 2013). There, the plaintiff alleged that an employee stole 616 fragrance formulas, but for 582 of them it only offered a list of the fragrance trade names and refused to produce any information about the formulas themselves. *Id.* at *5-7.[1]

The second set of cases Syntel relies on are entirely different from the circumstances here. The plaintiffs in those cases all claimed seemingly public information were trade secrets. In *IDX Systems v. Epic Systems*, it was "details" about a software system "that ordinary users of

---

[1] Syntel's other cases are similarly distinguishable. *See GlobalTap v. Elkay Mfg.*, 2015 WL 94235, *5 (N.D. Ill. Jan. 5, 2015) (identified trade secrets as the "concept of outdoor bottle filling stations" and "Marketing Plan"); *ValveTech v. Aerojet Rocketdyne*, 2018 WL 4681799, *6 (W.D.N.Y. Sept. 28, 2018) (identified "trade secrets relating to its schematics" and "research and development information"); *Imax v. Cinema Techs.*, 152 F.3d 1161, 1166-67 (9th Cir. 1998) (identified trade secrets as "including every dimension and tolerance that defines or reflects [its] design"); *Agrofresh v. Essentiv*, 2020 WL 7024867, *6-7 (D. Del. Nov. 30, 2020) ("testing protocols"); *Loop AI Labs v. Gatti*, 195 F. Supp. 3d 1107, 1112-14 (N.D. Cal. 2016) (public document describing secrets in vague terms like "[a]pplication of Plaintiff's technology to the analysis of big data…").

the software could observe" without any confidentiality restrictions. 285 F.3d 581, 584 (7th Cir. 2002). *TLS Management & Marketing Services v. Rodriquez-Toledo* involved "public and general information" about tax laws and a tax arbitrage strategy that "[t]o a large extent … consisted of public knowledge." 966 F.3d 46, 53-54 (1st Cir. 2020). As for *PaySys International v. Atos Se*, the alleged trade secrets were source code "written thirty years ago and licensed to people all over the world" and no facts suggested the code "ha[d] not become otherwise known to the general public" as a result of this broad licensing program. 2016 WL 7116132, *11 (S.D.N.Y. Dec. 5, 2016).

In those narrow circumstances where the evidence strongly suggested a lack of "secretness," the courts concluded that to have a trade secret in the first place, the trade-secret plaintiff must affirmatively "separate the [purported] trade secrets from the other information … known to the trade" for the obvious reason that the asserted trade secret otherwise appears to be nothing more than public information and general knowledge. *TLS*, 966 F.3d at 54 (quoting *IDX*, 285 F.3d at 584). That is not the situation here. TriZetto presented substantial evidence that its software, tools, and guides were unique in the field, kept

confidential, and could not be accessed without a confidentiality agreement. A-256(117:16-22); A-264(125:18-15); A-266(127:22-23); A-268(129:18-23); A-287-93(170:2-176:13); A-345-48(283:14-286:24); CA-45.

Syntel nonetheless insists TriZetto should have "identif[ied] the portions of each exhibit reflecting the 'secret' information." Syntel Br. 23-24. In other words, Syntel claims TriZetto was required to separate—*in its own confidential internal documents and source code*—what was generally known from what was not. No such requirement exists. *See GlobeRanger*, 836 F.3d at 492-93; *3M*, 259 F.3d at 595-96; *KCG Holdings*, 2020 WL 1189302, *10; *Comput. Assocs. v. Quest Software*, 333 F. Supp. 2d 688, 695 (N.D. Ill. 2004); *LivePerson*, 2018 WL 5849025, *10. A trade-secret owner is not required to walk line-by-line through its documents identifying every statement that is confidential. *3M*, 359 F.3d at 595-96. Evidence that TriZetto's exhibits, which reveal the inner workings of TriZetto's proprietary software, were created entirely within TriZetto and were kept secret presumptively establishes that the materials were "secret" and not generally available.

Nothing more is required. For that reason, Syntel's mischaracterization of Mr. Bergeron's testimony falls flat. Syntel Br. 9, 24. Syntel suggests that he improperly considered TriZetto's documents in their entirety to be trade secrets, but in reality, he considered the fact that TriZetto kept all of its documents confidential and testified that TriZetto's protected documents embodied trade secrets. A-368-71(307:12-310:20).

It makes no difference that TriZetto's trade secrets "involve[] a sophisticated and highly complex system." Syntel Br. 22. The trade secrets in *GlobeRanger*, *3M*, and other cases involved equally complex technologies, yet those cases still held the plaintiff sufficiently identified the trade secrets by identifying specific documents and offering testimony describing them. *See GlobeRanger*, 836 F.3d at 492-93; *3M*, 259 F.3d at 595-96; *ExpertConnect*, 2019 WL 3004161, *4; *Advanced Fluid*, 381 F. Supp. 3d at 386-87. To be sure, where a trade-secret plaintiff's assertions rely on vague labels or facially public information, that may not be enough. But TriZetto identified specific materials, and is not claiming trade-secret protection over public knowledge by putting

41

well-known facts in documents marked confidential. *See TLS*, 966 F.3d at 56.

Syntel is wrong that adequately identifying a trade secret requires distinguishing specific secret information within the document from non-secret information. Syntel Br. 26. "A plaintiff need not spell out the details of the trade secret." *Autodesk*, 2015 WL 2265479, *5. It is instead enough to describe the secret in sufficient detail to permit the defendant and the jury "to ascertain at least the boundaries within which the secret lies." *Oakwood*, 999 F.3d at 906-907. TriZetto satisfied that standard by describing the trade secrets in concrete terms and introducing into evidence sealed documents the jurors could review to learn the secret details. A-2329-33.

### 3. The District Court Did Not Shift The Burden To Syntel

Syntel contends the district court shifted the burden to Syntel to prove what was public, but it identifies no errors in the court's jury instructions. The burden remained on TriZetto to "identify [each] trade secret with adequate specificity" and then prove the secret was "not generally known," was "not readily discoverable," "derives independent economic value from not being known," and was adequately protected by

42

TriZetto. A-522-27(848:11-853:2); *see* 18 U.S.C. § 1839(3). TriZetto offered substantial evidence on each of these points for the reasons discussed above.

