**21-1370**
*Syntel Sterling Best Shores Mauritius, Ltd., et al. v. The TriZetto Grp., Inc., et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2022

(Argued: September 19, 2022 | Decided: May 25, 2023)

Docket No. 21-1370

SYNTEL STERLING BEST SHORES MAURITIUS LIMITED, SYNTEL, INC.,

*Plaintiffs-Counter-Defendants-Appellants*,

v.

THE TRIZETTO GROUP, INC., COGNIZANT TECHNOLOGY SOLUTIONS
CORP.,

*Defendants-Counter-Claimants-Appellees*.[†]

_____

Before:
 RAGGI, WESLEY, and LOHIER, *Circuit Judges*.

Plaintiffs-Counter-Defendants-Appellants Syntel Sterling Best Shores
Mauritius Limited and Syntel, Inc. (collectively, "Syntel") appeal from a final
judgment entered in favor of Defendants-Counter-Claimants-Appellees The
TriZetto Group, Inc. and Cognizant Technology Solutions Corporation
(collectively, "TriZetto") after a jury trial in the United States District Court for

_____

[†]    The Clerk of the Court is directed to amend the official caption as set forth above.

CERTIFIED COPY ISSUED ON 05/25/2023

Southern District of New York (Schofield, *J*.). Relevant here, the district court ordered and entered judgment that (1) Syntel misappropriated 104 of TriZetto's trade secrets in violation of the Defend Trade Secrets Act ("DTSA") and New York law; and (2) TriZetto's $284,855,192 compensatory damages award was proper under the DTSA.

On appeal, Syntel challenges the district court's judgment with respect to liability and damages. Regarding liability, Syntel advances two related arguments. First, Syntel argues TriZetto failed to identify any trade secret with the requisite specificity at trial. Second, Syntel argues there was no misappropriation as a matter of law because TriZetto authorized Syntel's use of the trade secrets. Both arguments fail. With respect to damages, Syntel argues upholding a compensatory damages award based on avoided development costs is impermissible under the DTSA in this case. Under these specific facts, we agree. Accordingly, we **AFFIRM IN PART** and **VACATE IN PART** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

––––––––––––––––––

KANNON K. SHANMUGAM, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC (Jaren Janghorbani, Nicholas P. Groombridge, Crystal L. Parker, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; J. Steven Baughman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, *on the brief*), *for Plaintiffs-Counter-Defendants-Appellants*.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, DC (Jason M. Wilcox, Hannah L. Bedard, Kirkland & Ellis LLP, Washington, DC; Michael W. De Vries, Kirkland & Ellis LLP, Los Angeles, CA; Adam R. Alper, Kirkland & Ellis LLP, San Francisco, CA; Leslie Schmidt, Kirkland & Ellis LLP, New York, NY, *on the brief*), *for Defendants-Counter-Claimants-Appellees*.

––––––––––––––––––

WESLEY, *Circuit Judge*:

This is a tale of trade secrets.[1]  The TriZetto Group, Inc. and Cognizant Technology Solutions Corporation (collectively, "TriZetto") develop software used by healthcare insurance companies.  One software product is Facets®, a platform which automates and manages common healthcare administrative tasks such as claim processing, claim adjudication, and billing.  TriZetto licenses its Facets software to healthcare insurance companies to manage services for over 170 million people in America.  But installing, upgrading, and customizing Facets to fit a client's specific needs requires a significant amount of time and skilled personnel.  As a part of its business, TriZetto also provides Facets customization and implementation consulting services to clients.  TriZetto competes in this services market with third-party companies because it permits Facets customers to choose their service provider.[2]

Although TriZetto performs much of its own Facets related services, sometimes it utilizes subcontractors.  One such subcontractor was Syntel Sterling Best Shores Mauritius Limited ("Syntel").  In 2010, TriZetto and Syntel entered into a Master Services Agreement ("MSA").  In exchange for a guaranteed annual payment from TriZetto, Syntel agreed to support Facets customers on TriZetto's

---

[1]    Citations to "App'x" refer to the Appendix, citations to "Special App'x" refer to Plaintiffs-Counter-Defendants-Appellants' Special Appendix, and citations to "Trial Tr." refer to portions of the trial transcript that do not appear in the Appendices.

[2]    Depending on the terms of TriZetto's contract with each customer, a third-party provider can either (1) freely access TriZetto's materials through the customer or (2) enter into a separate contract directly with TriZetto—a so-called "third-party access agreement"—to gain access to TriZetto's materials for purposes of servicing the customer.  In each case, the service provider is allowed to use TriZetto's guides, manuals, and other Facets materials for free.

behalf instead of competing with TriZetto for Facets services contracts. Under the MSA, TriZetto treated Syntel as a trusted business partner and gave Syntel's employees access to its trade secrets to perform Facets-related services for TriZetto.

TriZetto and Syntel enjoyed a cooperative relationship for much of their partnership, working together to outperform the Facets services competition. The relationship remained cooperative even after the parties' 2012 amendment to the MSA, which allowed Syntel to compete directly with TriZetto in the consulting services market ("Amended MSA").[3]

However, things began to sour in 2014 when Cognizant—Syntel's competitor—acquired TriZetto. As was its right, Syntel terminated the MSA and requested payment of rebates owed under the contract. In response, TriZetto refused to pay the rebates and raised concerns about Syntel continuing to use its confidential trade secrets post-termination.

Syntel filed suit against TriZetto in the Southern District of New York. Syntel's amended complaint alleged breach of the MSA, misappropriation of confidential information, and intentional interference with contractual relations, stemming from Cognizant hiring several Syntel employees to perform Facets work for TriZetto. TriZetto counterclaimed, alleging, as relevant here, that Syntel misappropriated trade secrets related to Facets in violation of the Defend Trade

---

[3]    In exchange for lowering TriZetto's payment commitment, the parties deleted a provision barring Syntel from competing for Facets services contracts and "any other provision in the [MSA] related to [Syntel] being restricted from competing with TriZetto." App'x 613–14.

Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and New York law. TriZetto also asserted that Syntel infringed its copyrights.

During discovery, Syntel destroyed documents and computers. As a result, the district court ordered a neutral forensic examination of Syntel's digital electronic devices and files, which revealed that "Syntel was actively creating a repository of [TriZetto's] trade secrets on its own or of its own to be used in future work." App'x 336. Based on those findings, the district court entered a preclusion order to sanction Syntel for continued discovery misconduct ("Preclusion Order").[4] Citing the Preclusion Order, the district court instructed the jury that Syntel had misappropriated 2 of the 104 claimed trade secrets—TriZetto's so-called "test cases" and "automation scripts." App'x 2131. Syntel does not appeal the Preclusion Order.

At trial, TriZetto elected to proceed with misappropriation counterclaims on its Facets trade secrets, which TriZetto characterized as falling into three categories: (1) software; (2) tools; and (3) guides and manuals. Syntel did not contest that it downloaded and used the trade secrets. It instead framed the entire case as about "what use was proper or improper." App'x 387. Its central theme was that the Amended MSA authorized Syntel to compete for Facets services business while using TriZetto's trade secrets.

---

[4] "The Preclusion Order barred Syntel from (1) 'offering or presenting any evidence that it did not misappropriate and unlawfully copy TriZetto's Facets test cases and automation scripts' and (2) 'offering or presenting any evidence that it independently developed any of the Platform Management Tools at issue in this case.'" Special App'x 3.