Syntel's real objection is that the jury rejected its factual argument that some of the secrets were publicly available. The jury was not required to accept Syntel's argument that the Facets source code was not a trade secret because part of it was filed with the Copyright Office. A-2033-36; A-2037. Filing the first and last twenty-five pages of code does not affect trade-secret protection for a document with thousands of pages of code TriZetto never submitted. Likewise, Syntel never linked TriZetto's patents to any of the trade secrets, and those patents nowhere disclose any source code. A-383(332:16-24); A-398(378:2-4). Similarly, the jury was entitled to find TriZetto adequately identified the trade secrets in its manuals even though they include a few sentences describing QWERTY keyboards and HMO plans. These are custom-made, unique documents, and as the case law demonstrates, even lengthy, confidential manuals that include significantly more "material[]" which would fall in the public domain" than a quick overview of a keyboard still remain trade secrets. *3M*, 259 F.3d at 596.

43

Syntel's other arguments take liberties with the record. Dr. Bergeron did not "admit[]"three earlier versions of TriZetto's guides and manuals were publicly available. Syntel Br. 29. Syntel's counsel downloaded those materials from what Dr. Bergeron characterized as "a piracy website." A-395-96(375:20-376:6). When asked about those guides during cross-examination, Dr. Bergeron testified "I don't know if you'd say" those guides were "publicly available." A-378(326:9-12). There is no evidence about who uploaded the materials or how long they were available on the Internet. A-392-93(372:11-373:13). The district court thus ruled that Syntel could not introduce those materials into evidence or reference Dr. Bergeron's testimony concerning those materials in its closing. A-2250.

Regardless, the jury could reasonably conclude that illegally posted copies of old guides and manuals did not render any of TriZetto's trade secrets publicly available or generally known. A-523(849:2-4); A-526(852:3-5). It is well-settled that a "trade secret does not lose its protection … if it is temporarily, accidentally or illicitly released to the public, provided it does not become 'generally known' or 'readily ascertainable *through proper means*.'" *U.S. v. Genovese*, 409 F. Supp. 2d

44

253, 257 (S.D.N.Y. 2005) (quoting § 1839(3)(B)); *DVD Copy Control Ass'n v. Bunner*, 116 Cal. App. 4th 241, 251 (2004); *Syncsort v. Innovative Routines Int'l*, 2011 WL 3651331, *13 (D.N.J. Aug. 18, 2011). To hold otherwise "would do nothing less than encourage misappropriators of trade secrets to post the fruits of their wrongdoing on the Internet as quickly as possible and as widely as possible." *DVD Copy Control Ass'n v. McLaughlin*, 2000 WL 48512, *3 (Cal. Super. Ct. Jan. 21, 2000). The jury rightly chose not to endorse such perverse incentives.

TriZetto's trade secrets were more than adequately identified, and Syntel's novel arguments to the contrary should be rejected.

## B.   TriZetto Presented Testimony And Other Evidence On Its Manual And Guides Trade Secrets

Syntel takes special aim at TriZetto's ninety-six manuals and guides. According to Syntel, "TriZetto did not offer any testimony specific to" those documents. Syntel Br. 32. That is not true. As discussed above, Mr. Noonan testified those guides reveal "the inner workings of Facets," the "heart" of the software, and "describe[] in a technical way the architecture of our database." A-246-47(87:8-88:19); A-267-69(128:6-130:18). He used TriZetto's data model guide as an example, showing the jury detailed architectural information on several pages of that manual.

45

A-246-50(87:8-91:5); A-267-68(128:22-129:5); CA-30-32. Dr. Bergeron pointed the jury to the audit records and emails identifying by name the manuals Syntel downloaded. A-369(308:3-20); A-728; A-365(304:8-14) (DTX-87 (A-739-817)).

This testimony is more than enough to identify what each manual and guide trade secret "really is," Syntel Br. 34, but TriZetto's evidence did not end with Mr. Noonan's and Dr. Bergeron's testimony. TriZetto admitted all ninety-six manuals and guides into evidence. The jury was free to examine the exhibits themselves to determine whether they qualified as trade secrets. TriZetto "encouraged" the jury to "look at the evidence in the jury room." A-530(882:2-11). And Dr. Bergeron presented several demonstratives linking individual manuals to specific exhibits. A-345(283:2-13). Although demonstratives are not evidence, they can help the jury connect the names of specific trade secrets to the evidence.

## C.   A New Trial Is Not Warranted

Even if the Court concludes TriZetto failed to adequately identify some or all of the manual and guide trade secrets, there is no need for a new trial. Syntel makes no argument that the jury rested its verdict on a "mistake about the law." *U.S. v. Salmonese*, 352 F.3d 608, 624 (2d Cir.

2003). Rather, Syntel argues the jury made a "mistake concerning the weight or the factual import of the evidence." *Id.* Thus, so long as there is sufficient evidence to support misappropriation of *any* trade secret, a new liability trial is unnecessary. *Advance Pharm. v. U.S.*, 391 F.3d 377, 391 (2d Cir. 2004).

Before any new trial could be granted, Syntel must also prove that any error was not harmless. *Chowdhury v. Worldtel Bangladesh Holding*, 746 F.3d 42, 50 (2d Cir. 2014) (adopting a "harmless error gloss onto the basic principle" of the general-verdict rule). Syntel suffered no harm because there is "adequate evidentiary support for a jury to find [Syntel] liable." *Id.* Given the jury's $285 million verdict, it is clear the verdict did not rest solely on the guides and manuals (for which TriZetto requested only $189 million in compensatory damages). A-423(407:15-18).