With respect to damages, TriZetto presented expert testimony indicating Syntel avoided expending roughly $285 million in research and development costs through its misappropriation.  This is not the full amount that TriZetto spent on research and development to make Facets; that is over $500 million.  As TriZetto's damages expert testified at trial, the $285 million figure represented a portion of the overall research and development costs, specifically, those costs for the period between 2004 to 2014, excluding client-funded research and development.  The record does not reflect the reason that the $285 million figure was so limited.  The expert also testified that TriZetto lost $8.5 million in profits, based on a Facets software upgrade Syntel performed for United Health Group ("UHG") using TriZetto's trade secrets.

The district court charged the jury on "several types of compensatory damages that could be available to TriZetto for its trade secret misappropriation claims:"  (1) TriZetto's lost profits, (2) Syntel's unjust enrichment, and (3) "reasonable royalty" damages, which were available "[a]s an alternative to lost profits or unjust enrichment."  Trial Tr. 867:17–19, 869:8–9.  As to unjust enrichment, the district court instructed:

> Unjust enrichment is the amount that Syntel benefited as a result of any misappropriation.  One form of unjust enrichment can be measured by accounting for the infringer's profits earned by using the trade secrets, when such profits can be proven.  An alternative form of unjust enrichment is called *avoided costs*.  Avoided costs may be considered only for TriZetto's federal misappropriation claim, and not for its state misappropriation claim.  Avoided costs are the amount

6

that Syntel would have incurred to achieve the same
result without the use of the appropriated trade secret.

App'x 529 (868:13–23) (emphasis added).

In summation, TriZetto's lawyer noted that it had introduced an expert
avoided costs estimate of roughly $285 million, while Syntel had offered none.
TriZetto's lawyer emphasized that this amount was "much less than the overall
price of the development" and was "only a tiny fraction of the overall money that
[Syntel] hoped to make."  Trial Tr. 907:2–6.  TriZetto's lawyer was referring to
evidence suggesting Syntel's goal was to make $1 billion with TriZetto's trade
secrets.

Meanwhile, Syntel's lawyer characterized TriZetto's avoided costs request
as an effort to "crush[] a potential competitor" that bore no rational relation to
actual damages.  *Id.* at 938:21.  Syntel's lawyer repeatedly emphasized the lack of
causal connection between the "actual infringing conduct" and TriZetto's avoided
costs demand.  *Id.* at 939:10–41:22.  Syntel's lawyer argued several reasons why
"[a]voided costs make no sense here:"  (1) Syntel did not take or destroy the value
of Facets; (2) Syntel could have used the same material for "free" by obtaining a
third-party access agreement from TriZetto; (3) "TriZetto still has the product" and
"makes hundreds of millions of dollars a year licensing [it] out;" and (4) Syntel
was just a competing services company—not a software company.  *Id.* at 940:5–
41:10.

In rebuttal, TriZetto's lawyer again emphasized that Syntel had offered no
alternative to the $285 million figure and argued—incorrectly (though without

7

objection)—that avoided costs damages are "what needs to be paid under the law when you violate the United States trade secret law." *Id.* at 954:7–10.

The jury returned a verdict for TriZetto on all counts. It found Syntel misappropriated TriZetto's trade secrets, violating both the DTSA and New York law, and that it infringed TriZetto's copyrights. To compensate for Syntel's misappropriation, the jury awarded TriZetto $284,855,192 in avoided development costs under the DTSA and $142,427,596 (one half that amount) as a "reasonable royalty" under New York law.[5] *Id.* at 907:14–17. The jury ultimately limited its award to $284,855,192 in compensatory damages and double that amount—$569,710,384—in punitive damages.[6]

After trial, Syntel renewed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and moved in the alternative for a new trial or remittitur under Federal Rule of Civil Procedure 59. Syntel made three arguments relevant to this appeal. First, it argued that TriZetto failed to identify any trade secrets with the requisite specificity at trial. Second, it argued that there was no misappropriation because the Amended MSA authorized Syntel to use 102

---

[5]    The jury separately awarded TriZetto $59,100,000 for copyright infringement, unchallenged on appeal.

[6]    The jury limited its compensatory damages award in response to Question 11 on the verdict form: "Being mindful of not awarding damages that result in double or multiple recovery for the same injury, what is the total amount of compensatory damages, if any, TriZetto is entitled to receive from Syntel in light of your answers to the previous three questions?" App'x 2254. With respect to the $8.5 million in lost profits, TriZetto took the view that awarding lost profits and avoided costs would constitute "double counting" under the DTSA; the district court accepted that view. Special App'x 15. As a result, the verdict form that TriZetto proposed and the district court accepted did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages.

8

of the 104 TriZetto trade secrets at issue.  Third, it argued that DTSA avoided costs damages were improper in this case as a matter of law.

The district court denied Syntel's post-trial motions but remitted the punitive damages award to $284,855,192, which TriZetto accepted.  The district court also entered a permanent injunction that, with two exceptions not relevant here, enjoins Syntel from using any of the 104 trade secrets going forward.  Syntel does not challenge the injunction.  This appeal followed.

## DISCUSSION

Syntel challenges the judgment's liability finding in two ways.  First, it argues the district court applied the wrong legal standard for identifying a trade secret with specificity.  Syntel contends that had the court applied the correct standard,  no reasonable jury could have found the existence of any trade secret on the evidence TriZetto presented at trial.  Second, Syntel argues that even if TriZetto adequately identified the alleged trade secrets, the district court erred in its understanding of the Amended MSA.  To Syntel, the Amended MSA unambiguously authorized its use of 102 of the 104 alleged trade secrets, such that there is no misappropriation as a matter of law.  Syntel separately challenges the damages award, arguing the district court erred in allowing avoided costs as permissible unjust enrichment damages under the DTSA in this specific case.

### I.  Standard of Review.

We review the denial of a Rule 50(b) motion *de novo*, "considering the evidence in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences that the jury might have drawn in that

party's favor."[7]  *Triolo v. Nassau Cnty.*, 24 F.4th 98, 105 (2d Cir. 2022).  In other words, we apply the same standard as the district court.  *See id.*

A district court may grant judgment as a matter of law only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." FED. R. CIV. P. 50(a)(1).  We affirm the denial of a Rule 50(b) motion "unless there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Ashley v. City of New York*, 992 F.3d 128, 138–39 (2d Cir. 2021).  This standard presents a "particularly heavy" burden for Syntel, where, as here, "the jury has deliberated in the case and actually returned its verdict" in favor of the non-movant.  *Triolo*, 24 F.4th at 105.  Further, "[i]t is an axiom of appellate procedure that we review legal questions *de novo* and questions of fact for clear error." *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013).

## II. Liability.

Syntel first argues no reasonable jury could have found for TriZetto on the trade secret misappropriation claims because TriZetto inadequately specified each asserted trade secret as a matter of law.  But whether TriZetto's trade secrets were adequately identified (and proved) was ultimately a question for the jury.  While presented as a legal challenge, Syntel's argument really attacks the sufficiency of

---

[7]     Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

the evidence supporting the jury's verdict. Because Syntel cannot show a "complete absence of evidence supporting" the jury's findings, they survive the challenge. *Ashley*, 992 F.3d at 138–39.

Syntel separately argues that the Amended MSA unambiguously authorized Syntel to use 102 of the 104 TriZetto trade secrets at issue.[8] Whether framed as a legal issue regarding the contract's interpretation or a factual issue based on extrinsic evidence, we conclude Syntel's argument comes up short.

## A. TriZetto Adequately Identified its Trade Secrets at Trial.

Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity.[9] *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020) (DTSA); *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 48–49 (2d Cir. 2018) (New York law). The specificity requirement "place[s] a defendant on notice of the bases for

---

[8] As mentioned above, the two remaining claimed trade secrets were the subject of the district court's Preclusion Order; as a result, the jury was directed to find misappropriation as to those alleged secrets.