The jury must have found that Syntel also misappropriated at least one of the other trade secrets. TriZetto's witnesses explained that, for Syntel to independently develop any *one* of the software or tools trade secrets, Syntel would have needed access to the full Facets software platform. A-225-27(66:21-68:4); A-252-61(113:13-122:21); A-351(289:17-

47

19); A-361(300:21-25). Based on that testimony, Mr. Britven explained that if Syntel misappropriated any *one* of the software or tools trade secrets, it should be liable for the full $284.9 million in compensatory damages. A-419(403:2-12); A-438-39(427:15-428:12). To set aside the jury's damages award, it is thus not enough for Syntel to prevail as to a subset of the trade secrets; rather, Syntel must show that the verdict with respect to *all of the software and tools trade secrets* was insufficiently supported by the evidence. Any purported error would otherwise be harmless. *Chowdhury*, 746 F.3d at 50; *Northpoint Tech. v. MDS Am.*, 413 F.3d 1301, 1312 (Fed. Cir. 2005). Syntel cannot make that showing here; substantial evidence shows each of 104 items TriZetto identified are trade secrets.

## II. TriZetto Did Not Authorize The Use Of 102 Of The 104 Trade Secrets

Syntel separately contends that the 2012 Amendment to the MSA authorized it to use 102 of the 104 trade secrets. (Syntel concedes that it misappropriated TriZetto's test and automation scripts.) The 2012 Amendment did nothing of the sort—it certainly did not "authorize" Syntel to covertly use TriZetto's trade secrets and falsely market them as Syntel's own proprietary technology. Without any language in the

48

contract expressly supporting Syntel's position, Syntel contends the parties *implicitly* amended the MSA to give Syntel the right to use the trade secrets to compete against TriZetto. That is absurd. Parties do not implicitly give away trade secrets they spent $285 million developing. As Syntel's own witness acknowledged, "[i]t would be flat wrong" to use TriZetto's trade secrets to compete against TriZetto. A-464-66(514:6-516:1); A-489(620:22-24).

The district court accordingly rejected Syntel's interpretation of the 2012 Amendment for two separate and independent reasons: (1) it is at odds with the unambiguous terms of the parties' agreements as a matter of law, and (2) even if the agreements were ambiguous, the jury considered and rejected Syntel's interpretation. Either way, the 2012 Amendment did not authorize Syntel's massive theft.

Three restrictions in the original MSA are relevant here. The first two restrictions prevent Syntel from using any trade secrets without TriZetto's permission. Under Section 13.01, Syntel cannot "use[]" TriZetto's intellectual property "other than in connection with providing the Services" under the agreement. A-659(§13.01); A-651(§1.01(125)) (defining "TriZetto Data"). Those "Services" are only ones that TriZetto

49

subcontracted with Syntel to provide.  A-650(§1.01(99)); A-653(§3.02); A-655-56(§4.01); A-663(§25.01(1)).  Syntel similarly agreed in Section 19.01 not to "use" or "disclose Confidential Information" without TriZetto's "consent."        A-661-62(§19.01);    A-647(§1.01(13))    ("Confidential Information").  The final restriction, in Section 29.17, prevented Syntel from competing against TriZetto for Facets consulting work.  A-664-65(§29.17(1)).  That provision encompassed any *competition* by Syntel; it was not directed to Syntel's *use* of TriZetto's technology—which was separately restricted by §§ 13.01 and 19.01.

The 2012 Amendment removed the non-compete provision in "Section 29.17 and any other provision in the Agreement related to [Syntel] being restricted from competing with TriZetto," but did not change Syntel's obligations under Sections 13.01 and 19.01.  A-614(Art.2(2)).  The Amendment does not mention either provision.  Instead, it merely allowed Syntel to compete with TriZetto using Syntel's own technology, and put it on an equal footing with TriZetto's other competitors, none of whom had a license to use TriZetto's trade secrets to compete against TriZetto.  A-319(215:3-6); A-403(387:1-13).  (In some cases, TriZetto agreed to third-party access agreements ("TPAA"), which

allowed third-party service providers to use some of TriZetto's confidential information for limited purposes when servicing a specific customer. *E.g.*, A-641.)

Reading the 2012 Amendment to authorize Syntel's use of TriZetto's trade secrets would require rewriting the terms of the parties' agreement. It is uncontested that Syntel's position finds no support in the Amendment's express provisions. Syntel instead contends that by eliminating restriction on competition, the 2012 Amendment "*effectively expanded*" the definition of "Services" to encompass any services Syntel performed "for third parties in competition with TriZetto"—even though not subcontracted by TriZetto—thereby authorizing Syntel to use the trade secrets under the terms of Section 13.01. Syntel Br. 41. That is nonsense.

Syntel's convoluted reasoning—that the parties made such a counterintuitive, *implied* change to the definition of "Services"—is inconsistent with the Amendment's *actual* changes to the contract. While the Amendment made numerous edits to specific provisions of the MSA, it did not change the definition of "Services." In fact, when the Amendment states that Section 29.17 and any other "related" non-

compete provisions are deleted, it identifies the definitions that are impacted—"Noncompetition Services," "Restricted Period," and "TriZetto Products." A-614(Art.2(1)); A-648-49(§§1.01(58), (73)); A-652(§1.01(132)). "Services" is not on that list and is not referenced anywhere in the Amendment.

Adopting Syntel's post-hoc re-definition of "Services" is also inconsistent with the MSA's terms. For all "Services," Syntel must provide reports to TriZetto, which include tracking against project plans, estimates, budgets, and staff recruitment and retention—precisely because it is acting a subcontractor, not a competitor. Those requirements make no sense if "Services" includes competing services. A-654(§3.12); A-667-702. And of course Syntel did not try to comply with those requirements in offering its competing services using TriZetto's stolen trade secrets—belying the notion it ever believed the made-for-litigation rationalization its lawyers offered at trial.

Similarly, the MSA defines "Service Delivery Organizations" as "the personnel of Service Provider [Syntel Mauritius] and Service Provider Agents who provide *the Services*," A-649(§1.01(77)), and requires that "*[a]ll* members of the Service Delivery Organization shall

52

be dedicated on a *full time basis to the TriZetto account*," A-657(§10.03(13)). By definition, "Services" cannot encompass Syntel's *competitive* efforts because everyone performing Services must be dedicated full time *to TriZetto's account*, not another Syntel customer's. Other provisions likewise require Syntel to perform the Services at TriZetto-approved locations, A-666(§2.03), deliver manuals describing how the Services will be performed for TriZetto's approval, A-658(§11.03), and seek advance approval of the quality controls Syntel will follow when performing the Services, A-660-61(§18.08(1)). None of these provisions make sense if "Services" includes services Syntel performs for third parties. Syntel's attempt to jam a square peg into a round hole simply will not work.