[9] Although this Court "has not squarely articulated the precise contours of the specificity requirement in the context of trade secrets," *Next Commc'ns*, 758 F. App'x at 49 n.3, we decline to do so here. Our review in this appeal is limited to examining the sufficiency of the evidence supporting the jury's verdict. Syntel does not argue that the district court's instruction or verdict sheet were deficient but instead elects to bring a sufficiency challenge. *See* Oral Arg. at 3:38–4:16. *See generally* Syntel Br. at 18–37 (nowhere arguing error in jury instructions or verdict sheet). Although Syntel has not requested that we do so, we may review jury instructions and verdict sheets for "fundamental error" in accordance with FED. R. CIV. P. 51. *See Kotler v. Jubert*, 986 F.3d 147, 158 n.38 (2d Cir. 2021). "Fundamental error" is "so serious and flagrant that it goes to the very integrity of the trial." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 49 (2d Cir. 2015). Because the precise contours of the specificity requirement in the context of trade secrets is "unsettled," we conclude that the jury charges and verdict sheet in this case did not compromise "the very integrity of the trial" and thus were not fundamental error. *See id.* at 49–50.

the claim being made against it," *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021), and allows a factfinder to determine whether certain information is, in fact, a trade secret. *See* Restatement (Third) of Unfair Competition § 39 cmt. d (characterizing purpose of specificity requirement as permitting determination of "fact of an appropriation"); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002) (observing that, if plaintiff fails to separate "trade secrets from the other information that goes into any software package," the court "cannot do its job" at summary judgment). The existence of a trade secret, including whether it was adequately identified, is "a fact-specific question to be decided on a case-by-case basis." *Oakwood Labs.*, 999 F.3d at 906; *see Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962) ("An exact definition of a trade secret is not possible.") (quoting Restatement (First) of Torts § 757 cmt. b). Thus, although the parties press for a general specificity rule, we need not and do not articulate such a rule today.

Viewing the evidence adduced at trial in the light most favorable to TriZetto, a reasonable jury could have determined the asserted trade secrets were in fact trade secrets. TriZetto's witnesses, including its fact witness Mr. Noonan and its technical expert Dr. Bergeron, provided extensive testimony identifying and describing the trade secrets. For each trade secret, Noonan explained (1) what the secret was, (2) how the secret was developed, (3) the value of the secret to TriZetto, and (4) that the secret was maintained as confidential. The jury was provided, for its viewing, a court exhibit—jointly submitted by the parties—listing each asserted trade secret by name. Moreover, Dr. Bergeron presented several demonstratives linking the title of each individual trade secret to specific exhibits. These

12

demonstratives listed the name, exhibit numbers, and general category for each asserted trade secret. Finally, the jury received the documents or source code tied to the asserted trade secrets.

### 1. Software Trade Secrets (Nos. 1–3).

We begin with TriZetto's three asserted software trade secrets: (1) the Facets software code, (2) TriZetto's DBBLD scripts, and (3) the framework for updating the Facets database.

After providing the jury a thorough overview of Facets' functionality, Noonan discussed the database tables and claim data model at "the heart of Facets." App'x 247 (88:16–19). At a high level, these tables and the data model convey the architecture of the Facets software. Noonan showed the jury depictions of TriZetto's claim tables and confirmed to the jury that the data model and the rest of Facets' internal computer architecture is "ke[pt] confidential." App'x 246 (87:5–24). He then described the DBBLD scripts and upgrade framework software. Noonan detailed what each software application does, the "necessary and very important" competitive advantage each piece of software provides to its customers' businesses, App'x 254–56 (115:6–117:15), and the steps TriZetto takes to keep the applications confidential. TriZetto then introduced the source code for all three of the software trade secrets into evidence.

Viewing the evidence in the light most favorable to TriZetto, a reasonable jury could have determined that the asserted software trade secrets were in fact trade secrets. Noonan identified the trade secrets by name, described them in detail, tied them to specific documents or source code, and communicated that TriZetto kept them confidential.

## 2. Tools Trade Secrets (Nos. 4, 102–104).

For the same reasons, we find TriZetto presented sufficient detail about its four asserted tools trade secrets: the (1) Data Dictionary, (2) Custom Code Impact Tool, (3) test cases, and (4) automation scripts. Noonan also identified TriZetto's tools trade secrets by name, described them in detail, tied them to specific documents or source code, and testified that TriZetto kept them confidential.

For example, Noonan not only described how the Data Dictionary operates, but also the confidential window it opens into "th[e] data structure that [TriZetto] built at the heart of Facets."[10] App'x 259 (120:4–7). Further, the jury heard it "would be damaging" to TriZetto if "the Data Dictionary was copied by a competitor and used for an unauthorized purpose." App'x 261 (122:11–17).

With respect to the Custom Code Impact Tool, Noonan described what the tool does, explained how it benefits customers, and confirmed TriZetto keeps its source code confidential "as a trade secret." App'x 261–63 (122:22–124:19). The source code for both the Data Dictionary and the Custom Code Impact Tool were admitted into evidence.

Noonan separately addressed the test cases and automation scripts trade secrets.[11] Those trade secrets, he explained, contain detailed instructions about

---

[10] Unlike situations where significant aspects of the trade secrets are publicly known or where versions of the trade secrets are used by others in the industry, the jury heard that Noonan, in his 30 years of experience, has never "seen anything like the Facets Data Dictionary out in the world" and would not "expect to see the Data Dictionary software code or the documents describing it out in the public" domain. App'x 261 (122:1–10).

[11] The Preclusion Order did not relieve TriZetto of its burden of proving that both of the items were, in fact, trade secrets.

14

how to test Facets after an installation or upgrade.  The jury also heard that these trade secrets are not generic items generally known in the field—Noonan testified that TriZetto has "been building these with Facets [] over the course of Facets' life" and that they are completely confidential.[12]  App'x 266–67 (127:24–128:2).  Noonan then illustrated a test case—showing the jury a specific case for processing a claim and explaining the steps it performs.  The test cases and automation scripts were also admitted into evidence as confidential exhibits.

As before, viewing the above evidence in the light most favorable to TriZetto, we conclude that a jury could have reasonably determined that the asserted tools trade secrets were in fact trade secrets.

### 3.  Manuals and Guides Trade Secrets (Nos. 5–101).

Syntel takes special aim at the jury's finding that TriZetto sufficiently identified its 97 asserted manuals and guides trade secrets.  In the procedural context before us, TriZetto produced sufficient evidence at trial to affirm the jury's findings.

For example, the jury heard testimony that TriZetto's manuals and guides differ meaningfully from those accompanying "off-the-shelf software."  App'x 267 (128:12–15).  Noonan testified that each manual and guide—in similar amounts of detail—dives deeply into "the inner workings of Facets" and the software's internal architecture.  App'x 268 (129:6–17).  He used the Data Model Guide as a

---

[12]     While showing the jury a cover page for a Facets test, TriZetto's lawyer asked Noonan if there was "anything in [the] document that shows that TriZetto keeps this document confidential and that it believes it's its trade secret information."  App'x 264 (124:1–18).  Noonan alerted the jury to a copyright notice on the page reading: "confidential and proprietary."  *Id.* at 124:19–23.

representative example, showing the jury detailed architectural information on several of its pages.

Noonan also used the Data Model Guide as a representative example to demonstrate that all 97 manuals and guides comprise commercially valuable information that TriZetto keeps confidential.[13]  Based on these identifications themselves, a jury could have reasonably determined that the contents of each manual and guide amounted to protected trade secrets.

The parties also provided the jury with a jointly submitted list of TriZetto's 104 proposed trade secrets, which included the corresponding trade secret number and title for each.  Dr. Bergeron presented several demonstratives linking the title of each individual manual or guide to specific exhibits.  These demonstratives listed the name, exhibit numbers, and general category (*i.e.*, "Billing" or "Commissions") for each asserted manual or guide trade secret.  TriZetto also submitted all 97 manuals and guides into evidence.