Even if the 2012 Amendment had somehow implicitly changed the definition of "Services," Syntel still could not use TriZetto's trade secrets to offer competing services. The 2012 MSA separately prohibits Syntel from "commercially exploit[ing]" any "TriZetto Data." A-659(§13.01(3)). Modifying the definition of Services (implicitly or otherwise), would not remove that restriction.

53

Syntel's alternative argument, that the 2012 Amendment "deleted Sections 13.01 and 19.01 in their entirety" is equally divorced from the agreement's language and common sense. Syntel Br. 40, 42-43. Syntel contends both provisions fall within the catch-all deleting "any [] provision in the Agreement related to [Syntel] being restricted from competing with TriZetto," A-614(Art.2(2)), but that interpretation finds no support in the MSA's language. Sections 13.01 and 19.01 recite confidentiality protections, not non-compete provisions.

Eliminating those provisions would also have far-reaching consequences. Not only could Syntel use TriZetto's trade secrets to compete against TriZetto, but Syntel could also publicly disclose them. *See* A-659(§13.01) (TriZetto's confidential information "shall not be … provided to third parties"); A-661-62(§19.01) (Syntel must treat TriZetto's "Confidential Information as confidential" and cannot "disseminate" or "disclose" that information without TriZetto's "prior consent"). Such public disclosure would destroy trade-secret protection for those materials, significantly reducing the value of intellectual property TriZetto spent decades developing. *See Ruckelshaus v. Monsanto*, 467 U.S. 986, 1002 (1984); *Life Spine v. Aegis Spine*, 8 F.4th 531, 540 (7th Cir.

2021). The notion that TriZetto agreed to such extraordinary terms without saying so is fanciful. Parties do not alter fundamental aspects of their contractual relationship in vague terms or through catch-all provisions.

Syntel's remaining arguments are irrelevant and wrong. Syntel relies on two pieces of extrinsic evidence to support its interpretation, but such evidence only matters if a contract is *ambiguous*. *See Banos v. Rhea*, 33 N.E.3d 471, 475 (N.Y. 2015). Syntel must show its interpretation of the 2012 Amendment is *unambiguously* correct, however, to overcome the jury's verdict that the 2012 Amendment did not authorize Syntel's use of TriZetto's trade secrets.

If the Court does resort to extrinsic evidence, there is no basis for reweighing that evidence. Syntel's strained reading is inconsistent with the testimony of every witness asked about the 2012 Amendment. Mr. Reddy, who was in charge of Syntel's competing services and Syntel's relationship with TriZetto, agreed that "when Syntel was competing against TriZetto, Syntel was not allowed to use TriZetto's proprietary, confidential, trade secret or copyrighted information." A-465(515:1-16); A-467(517:7-13). Mr. Moore confirmed "Syntel has not taken the position

55

that the amendment ... permits it to use [TriZetto's] confidential information to build competing products or services." A-490(630:12-24); A-640. TriZetto's witnesses likewise rejected the interpretation advanced by Syntel's lawyers. A-236(77:16-19); A-279(150:14-20); A-311(194:12-15); A-319(215:7-16). There is no evidence anyone at Syntel or TriZetto believed Syntel had the right to use the trade secrets to build a competing business when the misappropriation occurred.

The jury appropriately gave Syntel's competing evidence little weight. Syntel relies on Mr. Reddy's testimony that TriZetto congratulated Syntel on winning Capitol District Physicians Health Plan's ("CDPHP") business. Syntel Br. 42. There is no evidence corroborating that testimony, and the jury was not required to accept Mr. Reddy's self-serving testimony. TriZetto also supposedly offered its congratulations in 2013, *years before discovering Syntel's massive theft*. *Id.* at 6, 42 (citing A-452-53(476:22-477:8)). By purportedly congratulating Syntel, TriZetto did not approve of conduct Syntel kept hidden.

Syntel likewise incorrectly contends the evidence shows it could not compete without TriZetto's trade secrets. Syntel Br. 43. Undisputed

56

evidence established Syntel could compete for "less complex" and "low-end" consulting work without using TriZetto's trade secrets, just like multiple other service providers. A-319(215:3-6); A-403(387:1-13). Even for the "complex" work that required use of the types of tools TriZetto's trade secrets protect, Syntel had options other than misappropriation. A-366-68(305:21-307:3); A-404-05(388:23-389:2). Nothing prevented Syntel from doing its own independent development at its own expense. A-334-35(272:20-273:12); A-372-73(311:8-312:4); A-405(389:7-14); A-407(391:3-9).

Finally, Syntel unfairly criticizes the district court's post-trial order. The court did not "defer to the jury" when interpreting the 2012 Amendment. Syntel Br. 38. The court held that even "[a]s amended in 2012, the MSA is unambiguous—*as a matter of law*—that Syntel was free to compete with TriZetto but that Syntel was still obligated by the MSA's confidentiality provisions." SPA-6. As an alternative holding, the court held that, if the 2012 Amendment were ambiguous, the jury "rejected Syntel's interpretation of the [] Amendment," and its findings were "not seriously erroneous or contrary to the overwhelming evidence." *Id.* Finding Syntel's contract theory is wrong for two different reasons is not

57

an "error," Syntel Br. 39, and neither is observing that Syntel waited until after trial to recast its reading of the MSA as a legal question.

The unambiguous terms of the amended MSA are clear and so is the extrinsic evidence: TriZetto did not give Syntel a blanket license to use all of the trade secrets TriZetto spent years and hundreds of millions of dollars developing. By using those trade secrets anyway, Syntel misappropriated TriZetto's intellectual property in violation of the DTSA and New York law.

## III. The Jury Properly Awarded Avoided-Costs Damages For Unjust Enrichment

The jury awarded TriZetto $285 million in compensatory damages based on the research and develop costs Syntel saved by misappropriating TriZetto's trade secrets. These are the costs Syntel would have otherwise incurred to possess, use, and offer those technologies to its customers. That award is legally permissible and amply supported by the evidence.