When all the above evidence, along with all the reasonable inferences that may be drawn from it, is viewed in the light most favorable to TriZetto, it constitutes sufficient support for the jury's determination that the asserted manuals and guides trade secrets were in fact trade secrets as well.

\*       \*       \*

---

[13]     For example, Noonan told the jury that TriZetto guards the Data Model Guide as "confidential [] property" because it "contains TriZetto's trade secrets."  App'x 247 (88:9–12); 246 (87:18–22).  The jury later learned that TriZetto keeps the other 96 manuals and guides confidential for similar reasons.  Noonan then described the commercial value of TriZetto's manuals and guides—explaining they are "very important" materials whose unauthorized use "would be damaging" to TriZetto's service business.  App'x 268–69 (129:19–130:18).

16

Accordingly, we affirm the district court's denial of Syntel's Rule 50(b) motion on this issue.

### B. The Amended MSA Did Not Authorize Syntel to Use 102 of the 104 Claimed Trade Secrets.

Syntel separately argues that even if TriZetto met its burden to specify its 104 trade secrets, the district court erred in denying Syntel's Rule 50(b) motion for an independent reason: the Amended MSA unambiguously authorized Syntel's use of 102 of the 104 claimed trade secrets. We disagree.

The district court rejected Syntel's interpretation of the Amended MSA for two separate and independent reasons: (1) it is at odds with the unambiguous terms of the parties' agreements as a matter of law, and (2) even if the agreements were ambiguous, the jury considered and rejected Syntel's interpretation. According to Syntel, the district court improperly deferred to the jury on the legal issue of the interpretation of an unambiguous contract. Whether Syntel's argument is framed as a legal issue regarding the contract's interpretation or a factual issue based on extrinsic evidence, there is no basis to overturn the jury's findings that Syntel misappropriated TriZetto's trade secrets.

### 1. Applicable Law.

"New York law applies pursuant to the MSA." Special App'x 5 n.1. Under New York law, "[w]hether a contract is ambiguous is a question of law, and courts may not resort to extrinsic evidence to aid in interpretation unless the document is ambiguous." *Banos v. Rhea*, 25 N.Y.3d 266, 276 (N.Y. 2015); *see also, e.g.*, *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465, 467 (2d Cir. 2010). On the other hand, "[t]he resolution of an ambiguous provision, for which

17

extrinsic evidence may be used, is for the trier of fact." *Rhoda v. Rhoda*, 175 A.D.3d 1572, 1573 (2d Dep't 2019).

### 2. Relevant Contractual Provisions.

Three provisions in the original MSA are relevant here. Sections 13.01 and 19.01 both impose confidentiality obligations on Syntel, preventing the use of any TriZetto trade secret without TriZetto's permission.

Under Section 13.01, Syntel agreed *not* to "use[]" TriZetto's intellectual property "other than in connection with providing the Services" under the agreement. App'x 659 (§13.01); 651 (§1.01(125)). "Services" is defined in the MSA to include certain enumerated categories of services and "any new services agreed to by the Parties to be provided by [Syntel] pursuant to this Agreement." App'x 650 (§1.01(99)) ("Services"); 653 (§3.02) ("Designated Services"). Those "Services" are only ones that TriZetto subcontracted with Syntel to provide. Syntel similarly agreed in Section 19.01 not to "use" or "disclose Confidential Information" without TriZetto's "prior consent." App'x 661–62 (§19.01); 647 (§1.01(13)) (defining "Confidential Information"). The third relevant provision is Section 29.17, a non-compete provision that prohibited Syntel from, among other things, competing with TriZetto for Facets services contracts.[14] App'x 604 (§29.17).

In 2012, the parties agreed to amend the MSA—Syntel lost its right to guaranteed revenue from TriZetto but gained the right to compete with TriZetto

---

[14] Specifically, "to prevent any misuse or disclosure of Confidential Information," Section 29.17 prohibited Syntel from "provid[ing] any products or services" that required "technical, design, process or architectural knowledge of TriZetto's products or services relating to TriZetto's products." App'x 604 (§29.17).

by billing directly for servicing Facets customers. To effect that change, the parties removed the non-compete provision in "Section 29.17 and any other provision in the Agreement related to [Syntel] being restricted from *competing* with TriZetto." App'x 613–14 (Art. 2(2)) (emphasis added).

### 3. Analysis.

The parties' dispute boils down to whether the deletion of the MSA's non-competition provision authorized Syntel to use TriZetto's confidential information to compete with TriZetto. The district court correctly concluded the Amended MSA did no such thing. Syntel's view of the MSA in its altered format is that the agreement authorized Syntel to compete with TriZetto while TriZetto waived the *very thing* it values most.

The Amended MSA is unambiguous; Syntel was free to compete with TriZetto, but it was still obligated to abide by the MSA's confidentiality provisions. In the 2012 Amendment, the parties deleted the non-compete provisions in the MSA only so that Syntel could offer its own consulting services like any TriZetto competitor.

Syntel offers a rationale for the Amendment. Syntel first contends that by eliminating Section 29.17's restriction on competition, the Amended MSA "effectively expanded" the definition of "Services" to encompass any services Syntel performed "for third parties in competition with TriZetto." Syntel Br. 41–42. While Syntel's position finds no support in the Amendment's express provisions, Syntel argues no amendment to the definition of "Services" itself was necessary because the original MSA defined "Services" to include "any new services agreed to by the Parties." Syntel Rep. Br. 20 (citing App'x 550 (§1.01(99)).

Accordingly, Syntel contends the new "Services" the Amended MSA authorized were those that could leverage TriZetto's confidential trade secrets under Sections 13.01 and 19.01. *See id.* at 20–21 (citing App'x 577, 584). Syntel's reasoning—that the parties made an implied change to the definition of "Services"—is plainly inconsistent with the Amendment's actual changes to the MSA.

While the 2012 Amendment made numerous edits to specific provisions of the MSA, it made no change to the definition of "Services." When the Amendment states that Section 29.17 and any other "related" non-compete provisions are deleted in their entirety, it identifies the definitions impacted.[15] "Services" is not on that list and is not referenced anywhere in the Amendment.

Even if the Amended MSA had somehow implicitly changed the definition of "Services," Syntel unequivocally still could not use TriZetto's trade secrets to offer competing Facets services. The Amended MSA separately prohibits Syntel from "commercially exploit[ing]" any "TriZetto Data." App'x 659 (§13.01(3)). Modifying the definition of "Services" (implicitly or otherwise), would not remove that restriction.[16]

---

[15]     The list includes "Noncompetition Services," "Restricted Period," and "TriZetto Products." App'x 614 (Art. 2(1)); 648–49 (§§1.01(58), (73)); 652 (§1.01(132)).