Under the DTSA, a trade-secret holder may be "award[ed]… damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss." 18 U.S.C. § 1836(b)(3)(B)(i)(II). Unjust enrichment can be

58

measured in a number of ways, including "the development costs the defendant avoided by the misappropriation." *Matter of AmeriSciences*, 781 F. App'x 298, 309 (5th Cir. 2019); *GlobeRanger*, 836 F.3d at 499; *Wellogix*, 716 F.3d at 879. By misappropriating TriZetto's trade secrets, Syntel saved years of effort and at least $285 million in development costs.

Syntel's arguments for overturning the jury's damages award commit three fundamental mistakes. First, Syntel claims that avoided costs do not reflect the "actual benefit" it received from misappropriating TriZetto's secrets. Syntel Br. 46, 51, 54. Not so. Avoided costs measure *Syntel's actual savings* from misappropriating the trade secrets. *See* Restatement (Third) of Unfair Competition § 45, cmt. d, f. The research and development dollars that Syntel avoided spending benefited Syntel, giving it the ability to compete with TriZetto years earlier than it otherwise could have. A-400-01(383:3-11, 385:16-20). The $27 million in revenues Syntel claims it made from its Facets consulting work would have been at least a $257 million loss at that point, if Syntel had developed its own software, tools, and manuals rather than misappropriating TriZetto's. A-415-25(399:1-409:22); A-267-71(128:6-

59

132:2); A-2282-88.[2]    Whether Syntel translated those significant cost savings into significant profits before it was enjoined from continuing to use the fruits of its misappropriation is legally and economically irrelevant. *See GlobeRanger*, 836 F.3d at 500.

Second, Syntel criticizes a caricature of the district court's decision. The court did not hold that "the floor for damages in every DTSA case is the entire cost of developing the alleged trade secrets." Syntel Br. 51. A plaintiff, as the district court instructed the jury, must prove "the amount that [a defendant] would have incurred to achieve the same result without the use of the appropriated trade secret." A-529(868:21-23). This will not always be the trade secret's entire development cost. A defendant could show it had a lower-cost alternative, only needed to use part of the trade secret, or could have developed the trade secret more efficiently. Syntel could not make those showings here because the evidence established misappropriating or attempting to independently

---

[2] Syntel's $27 million figure likely underestimates its actual revenues. Syntel refused to produce any financial information after the second quarter of 2018, despite its expert's admission that it "would be typical" to "issue a supplement with the data up to the time of trial." A-503-05(759:20-761:22); A-443(463:17-21); A-515(795:2-19).

develop the trade secrets were its only options.  A-329-37(267:11-275:24); A-349(287:6-16); A-398-401(378:14-379:14, 383:3-11, 385:16-20); A-404-05(388:23-389:2).

Third, Syntel re-litigates factual questions the jury properly resolved.  The jury was free to reject Syntel's argument that it did not need the software trade secrets and that Syntel's "cost of using" the trade secrets "was zero."  Syntel Br. 52.  A company does not surreptitiously download over 100 trade secrets, and then lie and destroy documents to conceal its misappropriation, if it could have used those secrets for free.  A-331-33(269:14-271:14),    A-339-42(277:14-280:13),    A-362-63(301:18-302:8),    A-390(369:16-20),    A-467(517:5-15),    A-818-19,    A-1036 (downloads);    A-338-42(276:22-280:13),    A-727-29,    A-1057-61 (destruction); A-2264-66(37:5-14, 462:19-25), A-2261-62(102:9-11, 103:3-4, 104:5-8), A-723-24, A-1035 (lies).  The jury's compensatory damages award is supported by substantial evidence and should be affirmed.

### A. Avoided Costs Are Available As Unjust-Enrichment Damages In This Case

#### 1. Avoided Costs Are Available When A Defendant Uses Trade Secrets To Save Development Costs It Would Otherwise Incur

Syntel concedes that the DTSA permits unjust-enrichment damages, but seeks to impose artificial restrictions on when avoided costs are available. Nothing in the DTSA or the cases awarding avoided costs support those artificial limitations. Courts instead take a "flexible and imaginative approach to damages calculations in trade secret misappropriation cases" that recognizes avoided costs are a significant benefit a defendant often receives. *GlobeRanger*, 836 F.3d at 499; *Epic Sys. v. Tata Consultancy Servs.*, 980 F.3d 1117, 1130 (7th Cir. 2020).

The significant benefit from avoided costs does not disappear when a jury is "readily able to calculate both" the profits the defendant unjustly earned by misappropriating a trade secret and the plaintiff's resulting losses. Syntel Br. 47. Plaintiffs "are not limited to damages based on the misappropriator's profits," even when those profits are known. *GlobeRanger*, 836 F.3d at 500. The ultimate question when determining unjust-enrichment damages is "not what profits the infringer has made … but what *advantage* has he derived from his use" of the trade secrets.

62

*Id.* Avoided costs are one important advantage a trade-secret defendant often gains. *See Restatement (Third) of Unfair Competition* § 45, cmt. f.

The DTSA is even clearer that a plaintiff can recover avoided costs even when its own lost profits "are readily calculable." Syntel Br. 47. Congress provided that a plaintiff can recover *both* "damages for actual loss caused by the misappropriation of the trade secret; *and* damages for any unjust enrichment" the defendant received. 18 U.S.C. § 1836(b)(3)(B)(i). There is no statutory exception that forces a plaintiff to choose between lost profits and unjust-enrichment damages when the unjust-enrichment award is based on the research and development costs a defendant saved.

Equally misguided is Syntel's argument that avoided costs are available only when a defendant misappropriated "the full value of the trade secrets." Syntel Br. 49. Syntel bases this argument on a series of cases addressing when a plaintiff can seek its own development costs *as a measure of its own losses. See Softel v. Dragon Med. & Sci. Commc'ns*, 118 F.3d 955, 969 (2d Cir. 1997); *Univ. Computing v. Lykes-Youngstown*, 504 F.2d 518, 535-37 (5th Cir. 1974). In that specific context, courts have held a plaintiff may recover "the total value of the secret," including its

63

"development costs," only if the misappropriation destroys the secret's value. *Univ. Computing*, 504 F.2d at 535, 539. A plaintiff has not actually lost its entire development costs unless the secret becomes worthless.