[16]     Further to the point, "Syntel's post-hoc re-definition of 'Services' is also inconsistent" with other relevant MSA terms. TriZetto Br. 52. For example, for all "Services," Syntel needed to provide reports to TriZetto, which included tracking against project plans, estimates, budgets, and staff recruitment and retention—precisely because it was acting as a subcontractor, not a competitor. Those requirements would not make sense if "Services" included competing services. The MSA also defines "Service Delivery Organizations" as "the personnel of Service Provider [Syntel Mauritius] and Service Provider Agents who provide the Services," App'x 649 (§1.01(77)), and requires that "[a]ll members of the Service Delivery Organization shall be dedicated on a full time basis to the TriZetto account." App'x 657 (§10.03(13)). In our view, by

20

Syntel's alternative argument, that the 2012 Amendment "deleted Sections 13.01 and 19.01 in their entirety," is equally divorced from the agreement's language and common sense. Syntel Br. 40, 42–43. Syntel contends both provisions fall within the catch-all phrase deleting "any [] provision in the Agreement related to [Syntel] being restricted from competing with TriZetto," App'x 635 (Art. 2(2)), but that interpretation finds no support in the MSA's language. Sections 13.01 and 19.01 recite *confidentiality* protections, not *non-compete* provisions. We find it fanciful to suggest that TriZetto would authorize Syntel to use its trade secrets to compete for business without saying so. Further, we are unpersuaded that the parties—both sophisticated, multi-billion-dollar enterprises—would alter fundamental aspects of their contractual relationship in vague terms or through catch-all provisions.

Even if we considered the Amended MSA to be ambiguous, there is no basis for reweighing the extrinsic evidence that Syntel claims supports its interpretation.[17] Syntel's assertion that extrinsic evidence showed it was authorized to use TriZetto's trade secrets raised factual issues for the jury, which

definition, "Services" would not encompass Syntel's competitive efforts because everyone performing Services seemingly needed to be dedicated full time to TriZetto's account, not another Syntel customer's.

[17] Syntel principally relied on two pieces of extrinsic evidence. First was the testimony of Mr. Murlidhar Reddy—the man in charge of Syntel's competing services and Syntel's relationship with TriZetto. At trial, Mr. Reddy testified that TriZetto congratulated Syntel on winning Capitol District Physicians Health Plan's ("CDPHP") business. To Syntel, TriZetto's gesture supported its view that the Amended MSA authorized Syntel to use TriZetto's confidential information while servicing Facets customers. Second, Syntel cites testimony from TriZetto's witnesses stating that TriZetto's confidential materials were necessary for Syntel to provide "complex" consulting services to third parties, such as software upgrades.

was free to reject those arguments, especially in light of Syntel's lead witness's curious testimony that it would be "flat wrong" to interpret the Amended MSA as authorizing Syntel to freely use TriZetto's trade secrets to compete. *See* App'x 464–66 (514:6–516:1); 489–90 (620:22–24, 630:1–21). Because Syntel cannot show a "complete absence of evidence supporting the verdict" rejecting Syntel's interpretation, we will not overturn it.[18] *Ashley*, 992 F.3d at 138–39.

In sum, the unambiguous terms of the Amended MSA are clear and so is the extrinsic evidence: TriZetto did not authorize Syntel to use TriZetto's trade secrets to compete with TriZetto. Thus, Syntel misappropriated TriZetto's intellectual property in violation of the DTSA and New York law.

*     *     *

Accordingly, we affirm the district court's denial of Syntel's Rule 50(b) motion on this issue, too.

---

[18] The jury apparently gave both pieces of Syntel's extrinsic evidence little weight. First, there was no evidence corroborating Mr. Reddy's testimony that TriZetto congratulated Syntel on winning CDPHP business, and the jury was not required to accept it as true. TriZetto also supposedly offered its congratulations in 2013, years before discovering Syntel's misappropriation of its trade secrets. Second, undisputed evidence established Syntel could compete for "less complex" and "low-end" consulting work without using TriZetto's trade secrets, as could many other service providers. *See* App'x 403 (387:1–17); 319 (215:3–6). Even for the "complex" work that required use of the types of tools TriZetto's trade secrets protect, Syntel had options other than misappropriation: independent development at its own expense.

## III.    Damages.

Syntel separately contends the district court erred by upholding the jury's $285 million compensatory damages award under the DTSA.[19]  The primary question presented is whether the DTSA permits recovery of avoided costs as unjust enrichment damages in this specific case.  It does not.  Accordingly, we vacate the district court's DTSA damages judgment and remand the case for further proceedings consistent with this opinion.[20]

### A. Standard of Review.

"[T]he amount of recoverable damages is a question of fact" reviewed for clear error, but the district court's understanding of whether avoided costs damages are proper under the DTSA in this specific case—*i.e.*, "the applicable damages measurement"—is a legal question reviewed *de novo*.[21]  *Bessemer Tr. Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010).

---

[19]    Syntel does not directly challenge the legality of the district court's permanent injunction or its punitive damages award.  That said, it asks this Court to "direct the district court on remand" to "adjust[] [the] punitive damages award" should we vacate the district court's DTSA compensatory damages judgment.  Syntel Br. 59–60.

[20]    Syntel argues the district court made two independent errors in upholding the jury's $285 million avoided costs award.  The first, Syntel says, was determining that avoided costs damages are available as unjust enrichment damages under the DTSA in *this* specific case.  Under the particular facts before us, we agree.  Therefore, we need not consider Syntel's second argument: that no reasonable jury could have found that a causal link existed between the $285 million award and any misappropriation alleged by TriZetto after the DTSA's enactment.

[21]    TriZetto contends we must review the district court's DTSA damages judgment under the more deferential abuse of discretion standard.  TriZetto frames Syntel's argument on appeal as challenging the excessiveness of the jury's award.  To be sure, when assessing whether a damages award is excessive, we have held that damages calculations are "generally within the province of the jury, and a district court's refusal to set aside a jury award will be overturned only for abuse

23

**B.  The DTSA's Remedial Scheme.**

Before the DTSA's enactment, trade secret plaintiffs claiming misappropriation had to pursue remedies governed by state law.  The Uniform Trade Secrets Act ("UTSA") served as a model statute for trade secret laws in forty-eight states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.[22] *See* David S. Levine & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act*, 53 WAKE FOREST L. REV. 105, 113 (2018).  One of the DTSA's main intended benefits was that it would provide a "single, national standard for trade secret misappropriation with clear rules and predictability for everyone involved."  H.R. Rep. No. 114-529, at 6 (2016); S. Rep. No. 114-220, at 14 (2016); 162 Cong. Rec. H2032 (Rep. Conyers supporting the bill because it "would foster uniformity among the States").  Accordingly, the

---

of discretion." TriZetto Br. 25–26 (citing *Paolitto v. John Brown E. & C.*, 151 F.3d 60, 66 (2d Cir. 1998)).  But even if we accept TriZetto's framing of Syntel's arguments, we functionally review *de novo* the district court's decision to uphold the jury's award of avoided costs as unjust enrichment. The jury award fails as a matter of law because the district court's decision to uphold the award is itself "premised on a legal error [and] is necessarily an abuse of discretion."  *See, e.g., Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 757 (2022) (functionally reviewing *de novo* denials of motions for leave to amend, to substitute into an action under Rule 17(a), and to approve a class action settlement agreement).

[22]      Despite its name, the UTSA did not induce a uniform set of laws.  Although many states have adopted variations of the UTSA, "the state laws vary in a number of ways . . . ." H.R. Rep. No. 114-529, at 4 (2016).  The Senate Committee on the Judiciary observed in their consideration of the DTSA that, "[a]lthough the differences between State laws and the UTSA are generally relatively minor, they can prove case-dispositive . . . ."  S. Rep. No. 114-220, at 2–3 (2016). Congress thus sought to harmonize the differences in state trade secret law by enacting the DTSA. *See id.* at 14 ("This narrowly drawn legislation will provide a single, national standard for trade secret misappropriation . . . .").

DTSA's language and its remedial scheme dictate the analysis when considering the monetary remedies available under the statute.