An unjust-enrichment award, by contrast, measures *what a defendant gained* by misappropriating a trade secret, *not what the plaintiff lost*. *Epic*, 980 F.3d at 1130; *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 634 (2d Cir. 1946). The development costs Syntel saved do not depend on whether it robbed TriZetto of the full value of its trade secrets. Syntel's cost savings remain the same regardless of whether the value of the trade secrets to TriZetto went up, down, or remained the same.

For similar reasons, no court has held avoided costs are available only when a defendant "launches a competing product" or "gains a head start." Syntel Br. 49. A defendant can unjustly avoid development costs even if it misappropriates the trade secret for other reasons, such as entering a different market or using trade secrets to negotiate better prices from suppliers. *See Quantlab Techs. v. Kuharsky*, 696 F. App'x 682, 689-90 (5th Cir. 2017); *AmeriSciences*, 781 F. App'x at 302-03. The

64

test for awarding avoided costs is instead a simple one: did the defendant use the trade secrets "to avoid the research and development costs that would normally be necessary" to achieve its business objectives? *Steves & Sons v. JELD-WEN*, 2018 WL 2172502, *5-6 (E.D. Va. May 10, 2018); *see Epic*, 980 F.3d at 1130 ("the measurement is context dependent").

But Syntel did use the misappropriated trade secrets to offer a competing product and gain a head start. Its Facets consulting services directly competed against TriZetto for business, including the UHG contract Syntel ultimately won. Indeed, that was the whole point of its plan to "go to war" with TriZetto using "an arsenal" of TriZetto's trade secrets. A-322(243:16-17); A-477-79(578:15-580:16); A-487-88(616:17-617:1); A-734-35; A-737; A-2266-67(463:8-466:2). Syntel needed the trade secrets to enter that market. A-351(289:17-19); A-361(300:21-25); A-365-68(304:25-307:3). Nothing in principle or precedent supports an arbitrary rule that Syntel must turn over its avoided development costs for a competing product, but can keep its avoided costs for a competing service. Moreover, Syntel re-labeled TriZetto's trade secrets as its own, which it then listed as the top "Syntel" "Value-Add[s]" in its marketing

65

materials. A-342-43(280:15-281:10); A-339-40(277:8-278:7); A-478-79(579:10-580:16); A-730-31; A-2030-31. That is not just offering a competing product; it is using direct copies of TriZetto's trade secrets to compete.

By misappropriating TriZetto's trade secrets, Syntel accelerated its entry into the complex services market. The software, tools, and guides Syntel misappropriated represent "the culmination of [] decades of work" and significant financial investments. A-229(70:9-20); A-250(91:6-18); A-284(167:14-23); A-400-01(383:3-11, 385:16-20); A-431(417:3-19); A-436(423:17-25); A-441-42(459:5-460:18); A-516(796:7-17). Using the trade secrets, Syntel "leapfrogged over the research and development phase and all the associated time" to "go right to market" and compete with TriZetto. A-401-02(385:16-386:9). Skipping those steps provided Syntel a head start that could only have been achieved through misappropriation. *See Epic*, 980 F.3d at 1130.

Syntel's contention that it did not receive any benefit from using the trade secrets after the DTSA's effective date is meritless. It makes no difference that Syntel never offered a software product that competed directly against Facets. The jury found that Syntel *used* the software

66

trade secrets without permission, advertised the advantages of those trade secrets in its marketing materials, and benefited from its unauthorized use. A-364-68(303:11-307:10); A-423-25(407:19-409:6); A-2135 (DTX-87 (A-739-817)); A-2021-27; A-2030-31.

It is likewise irrelevant that Syntel first offered consulting services to CDPHP in 2013, three years before the DTSA's May 2016 effective date. Syntel Br. 50. Syntel's work for CDPHP was governed by a TPAA with TriZetto that limited the permissible uses of TriZetto's confidential information to enumerated services for CDPHP. A-483-84(600:14-601:15); A-641. That TPAA did not give Syntel the right to use TriZetto's trade secrets beyond the agreed-upon scope for CDPHP, and certainly not to develop a broader competing business with other customers. A-641. There is no evidence Syntel could have offered services to the broader Facets market before or after the DTSA was enacted without the misappropriated trade secrets.

### 2. Syntel's Arguments Would Upend Settled Law And Create Troubling Incentives

Syntel's other arguments against the damages award have been rejected by other courts and mischaracterize the district court's decision. Syntel first protests that the avoided-costs award is "orders of magnitude

greater than" its profits. Syntel Br. 54. But avoided-cost awards frequently exceed the defendant's profits resulting from its misappropriation. *See GlobeRanger*, 836 F.3d at 499-500; *Salsbury Labs. v. Merieux Labs.*, 908 F.2d 706, 714-15 (11th Cir. 1990). In *GlobeRanger*, for instance, the Fifth Circuit affirmed a $19.7 million avoided-costs award even though the defendant only earned $860,000 in profits. 836 F.3d at 499-500. *Salsbury* upheld $1 million in avoided costs for developing a vaccine that only generated a $52,000 profit. 908 F.2d at 714-15. Both decisions reflect the principle that "the lack of actual profits does not insulate [] defendants from being obliged to pay for what they have wrongly obtained in the mistaken belief their theft would benefit them." *Univ. Computing*, 504 F.2d at 536; *In re Cross Media Mktg.*, 2006 WL 2337177, *6 (S.D.N.Y. Aug. 11, 2006). Were the rule otherwise, a defendant could unjustly keep its avoided costs if caught early, before it could leverage those secrets into significant profits.

Worse still, under Syntel's view, avoided costs would be a dead-letter. They would only be available when a trade-secret holder would not want them—when disgorgement of the infringer's profits exceeds its avoided costs. That is not the law, nor should it be. Defendants often

68

overestimate the profits they will earn from misappropriating others' intellectual property.  Here, Syntel projected its misappropriation would create a $1 billion opportunity and generate $100 million per year.  A-638-39.  Like others who misappropriate trade secrets, Syntel "should not benefit from hindsight perspective that its gamble of misappropriating the trade secret turned out not to be so profitable."  *GlobeRanger*, 836 F.3d at 500.