To be clear, though, the DTSA does not preempt or displace state trade secret law remedies.[23]  Indeed, the federal statute directly incorporates certain provisions from the UTSA—for example, the DTSA's compensatory damages provision is "drawn directly" from § 3 of the UTSA.[24]  H.R. Rep. No. 114-529, at 13 (2016).  There are, as a result, several cases examining state enactments of the UTSA's compensatory damages provision that, in doing so, analyze identical language found in the DTSA.[25]

---

[23]  *See* 18 U.S.C. § 1838 ("[T]his chapter shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by United States Federal, State, commonwealth, possession, or territory law for the misappropriation of a trade secret . . . ."); *see also* H.R. Rep. No. 114-529, at 6, 14, 25 (2016).

[24]  The UTSA provides that "actual loss caused by misappropriation and the unjust enrichment that is caused by misappropriation that is not taken into account in computing actual loss" can all be included as a measure for trade secret compensatory damages.  Unif. Trade Secrets Act § 3(a) (amended 1985).

[25]  Federal courts have expressed views about the availability of avoided costs damages in misappropriation cases arising under state law.  In the cases pre-dating the DTSA, the state law claims made their way into federal court due to diversity jurisdiction or supplemental jurisdiction.  *See, e.g.*, *Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 707, 710 (11th Cir. 1990) (applying Georgia trade secret law while sitting in diversity).  The same is true for state-law-based claims filed after the DTSA's enactment.  *See, e.g.*, *Epic Systems Corp. v. Tata Consultancy Servs., Ltd.*, 980 F.3d 1117, 1123, 1128 (7th Cir. 2020) (applying Wisconsin's UTSA on two bases, diversity and supplemental jurisdiction); *see also PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, 47 F.4th 156, 160 n.10 (3d Cir. 2022) (applying Pennsylvania's UTSA based on supplemental jurisdiction).

The DTSA's enactment created a federal civil cause of action for the misappropriation of trade secrets occurring on or after May 11, 2016.[26]  Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 2(e), 130 Stat. 376, 381–82 (2016). The remedies available under the DTSA include both equitable relief and monetary damages.  For example, the DTSA empowers a federal court to grant an injunction to prevent actual or threatened misappropriation of trade secrets.  *See* 18 U.S.C. §1836(b)(3)(A)(i).  Additionally, upon the finding of liability, the DTSA permits the recovery of compensatory damages,[27] punitive damages,[28] and attorney's fees.[29]  *See* 18 U.S.C. §§ 1836(b)(3)(B–D).

The DTSA's broad compensatory damages provision allows a court to award: (1) "damages for actual loss caused by the misappropriation;"[30] and (2) "*damages for any unjust enrichment caused by* the misappropriation . . . *that is not addressed in computing damages for actual loss*;"[31] or (3) "in lieu of damages measured

---

[26]     Although some claims of misappropriation occurred prior to the DTSA's effective date, the parties agree that the profits and losses at issue here arise from misappropriation occurring after May 11, 2016.  Syntel's use of TriZetto's trade secrets to conduct UHG's Facets upgrade occurred in November 2016.  Accordingly, the application of the DTSA to this controversy is not in question.

[27]     *See* 18 U.S.C. § 1836(b)(3)(B).

[28]     *See* 18 U.S.C. § 1836(b)(3)(C) ("[I]f the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the [compensatory] damages awarded under subparagraph (B).").

[29]     *See* 18 U.S.C. § 1836(b)(3)(D) ("[I]f a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.").

[30]     18 U.S.C. § 1836(b)(3)(B)(i)(I).

[31]     18 U.S.C. § 1836(b)(3)(B)(i)(II).

by any other methods . . . a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret."[32]  18 U.S.C. § 1836(b)(3)(B) (emphasis added).  The statute thus permits a plaintiff to recover both its actual losses and a misappropriator's unjust benefit caused by misappropriation, so long as there is no double counting.  *See* 18 U.S.C. § 1836(b)(3)(B)(i).

Deciding what constitutes unjust enrichment is a fact-intensive endeavor. Because courts take a "flexible and imaginative approach to damages calculation in trade secret misappropriation cases," unjust enrichment can take several forms and cover a broad array of activity.[33]  *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, 836 F.3d 477, 499 (5th Cir. 2016).  In some instances, unjust enrichment can include "avoided costs"—*i.e.*, the costs a trade secret holder had to spend in research and development that a trade secret misappropriator saves by avoiding development of its own trade secret.  *See, e.g., id.; see also* Restatement (Third) of Unfair Competition § 45 cmt. f (1995).  The parties concede that avoided costs are recoverable as damages for unjust enrichment under the DTSA.  They dispute, however, whether avoided costs are available under the particular facts of this case.

---

[32]     18 U.S.C. § 1836(b)(3)(B)(ii).

[33]     For example, unjust enrichment can include a "defendant's increased profits derived from its use of a misappropriated trade secret."  David S. Almeling *et al., Disputed Issues in Awarding Unjust Enrichment Damages in Trade Secret Cases*, 19 SEDONA CONF. J. 667, 687 (2018).  Unjust enrichment "may also include any increased business value to [a] defendant that is attributable to the [trade secret] misappropriation, such as the company's potentially lucrative (though difficult to quantify) 'first mover advantage' achieved by acceleration of its product or business to market before that of any other competitor (including the plaintiff)."  *Id.*

To answer that question, one needs to consider the entirety of the DTSA's remedial scheme, not each provision in isolation. *See Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) (stating that the "meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme"). Section 1836(b)(3)(B)(i)(II) awards compensatory damages to aggrieved trade secret holders whose injuries are not adequately addressed by lost profits. It provides a tool to make trade secret holders whole by further awarding "damages for any unjust enrichment caused by the misappropriation . . . not addressed in computing damages for [their] actual loss"—*i.e.*, in instances where the value of the secret is damaged, or worse yet—destroyed. 18 U.S.C. § 1836(b)(3)(B)(i)(II).

The origins of "unjust enrichment," which is "a basis of civil liability involving a claim for recovery that sometimes also goes by the name *restitution*," *Unjust Enrichment*, BLACK'S LAW DICTIONARY (11th ed. 2019), also inform our review of § 1836(b)(3)(B)(i)(II). *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. c ("In short, most of the law of restitution might more helpfully be called the law of unjust or unjustified enrichment."); *see also* Restatement (Third) of Unfair Competition § 45 cmt. c ("The restitution remedy awards to the plaintiff the enrichment unjustly acquired by the defendant as a result of the appropriation of the plaintiff's trade secret.").

Restitution may consist of "a return or restoration of what the defendant has gained in a transaction," which "may be a return of a specific thing or . . . a money substitute for that thing." 1 Dan B. Dobbs, *Law of Remedies* § 4.1(1) (1993); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. e(1) (describing

"specific restitution" as a "remedy" that may "restore[] the identical asset that the claimant has lost"). To the extent that TriZetto's trade secrets were "specific thing[s]" that TriZetto sought to recover from Syntel, the district court's remedial order accomplished that restitutionary goal by ordering Syntel to "remove from its possession and quarantine" the 104 trade secrets at issue. App'x 2325.

The remedy of restitution can sometimes require more than the return of specific things. Indeed, "there are significant instances of liability based on unjust enrichment that do not involve the restoration of anything the claimant previously possessed." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. c. Such instances can arise in cases where a defendant profits from the plaintiff's property. Under such circumstances, an "accounting of the defendant's profits on sales attributable to the use of the trade secret" may serve as one available remedy for trade secret misappropriation. Restatement (Third) of Unfair Competition § 45 cmt. f.