Syntel attempts to limit *GlobeRanger* to its facts, asserting that the defendant there used the trade secrets to develop its own product, but that is a meaningless distinction.  Just as the defendant in *GlobeRanger* "used the full value of the trade secrets when it incorporated them into a new competing product," Syntel Br. 52, Syntel used the full value of TriZetto's trade secrets by building its services business on those stolen trade secrets.  TriZetto does not allow competitors to use its trade secrets and market them as their own "at no cost."  *Id*.

Awarding avoided costs that exceed a defendant's profits does not "effectively award[] punitive damages."  *Id*.  Avoided costs are not "punishment" for unwise business "risks" or measured by a defendant's "'unrealized' potential profits."  *Id*. at 53.  They measure the actual value

69

received from the misappropriation, thereby compensating the plaintiff for the research and development costs a defendant unjustly avoided through misappropriation. *See Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1021 (10th Cir. 2008) (unjust-enrichment damages "ensure that misappropriators are not allowed to keep ill-gotten gains from their unlawful acts"). Transferring those cost savings from the misappropriator to the trade-secret owner is not an arbitrary deprivation of property, but rather a necessary part of restoring the parties to the financial position they would have been in had the misappropriation not occurred. Misappropriators would otherwise face no meaningful consequences unless their misappropriation pays handsome profits.

The damages award in this case breaks no new ground. The district court did not instruct the jury that the entire cost of developing the alleged trade secrets is the floor for damages in every DTSA case or that the jurors could ignore the actual financial benefit to Syntel. Syntel Br. 51. TriZetto had the burden to prove "the amount that Syntel would have incurred to achieve the same result without the use of the appropriated trade secret." A-529(868:21-23). This measure of avoided costs will sometimes be less than the full cost of developing a trade secret. In cases

where the defendant saved few expenses from misappropriating the trade secret—either because it had less costly alternatives to independent development or because it needed only some of the secret information—its avoided costs will be minimal. But the magnitude of Syntel's theft in this case is staggering and Syntel could have legitimately competed against TriZetto only if it had independently developed the materials it misappropriated. A-329-37(267:11-275:24); A-349(287:6-16); A-398-401(378:14-379:14, 383:3-11, 385:16-20); A-404-05(388:23-389:2). Having received a massive financial benefit from misappropriating those secrets, there is nothing unjust about the jury awarding that benefit as unjust-enrichment damages.

## B. Substantial Evidence Supports the Jury's Avoided-Costs Award Under The DTSA

The causal connection between Syntel's misappropriation and the avoided-costs award is clear. Without misappropriating TriZetto's trade secrets, Syntel would have needed to spend at least $285 million (likely more) to independently develop the trade secrets. A-400-01(383:3-11, 385:16-20); A-431(417:3-19); A-436(423:17-25); A-441-42(459:5-460:18). Syntel benefited from saving those hundreds of millions of dollars when it used TriZetto's trade secrets after the DTSA was enacted. Syntel

71

repeatedly passed off TriZetto's trade secrets as its own in order to compete with TriZetto. A-479(580:4-16); A-735 ("Our Tools"); A-2030-31; A-1041; A-722.

Syntel does not dispute that it used TriZetto's trade secrets after the DTSA's May 2016 effective date. UHG's Facets upgrade occurred in November 2016. A-367-68(306:19-307:3). Syntel advertised its ongoing use of the tools trade secrets through trial. A-2030-31; A-2106-07. Syntel's advertisements highlighted its use of TriZetto's trade secrets, touting that it "leverag[ed]" Facets "tools and accelerators" like the "Step-up probe," "D2 Data Generator," a "[r]epository with 3,000+ FACETS test cases and 500+ automation scripts," and other "[p]latform [m]anagement tools." A-2031; A-2107.

TriZetto presented substantial evidence that Syntel used its trade secrets while performing Facets services, and Syntel's own financial records established that it actually performed these services for customers other than UHG after May 11, 2016. A-255-59(116:2-120:1); A-263(124:5-16); A-342-43(280:14-281:10); A-347(285:12-22); A-360-61(299:18-300:20); A-367-68(306:23-307:10); A-498-500(734:24-736:7); A-503-04(759:12-760:6); A-725-26; A-728; A-1037; A-1045; A-2021-27; CA-

40-41. Mr. Moore agreed that as of 2018, "Syntel continued to use tools in connection with providing Facets services." A-488(617:13-16). Other evidence established Syntel continued using TriZetto's manuals and guides. A-369-73(308:21-312:7); A-1049(¶4). Syntel "[n]ever" "stop[ped] using TriZetto's asserted trade secrets." A-373(312:5-7).

Syntel's assertion that it only used the trade secrets to provide services to UHG is not only wrong, but legally irrelevant. To calculate avoided costs, it does not matter whether Syntel used the trade secrets to service a single client or 100. Avoided costs are not a proxy for lost profits, *Epic*, 980 F.3d at 1130; *Russo*, 550 F.3d at 1021; *GlobeRanger*, 836 F.3d at 500, and Syntel's cost savings do not depend on the number of clients served or the revenue generated. Syntel would have needed to independently develop the trade secrets to legitimately offer its Facets services to even one client. A-329-37(267:11-275:24); A-349(287:6-16); A-398-401(378:14-379:14, 383:3-11, 385:16-20); A-404-05(388:23-389:2).

The jury's damages award also does not charge Syntel for the value of "the entire Facets software platform." Syntel Br. 55. TriZetto did not seek its total development costs, which exceeded $500 million, let alone the total value of Facets. A-434(421:1-6); A-436(423:17-25). TriZetto

73

sought only the costs Syntel avoided through its misappropriation. A-430-31(416:15-417:19). The jury reasonably concluded that those savings totaled $285 million.