In still other circumstances, restitution can require a defendant to return the costs it saved through the misappropriation of a plaintiff's property. The Third Restatement of Unfair Competition explains that "[i]n some situations the defendant's enrichment is represented by profits from sales made possible by the appropriation," while in others it is represented "by savings achieved through the use of the trade secret in the defendant's business." Restatement (Third) of Unfair Competition § 45 cmt. c. Under the common law, in other words, "[a] saved expenditure . . . is no less beneficial to the recipient than a direct transfer." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d. But the amount of avoided costs damages recoverable must still derive from "a

29

comparative appraisal of all the factors of the case," among which are "the nature and extent of the appropriation" and "the relative adequacy to the plaintiff of other remedies." Restatement (Third) of Unfair Competition § 45(2).[34] Awarding avoided costs in the absence of such a comparative appraisal risks producing an unjust windfall for trade secret holders.[35]

Accordingly, for purposes of deciding whether unjust enrichment in the form of avoided costs was permissibly awarded in this case, the relevant question is: did Syntel's misappropriation injure TriZetto *beyond* its actual loss of $8.5 million in lost profits? The answer to that legal question turns on several important facts—for example, TriZetto retaining the use and value of its trade secrets and the district court permanently enjoining Syntel from using TriZetto's secrets. These facts matter; the DTSA's equitable remedies work as a powerful tonic to reduce the harm a trade secret holder suffers beyond its lost business. The DTSA allows district courts to enjoin the misappropriation of a trade secret to prevent its continued use and/or its diminution in value. *See* 18 U.S.C. § 1836(b)(3)(A)(i).

Reading the statute's compensatory damages provision otherwise—as focusing *exclusively* on Syntel's saved expenses to award avoided costs—ignores the extent to which Syntel's misappropriation injured TriZetto and impermissibly

---

[34] Such an appraisal might well support an avoided costs award where misappropriation effectively destroys a trade secret, precluding both the secret's restitution to its owner and a reliable measure of the owner's future lost profits. The example is merely illustrative, not exhaustive.

[35] These common law principles are consistent with the language and the structure of the DTSA.

discounts the comparative appraisal that governs equitable trade secret remedial determinations.  *See* Restatement (Third) of Unfair Competition § 45(2).  Under that reading, avoided costs would be available as unjust enrichment damages in any case of misappropriation, even where a trade secret owner suffers *no compensable harm* beyond its lost profits or profit opportunities.  If accepted, that view would permit avoided costs awards that are more punitive than compensatory.[36]  That would be a curious distortion of the DTSA's remedial scheme and would ignore the significance and the reach of a district court's permanent injunction power.

### C. Analysis.

There is no dispute that Syntel unjustly benefitted from misappropriating TriZetto's trade secrets to service UHG (*i.e.*, earning $27 million in revenue, corresponding to $823,899 in profits).  But critically, those profits were the only enrichment Syntel unjustly gained at TriZetto's expense, and they were "addressed in computing damages for [TriZetto's] actual loss." 18 U.S.C. § 1836(b)(3)(B)(i)(II).  TriZetto's expert testified that the actual loss TriZetto suffered post-DTSA from Syntel using its trade secrets to service UHG was $8.5 million in lost profits.  *See* App'x 412 (396:9–12); 433 (419:4–8).  Thus, through its misappropriation, Syntel realized $823,899 in unjust profits "at the expense of"

---

[36]     The policy of punishing wrongdoers is already served by the DTSA's separate provision for punitive damages.  *See* 18 U.S.C. § 1836(b)(3)(C).

TriZetto's $8.5 million profit opportunity.[37]  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).

Beyond its lost profits, however, TriZetto suffered no compensable harm supporting an unjust enrichment award of avoided costs.  The district court's permanent injunction ended Syntel's use of TriZetto's trade secrets, and, therefore, its ability to profit from any avoided costs.  Further, Syntel's misappropriation did not diminish, much less destroy, the secrets' continued commercial value to TriZetto.  In fact, TriZetto has retained the profitable use of its trade secrets; Facets is worth even more today than it was when the misappropriation occurred.  Accordingly, TriZetto is not entitled to avoided costs as a form of unjust enrichment damages in this specific case.

To be sure, future cases may present a range of factual scenarios concerning a defendant who has realized only modest profits from its misappropriation of trade secrets but has, nevertheless, been enriched by avoided costs in a larger amount at the expense of the secret holder.  This might depend on, for example, the extent to which the defendant has used the secret in developing its own

---

[37]     As noted above, TriZetto's expert (Britven) presented three damages theories to the jury at trial.  TriZetto's principal theory was unjust enrichment based on avoided development costs. As a first alternative, Britven presented a reasonable royalty theory that set damages at 50% of TriZetto's relevant development costs, or $142 million.  As a second alternative, he suggested that TriZetto's damages should be the $8.5 million in TriZetto lost profits.  TriZetto was of the view that an award of lost profits ($8.5 million) and avoided costs damages ($285 million) would constitute impermissible double recovery under the DTSA.  The jury was therefore not asked to specify the source of its compensatory damages award under the DTSA.  Because the jury awarded TriZetto avoided costs damages, the jury did not specifically decide to award TriZetto lost profits damages.  We do not need to decide the extent to which an award of lost profits and avoided costs may (or did) overlap under the DTSA, as the question before us is limited to whether avoided costs are recoverable as a matter of law under these facts.

competing product, the extent to which the defendant's misappropriation has destroyed the secret's value for its original owner, or the extent to which the defendant can be stopped from profiting further from its misappropriation into the future. But in this case, perhaps unusually, none of those circumstances supports awarding TriZetto $285 million of the costs it spent in developing the misappropriated secrets. TriZetto's valuable trade secrets are still that—valuable and secret.

Most of the cases TriZetto and the district court employ to support awarding avoided costs concern claimants who, at least to some degree, lost the value of their misappropriated trade secrets.[38] Avoided costs compensated for that loss. For example, in *GlobeRanger Corp. v. Software AG U.S. of Am., Inc.*, the defendant "used the [claimant's trade secrets] in developing its own product," thereby diminishing the value of the trade secret to the claimant. 836 F.3d 477, 499 (5th Cir. 2016). In *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, too, the defendant destroyed the value of a claimant manufacturer's trade secret when it adopted and used the manufacturer's vaccine production process to create its own competing vaccine.[39] 908 F.2d 706, 712, 714–15 (11th Cir. 1990). But again, this case is different: TriZetto offered no proof that Syntel's misappropriation diminished the value of its trade secrets to any degree.

Syntel never developed or sold a competing software product using TriZetto's trade secrets. Syntel competed for services in a market in which Syntel

---

[38]     We need not consider the unpublished out-of-circuit decisions that TriZetto cites.

[39]     The Eleventh Circuit "enjoined defendants from disclosing Salsbury's trade secrets and from using Stabilizer H but not from producing or selling the competing vaccine." *Id.* at 708.

and other third parties were routinely granted permission to use TriZetto's trade secrets, often for free. TriZetto contends that there is no difference from an avoided costs perspective when the trade secrets relate to competing services as opposed to a competing product. Even if that were so—a point we need not decide—that argument misses the point. Syntel might have had to turn over avoided costs (or some portion of avoided costs) for using TriZetto's trade secrets to gain a significant head start into the market for Facets-related services if, for example, it either diminished the value of, or publicly disclosed, TriZetto's trade secrets while advertising or providing Facets services to third parties. But TriZetto offered no proof that is what happened here.

Our holding might appear in some tension with *Epic Systems Corp. v. Tata Consultancy Services, Ltd.*, a Seventh Circuit decision applying Wisconsin's Uniform Trade Secrets Act.[40] 980 F.3d 1117 (7th Cir. 2020). There, the Seventh Circuit upheld a $140 million avoided costs award based on the "significant head start" in operations TCS gained through misappropriation.[41] *See id.* at 1130, 1132– 33. Importantly, however, Epic suffered no economic harm from TCS's

---

[40] As discussed *supra* at 25 n.25, the Wisconsin UTSA's compensatory damages provision mirrors the DTSA's. *Compare* Wis. Stat. § 134.90(4)(a) ("A court may award [compensatory] damages in addition to, or in lieu of, injunctive relief under sub. (3). Damages may include both the actual loss caused by the violation and unjust enrichment caused by the violation that is not taken into account in computing actual loss."), *with* 18 U.S.C. § 1836(b)(3)(B)(i) ("A court may . . . award . . . [compensatory] damages for any unjust enrichment caused by the misappropriation . . . that is not addressed in computing damages for actual loss.").