The jury correctly rejected Syntel's argument that it could have "accessed TriZetto's materials for free." Syntel Br. 57. Syntel suggests it could have requested a TPAA from TriZetto, but no TPAA would have authorized copying confidential code from TriZetto's data dictionary into a competing tool that Syntel claimed was its own proprietary solution. A-331-35(269:9-273:7); A-351-52(289:21-290:3); A-730-31. Syntel's conduct likewise belies its claim that it could have obtained a no-cost TPAA. Not only did Syntel conceal its theft during this litigation, it expressly acknowledged in a board meeting that TriZetto could "refuse to sign TPAA," preventing Syntel's use of TriZetto's trade secrets. A-633. Syntel knew TriZetto was under no obligation to sign additional TPAAs and had no financial incentive to do so.

Syntel's other causation arguments are a grab bag of non-sequiturs. The permanent injunction sheds no light on whether Syntel's misappropriation generated significant cost savings. The injunction prevents future misappropriation and future lost profits, while avoided

costs compensate TriZetto for Syntel's past actions based on what Syntel would have spent to independently develop the misappropriated trade secrets. SPA-27-28; 18 U.S.C. § 1836(b)(3)(B)(i) (authorizing lost profits "*and*" unjust-enrichment damages). And an avoided-costs award does not confer a compulsory license to use the trade secrets. It reflects the benefits Syntel unjustly gained from having and using the trade secrets in the past, not the trade secrets' value on a forward-looking basis. *Russo*, 550 F.3d at 1021. Regardless, even if there were tension between awarding avoided costs and entering an injunction, that would at most suggest the district court erred by entering an injunction—a decision unchallenged on appeal—not that the jury's avoided-costs award is improper. Syntel's related argument that avoided costs are the upper-most ceiling on trade-secret damages is unavailing for similar reasons. Avoided costs and other unjust enrichment remedies measure the benefit Syntel actually derived from using the trade secrets, not the amount it would have been willing to pay in a hypothetical arms-length negotiation. *See Matarese*, 158 F.2d at 634.[3]

---

[3] Syntel asserts in a footnote that the $142 million reasonable royalty the jury awarded as an alternative remedy is also improper. Syntel Br. 48 n.7. Syntel waived that argument below by raising it too late and waived

That leaves Syntel's meritless fair notice and due process concerns. There is nothing unforeseeable about a damages award that orders a defendant to compensate the trade-secret owner for development costs the defendant avoided by using the trade secrets, even if those costs exceed the defendant's resulting profits. Avoided costs are a well-established remedy for trade-secret misappropriation, and courts have warned that "plaintiffs are not limited to damages based on the misappropriator's profits." *GlobeRanger*, 836 F.3d at 500; *Salsbury*, 908 F.2d at 714-15. But even if a large avoided-costs award could sometimes raise fair notice concerns, those concerns do not exist here. Syntel should have known it risked significant liability when it chose to misappropriate TriZetto's trade secrets in pursuit of a $1 billion opportunity. A-638-39. Due process does not promise Syntel a free pass because its theft "turned out not to be so profitable." *GlobeRanger*, 836 F.3d at 500.

---

it on appeal by only raising it in a footnote. *U.S. v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993). Regardless, Mr. Britven sufficiently tied his opinions to the facts of this case. A-406-09(390:7-393:3); A-427-28(411:14-412:21); A-431-33(417:23-419:16). Thus, even if Syntel were to prevail on its avoided-cost argument, TriZetto is at least entitled to a $142 million reasonable royalty.

Further disproving any due process concerns, Syntel itself is a multi-billion dollar enterprise that is bigger than TriZetto. After TriZetto was purchased by Cognizant in 2015 for $2.7 billion, A-295-96(178:21-179:20), Syntel was purchased by Atos, an international IT company, in 2018 for $3.4 billion, A-507-08(763:25-764:13); A-2108-14. The purchase announcement touted Syntel's intellectual property, A-2110, but Syntel knew full well that "its" intellectual property was actually stolen TriZetto trade secrets it used to make itself "the leading third-party provider of Facets services." A-2115-16; A-505-10(761:23-766:2). Syntel cannot be surprised that the jury agreed TriZetto's trade secrets were valuable.

The avoided-costs award was legally proper and directly connected to the savings Syntel realized through its misappropriation. Overturning that aspect of the jury's verdict would give Syntel a significant windfall and send the wrong message—that companies can attempt to launch new products or services using misappropriated trade secrets risk-free; if the new offering is unsuccessful, there would be no meaningful financial consequences. This would represent a radical change in trade-secret law.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment.

77

January 6, 2022                          Respectfully submitted,

                                         /s/ *John C. O'Quinn*
                                         John C. O'Quinn
                                         Jason M. Wilcox
                                         Hannah L. Bedard
                                         KIRKLAND & ELLIS LLP
                                         1301 Pennsylvania Avenue, NW
                                         Washington, DC 20004
                                         (202) 389-5000

                                         Michael W. De Vries
                                         KIRKLAND & ELLIS LLP
                                         555 S. Flower Street
                                         Los Angeles, CA 90071
                                         (213) 680-8400

                                         Adam R. Alper
                                         KIRKLAND & ELLIS LLP
                                         555 California Street
                                         San Fransisco, CA 94104
                                         (415) 439-1400

                                         Leslie Schmidt
                                         KIRKLAND & ELLIS LLP
                                         601 Lexington Ave.
                                         New York, NY 10022
                                         (212) 446-4000

                                         *Counsel for Appellees*

## CERTIFICATE OF SERVICE

On January 6, 2022, the foregoing document was submitted to the Court through the CM/ECF system. All participants in the case are represented by registered CM/ECF users and will be notified of filing electronically by the CM/ECF system.

Pursuant to Local Rule 31.1, Appellees submitted six paper copies of the foregoing document to the Court.

*/s/ John C. O'Quinn*

## CERTIFICATE OF TYPE-VOLUME AND
## TYPEFACE COMPLIANCE

This brief complies with the type-volume and typeface limitations specified in Federal Rule of Appellate Procedure 32(a)(7) and Second Circuit Rule 32.1(a)(4)(A). This brief is proportionally spaced, uses 14-point Century Schoolbook font, and, according to the word processing system used to prepare this document, contains 13,998 words.

*/s/ John C. O'Quinn*