[41] TCS used Epic's trade secrets to create a "comparative analysis"—a spreadsheet comparing TCS's health-record-software (called "Med Mantra") to Epic's software. *Id.* at 1123. TCS used the comparative analysis in "an attempt to enter the United States health-record-software market, [in an unsuccessful attempt] to steal Epic's client, and [to] address key gaps in TCS's own Med Mantra Software." *Id.*

misappropriation, *id.* at 1144 n.5, and the "district court entered an injunction prohibiting TCS from using, possessing, or retaining any of Epic's trade secrets." *Id.* at 1127. We disagree with the court's reasoning insofar as it can be seen to endorse a view that avoided costs are available as compensatory damages under the DTSA *whenever* there is misappropriation of any trade secret relating to an owner's product. To the extent no corresponding harm to the trade secret owner would be necessary, such a view unhinges avoided costs from the DTSA's compensatory moorings and overlooks the remedial benefits, as here, of a timely injunction that prevents the dissemination and use of a trade secret.[42] *Cf.* 4 Roger

---

[42]     TriZetto and the district court also cite *Steves & Sons, Inc. v. JELD-WEN, Inc.* to support awarding avoided costs. No. 16-cv-545-(REP), 2018 WL 2172502 (E.D. Va. May 10, 2018). There, the district court denied Steves' motion for summary judgment on JELD-WEN's trade secret misappropriation damages claims arising under the DTSA and Texas's UTSA. *Id.* at *1. In the court's view, JELD-WEN presented enough evidence on its unjust enrichment claim to avoid summary judgment. *Id.* at *7. It reasoned avoided costs could be available where the defendant used doorskin manufacturing trade secrets to assess the feasibility of building a competing manufacturing plant. *Id.* The avoided costs theory went: Steves' possession of trade secrets about important manufacturing components would allow it to "increase the plant's profitability through a reduction in its per skin costs." *Id.* at *3. Critically, however, Steves did not build the plant—it only took limited steps towards doing so, such as negotiating with potential business partners. *Id.* at **5, 7. Moreover, JELD-WEN suffered minimal harm from the actual misappropriation, and the injunctive relief it requested would have precluded Steves' future use of the trade secrets. *Id.* at **4, 10.

TriZetto never referenced *PPG Industries, Inc. v. Jiangsu Tie Mao Glass Co., Ltd.* in support of its argument to uphold the district court's avoided costs award. 47 F.4th 156 (3d Cir. 2022). There, the Third Circuit affirmed an $8.8 million avoided costs award under Pennsylvania's UTSA even though the claimant "did not demonstrate actual loss from [the defendant's] misappropriation," and a permanent injunction prevented the defendant from any further misappropriation of the claimant's secrets. *Id.* at 161, 163; *compare* 12 Pa. Cons. Stat. Ann. § 5304(a), *with* 18 U.S.C. § 1836(b)(3)(B)(i). As with *Epic Systems Corp.*, we decline to follow the reasoning of these two decisions. They denied summary judgment on/affirmed avoided costs awards based *solely* on the defendant's cost savings, despite no corresponding harm to the trade

M. Milgrim, *Milgrim on Trade Secrets* § 15.02 (measuring an unjust enrichment award "by the value of the misappropriated trade secret . . . may preclude an award of injunctive relief on the theory that having received the full value of its trade secret, the owner is not entitled to further relief").

Here, as well, the district court effectively awarded punitive damages under the guise of compensatory damages.  TriZetto presented evidence of the actual financial impact of Syntel's actions on both parties.  Yet rather than focusing on that evidence, the district court reasoned that avoided costs that have no correlation to Syntel's gain at TriZetto's expense were appropriate because Syntel "should bear the business risk" of its misappropriation regardless of its temporal length.  Special App'x 16.  To the extent the district court deemed it necessary to punish Syntel for any unrealized potential profits or "business risk" it took, that punishment is appropriately considered in the context of punitive damages under the DTSA.  *See* 18 U.S.C. § 1836(b)(3)(C).

Accordingly, we conclude that, as a matter of law, an unjust enrichment award of avoided costs was unavailable under the specific facts of this case. Syntel's unjust gain was fully "addressed in computing damages for [TriZetto's] actual loss," and TriZetto suffered *no compensable harm* beyond that actual loss.  *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II).  Syntel's onetime use of the trade secrets to service UHG did not jeopardize their continued value to TriZetto.  TriZetto—*not Syntel*— currently retains their profitable use, and a permanent injunction prohibits Syntel from using them in the future.  Awarding TriZetto $285 million of the costs it

---

secret holder.  That result is inconsistent with our view of when avoided costs are available as unjust enrichment damages under the DTSA.  *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II).

incurred to develop its trade secrets would be inconsistent with the purpose of avoided costs in trade secret cases and with the DTSA's remedial scheme. Under these facts, upholding the avoided costs award would entitle TriZetto to a windfall. The district court's DTSA damages judgment is vacated.

### D. Disposition.

We remand the case for the district court to address the propriety of the two jury awards based on TriZetto's damages theory of awarding a reasonable royalty: (1) the $142,427,596 New York trade secret misappropriation award and (2) the $59,100,000 copyright infringement award. Although the parties addressed the propriety of these awards in their motion papers below,[43] there was nothing to appeal here since the jury, to avoid double counting, did not factor them into their total compensatory damages award, instead relying exclusively on the $284,855,192 damages in avoided costs for the DTSA claim.[44] *See* Special App'x 12 n.3; App'x 2254.

---

[43]   In its Rule 50(a) and Rule 50(b) motions, Syntel objected to the jury's reasonable royalty awards of $142 million for trade secret misappropriation under New York law and $59 million for copyright infringement because: (1) both were based on avoided costs that are inapplicable in this case; and (2) both were based on a 50/50 split methodology between TriZetto and Syntel for avoided costs that is improper as a matter of law. As mentioned, the district court did not resolve the challenge to either award because it awarded avoided costs under the DTSA.

[44]   Both Syntel and TriZetto waived consideration by this Court of the propriety of the $142 million reasonable royalty award under New York law. Syntel waived the argument that the award was improper by raising it only in a footnote on appeal. *See U.S. v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993). And the same is true for TriZetto, who also addressed the award's propriety only in a footnote. *See* TriZetto Br. 75–76 n.3 ("[E]ven if Syntel were to prevail on its avoided-cost argument, TriZetto is at least entitled to a $142 million reasonable royalty.").

Of note, we *do not* remand for the court to determine if TriZetto is entitled to lost profit damages under § 1836(b)(3)(B)(i)(I) of the DTSA. To be sure, TriZetto's expert testified that the company suffered $8.5 million in lost profits through Syntel's misappropriation, and the district court instructed the jury that TriZetto could recover those lost profits as damages under the DTSA. But at trial, TriZetto took the view that awarding lost profits and avoided costs would constitute "double counting" under the DTSA; the district court accepted that view. Special App'x 15. As a result, the verdict form that TriZetto proposed and the district court accepted did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages. Because TriZetto does not argue on appeal that it is entitled to its lost profits if we vacate the avoided costs award, we do not instruct the district court to consider the issue on remand.

## CONCLUSION

For the foregoing reasons, we **AFFIRM IN PART** and **VACATE IN PART** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

38